**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

WILLIAM ANDERSON,
Personal Representative of the Estate Of Jacob Anderson (Deceased)

WILLIAM ANDERSON &
KRISTI ANDERSON
(Orono, MN)

*Plaintiffs,*

vs.

CITY OF MINNEAPOLIS

CITY OF MINNEAPOLIS FIRE DEPARTMENT

CITY OF MINNEAPOLIS POLICE DEPARTMENT

COUNTY OF HENNEPIN

HENNEPIN HEALTHCARE SYSTEMS, INC., & HCMC

HCMC AMBULANCE SERVICES/EMERGENCY MEDICAL SERVICES

HENNEPIN COUNTY MEDICAL EXAMINER'S OFFICE

INDIVIDUAL FIRE DEPARTMENT PERSONNEL IN THEIR INDIVIDUAL CAPACITIES: SHANA D. YORK, ANTHONY J. BUDA, RAUL A. RAMOS, AND INDIVIDUALS TO BE DETERMINED

Case No. 16-CV-04114

**COMPLAINT AND JURY DEMAND**

INDIVIDUAL AMBULANCE SERVICES PERSONNEL IN THEIR INDIVIDUAL CAPACITIES: DANIEL F. SHIVELY AND INDIVIDUALS TO BE DETERMINED

INDIVIDUAL MEDICAL EXAMINER'S OFFICE PERSONNEL, IN HIS INDIVIDUAL CAPACITY: MITCHEL MOREY, MD

INDIVIDUAL POLICE OFFICERS IN THEIR INDIVIDUAL CAPACITIES: DANIEL J. TYRA, SHANNON L. MILLER, DUSTIN L. ANDERSON, SCOTT T. SUTHERLAND, D. BLAURAT, EMILY DUNPHY, CHRISTOPHER KARAKOSTAS, MATTHEW GEORGE, JOSEPH MCGINNESS, CALVIN PHAM, KRIS TYRA, JOSH BETTS, KARI QUAST, ARLENE M. JOHNSON, MATTHEW T. RYAN, AND INDIVIDUALS TO BE DETERMINED

*Defendants.*

## INTRODUCTION

Jacob "Jake" Anderson was a handsome, vibrant young man with a promising future. In Fall of 2013, he was a first semester freshman at the University of Minnesota in Minneapolis, a member of Phi Kappa Alpha fraternity, a University of Minnesota lacrosse player, and a friend to many. On the night of December 14, 2013, Jake attended

an "ugly sweater party" with his friends. Early the next morning, on December 15, 2013, he was found in a severe hypothermic state. He was later declared dead, due to hypothermia, on December 15, 2013. This is an action for injuries and damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with their son Jake's death.

For their Complaint against Defendants, Plaintiffs state and allege as follows:

## PARTIES

1. Plaintiff William Anderson, Personal Representative of the Estate of Jacob Anderson, deceased, opened the estate in Hennepin County, Minnesota. He is the Administrator of the estate of his son, Jacob Anderson, and sues for the Estate. Jacob was the son of William and Kristi Anderson, who sue on their own behalf, individually. Jacob had two siblings, an older sister, Emily, and a younger brother, Luke.

2. Plaintiff William Anderson is a Minnesota resident with an address at 1408 Baldur Park Road, Wayzata, Minnesota 55391. He is the father of the deceased Jacob Anderson.

3. Plaintiff Kristi Anderson is married to Plaintiff William Anderson. She is a Minnesota resident with an address at 1408 Baldur Park Road, Wayzata, Minnesota 55391. She is the mother of the deceased Jacob Anderson.

4. Defendant City of Minneapolis ("Minneapolis" or "City") is a municipal corporation and a Minnesota political subdivision organized under the laws of the State of Minnesota. Minneapolis is governed by a City Council.

5. Defendant City of Minneapolis Police Department is a department of the City of Minneapolis with a business address at 350 South 5th Street, Room 130, Minneapolis, Minnesota 55415.

6. Defendant City of Minneapolis Fire Department is a department of the City of Minneapolis with a business address at 350 South 5th Street, Room 233, Minneapolis, Minnesota 55415.

7. Defendant County of Hennepin ("Hennepin County" or "County") is a municipal corporation and a political subdivision of the state of Minnesota organized under the laws of the State of Minnesota. Hennepin County is governed by a board of County Commissioners.

8. Defendant Hennepin Healthcare Systems, Inc. & HCMC (herein "HCMC") is a public corporation pursuant to Minnesota Law 2005, Chapter 125, whose ambulance/emergency medical services are located at 701 Park Avenue South, Minneapolis, Minnesota, 55415 and perform advanced life support services as "Hennepin – EMS."

9. Defendant Hennepin County Medical Examiner's Office is a department of Hennepin County with a business address at 530 Chicago Avenue, Minneapolis, Minnesota 55415.

10. Defendant Shana D. York is a captain with the Minneapolis Fire Department, and is believed and therefore averred to be a resident of Minnesota. She is sued in her official and individual capacity.

11. Defendant Raul A. Ramos is an officer with the Minneapolis Fire Department, and is believed and therefore averred to be a resident of Minnesota. He is sued in his official and individual capacity.

12. Defendant Daniel F. Shively is a paramedic with Hennepin – EMS and is believed and therefore averred to be a resident of Minnesota. He is sued in his official and individual capacity.

13. Defendant Daniel J. Tyra has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

14. Defendant Shannon L. Miller has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his or her official and individual capacity.

15. Defendant Dustin L. Anderson has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

16. Defendant Scott T. Sutherland has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

17. Defendant D. Blaurat has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his or her official and individual capacity.

18. Defendant Emily Dunphy has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in her official and individual capacity.

19. Defendant Christopher Karakostas has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

20. Defendant Matthew George has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

21. Defendant Joseph McGinness has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

22. Defendant Calvin Pham has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

23. Defendant Kris Tyra has been an officer with the Minneapolis Police Department and/or officer with the University of Minnesota at all times relevant to this matter and is sued in his or her official and individual capacity.

24. Defendant Josh Betts has been an officer with the Minneapolis Police Department and/or University of Minnesota at all times relevant to this matter and is sued in his official and individual capacity.

25. Defendant Kari Quast has been an officer with the Minneapolis Police Department and/or University of Minnesota at all times relevant to this matter and is sued in her official and individual capacity.

26. Defendant Arlene M. Johnson has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in her official and individual capacity.

27. Defendant Matthew T. Ryan has been an officer with the Minneapolis Police Department at all times relevant to this matter and is sued in his official and individual capacity.

28. Defendant Mitchel Morey, MD has been a staff pathologist and Assistant Medical Examiner with the Hennepin County Medical Examiner's office at all times relevant to this matter and is sued in his official and individual capacity.

29. Defendants John Doe 1-10 are individuals whose names are unknown at this time and may have responsibility under the facts of this case.

30. Defendants John Doe Corporations or Governmental Entities 1-5 are corporate entities or governmental entities whose names are unknown at this time and may have responsibility under the facts of this case.

## JURISDICTION

31. This Court has jurisdiction over this action pursuant to Title 28 U.S.C. §§1331 and 1343(3). This civil action arises under the Constitution and laws of the United States. Specifically, it arises under the Fourteenth Amendment to the Constitution and Title 42, Section 1983. Plaintiffs invoke the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to hear and adjudicate state law claims. Each and all of the acts (or omissions to act) alleged herein were done by defendants, or their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs

and usages of the City of Minneapolis and/or Hennepin County, Minnesota, the State of Minnesota; and, under color and pretense of applicable federal law as plead herein.

32. Venue is proper in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2) and (c) in that a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this federal judicial district.

## FACTUAL ALLEGATIONS

33. This is an action for injuries and damages suffered by Plaintiffs as a direct and proximate result of Defendants' wrongful conduct in connection with their son Jacob Anderson's death on December 15, 2013.

34. Jacob William Anderson ("Jake") was a 19 year old freshman at the University of Minnesota, Twin Cities, studying at the College of Liberal Arts. He was a member of Phi Kappa Alpha fraternity and played for the University of Minnesota Lacrosse Team.

35. Jake was a friendly and social young man. He had made many new friends at his fraternity, on the lacrosse team, in his dormitory and in the classroom.

36. On the night of December 14, 2013, Jake attended an "Ugly Sweater party" with several other University of Minnesota students. He was seen leaving the party by other attendees at or around 11:15 p.m.

37. Based on information and belief, and for unexplainable reasons, Jake did not return to his dormitory that evening.

38. The temperature outside on the night of December 14, 2013 and early morning of December 15, 2013, was approximately 0º F (zero degrees Fahrenheit). Some reports indicate that the wind chill temperature was -15º F (fifteen degrees below zero).

39. Early on the morning of December 15, 2013, an amateur photographer discovered Jake lying face down, slumped over a metal rail in a remote area near the 10th Ave. SE Bridge in Minneapolis on the northeast side of the Mississippi River. His body was discovered near a road that serves as an access to a steam and coal plant. It is unknown how or why Jake arrived at this location.

40. At 8:44 a.m. on December 15, the photographer called 911 Emergency Service. The Minneapolis Police Department ("MPD"), Minneapolis Fire Department ("MFD"), and HCMC Ambulance Services/Emergency Medical Services ("HCMC Ambulance Services" or "EMS") were all dispatched to the scene.

41. At 8:54 a.m., the Minneapolis Fire Department was first to arrive on the scene.

42. Based upon information and belief, individual defendants Shana D. York, Anthony J. Buda, and Raul A. Ramos were among MFD personnel responding to the scene.

43. Based upon information and belief, at least some MFD personnel arriving on scene were certified Emergency Medical Technicians.

44. According to the MFD's internal guidelines and protocols, all MFD responders are required to provide ongoing medical treatment to victims until ambulance services personnel arrive on scene.

45. The Minneapolis Fire Department has set forth a Standard Operating Procedure for assessing and treating hypothermia victims in the field.

46. MFD personnel who were on scene knew or should have known that cold weather conditions can lead to moderate to severe cases of survivable hypothermia.

47. The responding MFD officials failed to recognize Jake Anderson as a hypothermia victim, despite the extremely cold outdoor weather conditions in which he was found and his body's exhibiting known symptoms of severe hypothermia.

48. The responding MFD officials failed to provide medical treatment to Jake Anderson after assessing his body for no more than one minute and thirty seconds before summarily determining that Jake was dead.

49. The correct course of action for MFD responders treating hypothermia victims (according to the Department's own Patient Care Guidelines, which have been issued with the authority of the Minneapolis City Council and County Ordinance 9 relating to ambulance services) would have been to initiate rescue and warming efforts

until the HCMC Ambulance Services/Hennepin EMS team arrived on scene and assumed medical care.

50. The MFD responders prepared an Incident Report to document their response to the scene. In sections C and D of the MFD "300D" Incident Report, the scene was coded as a "Type: EMS – DOA (No BLS Provided)", indicating that no BLS (Basic Life Support) was provided to Jake, and no aid was given to Jake or received by Jake.

51. The MFD Incident Report narrative states "Patient had no pulse and no breathing and was frozen indicating obvious death," at which point the MFD cancelled EMS 'per protocol.'

52. Jake Anderson's death was declared by the MFD at 8:57:24 a.m.

53. MFD Standard Operating Procedure states that MFD personnel **may not cancel ambulance response prior to their arrival** unless the patient falls within specific parameters; these parameters state that to declare death and cancel EMS, patient must be **"Cold in a warm environment**" and/or have signs of "obvious mortal trauma." Obvious mortal trauma is generally considered to be an injury as apparent as a beheading, animal predation, or skin slippage.

54. Jake Anderson was found cold in a cold environment, and as such, MFD should have followed their Patient Care Guidelines for Hypothermia, pursuant to their

legal obligation, which instruct that if "no pulse start CPR [and] attach AED" and further instructs that **"patient outcome cannot be determined until rewarming is complete."**

55. According to the MFD's Standard Operating Procedures, when MFD makes the determination to cancel EMS, a 300A incident report should be filed. Here, MFD filed a 300D incident report, rather than the required 300A report.

56. MFD responders acted contrary to statutory authority and unreasonably under the circumstances when they willfully and deliberatively deviated from the standard protocol for properly assessing and stabilizing hypothermia victims.

57. HCMC Ambulance Services/EMS arrived on scene at 8:56 a.m., one minute and 24 seconds before MFD cancelled EMS at 8:57:24 a.m.

58. In general, when EMS paramedics arrive on the scene, they are considered the highest on-scene medical authority over the MFD. (Minneapolis Fire Department Standard Operating Procedures. Patient Care Guidelines.)

59. Based upon information and belief, the following individual HCMC Ambulance Services personnel responded to the scene where Jake was found: Daniel F. Shively and Anthony A. VanBeusekom (now retired).

60. HCMC Ambulance Services personnel who were on scene knew or should have known that cold weather conditions can lead to moderate to severe cases of survivable hypothermia.

61. Severe cases of Hypothermia can mimic death and cause victims to remain pulseless and breathless. Symptoms such as not having a pulse and not breathing are not uncommon for victims of survivable severe hypothermia, and the Hennepin County EMS Standing Order on Hypothermia even states, **"Clinical signs of death may be misleading."**

62. The Hennepin County Standing Order on Hypothermia is known or should have been known to the responding HCMC Ambulance Services personnel.

63. All Hennepin County ambulance providers are subject to the standards and protocols developed and approved by the Hennepin County Emergency Medical Services Advisory Council, which includes the Advanced Life Support Protocols, and the Standing Order on Hypothermia.

64. Based on eye witness reports and on information and belief, EMS paramedics Daniel Shively and Anthony Van Beusekom spent less than two minutes on the scene, which according to a witness, was barely enough time to walk from the ambulance to where Jake was located and back again, let alone examine Jake in any meaningful way.

65. HCMC EMS paramedics did not bother to examine Jake, and did not even do an independent assessment for pulse, breath, or airway ice formation.

66. HCMC EMS providers filed a Patient Care Report, stating that they were "cancelled by other units on scene." This Patient Care Report would have been

acceptable had they been cancelled *before* their arrival, but since that was not the case (HCMC Ambulance Services had already arrived on scene before MFD cancelled their services), EMS paramedics had other protocols they should have followed and the EMS paramedics should have filed a full Patient Care Report in compliance with its Required Documentation Policy. HCMC Ambulance Services failed to follow its own standard operating procedures in such circumstances.

67. The *Hennepin County EMS System Required Documentation Policy*, states that the basic documentation required if an ambulance arrives on scene is "A description of location, the scene of events, number of persons involved, and number of persons offered medical evaluation or documentation of the persons on scene who indicate no medical evaluations were necessary."[1] This is the minimal information required when an ambulance arrives on scene.

68. The *Hennepin County EMS System Required Documentation Policy* also requires that "Patient Contact be fully documented." "Patient Contact" is defined, in part, as "someone who has an observable injury or illness."

69. EMS personnel had a duty to perform and issue a full Patient Care Report because (a) they arrived on scene before they were cancelled and (b) there was at least one patient with an "observable injury or illness."

---

[1] *Hennepin County EMS System Required Documentation Policy*, approved by the Hennepin County EMS Council, October 13, 2005.

70. Jake Anderson had an observable "injury or illness." Jake was suffering from severe hypothermia. Jake was not conscious. He could not advocate for himself, he could not request medical attention. He relied on the MFD, HCMC EMS and MPD to save his life, which they did not do. Instead they summarily pronounced Jake dead, in complete and total contravention of their Standard Operating Procedures, and in particular, their protocol for treating hypothermia victims.

71. EMS paramedics knew or should have known about the dangers and treatment of severe hypothermia during the winter in Minnesota.[2,3] Indeed, this is where they live and work.

72. On the morning of December 15, 2013, HCMC paramedics fell deplorably below their standard of care by failing to provide *any* medical treatment to Jake Anderson, knowing that hypothermia victims must receive immediate care upon their arrival to the scene.

---

[2] In a similar situation, just a week earlier in Duluth, MN (on December 6, 2013) a young female college student, Alyssa Lommel, was found frozen by a passersby after being exposed to dangerously low temperatures for more than 9 (nine) hours. Ms. Lommel had been dropped off at her home at about midnight, passed out and remained on the door step until 9:30 am the following morning. The passersby called 911. Emergency services arrived, assessed Ms. Lommel's condition, and immediately took Ms. Lommel to the hospital. Unlike Jake Anderson, Ms. Lommel survived over 9 (nine) hours of exposure to temperatures of -17 º F (minus seventeen degrees Fahrenheit) because she received proper EMS life support and emergency care.

[3] In another similar situation, on February 21, 2015, Justin Smith, 25, of McAdoo, PA, survived minus 4-degree temperatures after being exposed for 12 hours. He was found lifeless and frozen solid. He had no pulse, no blood pressure and appeared to be dead. EMS arrived, and Gerald Coleman, M.D., the emergency department physician on duty at the local hospital at the time Justin was found ordered that they perform CPR. "My clinical thought is very simple: You have to be warm to be dead," said Dr. Coleman. Mr. Smith is alive today to tell his story. Kaplan, Sarah. "Being Frozen 'to Death' Saved This Man's Life. It Could save Others,' Too." *Washington Post*. The Washington Post, 20 Jan. 2015. Web. 24 Oct. 2016.

73. HCMC Ambulance Services responders acted contrary to statutory authority and unreasonably under the circumstances when they willfully and deliberatively deviated from the standard protocol for properly assessing and stabilizing hypothermia victims.

74. The next emergency medical provider on scene was the Minneapolis Police Department (MPD). MPD officers arrived on scene at 8:57 a.m.

75. Based on information and belief, the MPD officers arriving to the scene included Daniel Tyra, Shannon Miller, Dustin Anderson, Scott Sutherland, Sgt. D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Kris Tyra, Josh Betts, Kari Quast, Arlene Johnson and Matthew Ryan.

76. The purpose and duty of all police departments is to "protect and to serve" the citizens of their communities. The MPD Policy and Procedure Manual commands that it is "the primary responsibility of an officer in any situation…to take all steps necessary to preserve life" and "EMS shall be requested at the scene of an apparent death unless a physician is present or there is not even a remote possibility that the person is alive."

77. MPD had a duty to keep the HCMC EMS personnel on scene to provide medical assistance because Jake had no "obvious" signs of death ("obvious" signs of death being decapitation, skin slippage or animal predation, according to the HCMC EMS System's ALS protocols, p. 180), and more likely than not, Jake was still alive.

However, in an act of gross negligence, the MPD officers failed to direct HCMC Ambulance Services personnel to remain on the scene after they arrived, and to administer aid to Jake.

78. HCMC Ambulance Services left the scene at 8:58 a.m., just two minutes after arriving on scene at 8:56 a.m.

79. MFD relinquished control of the scene to the MPD. MFD left the scene at 9:02 a.m.

80. MPD officers on the scene notified their dispatcher that Car 710 was requested at the scene. Car 710 is called onto a scene for all suspicious deaths or homicides, mandated by MPD Policy.

81. According to MPD policy, in the event of a homicide or suspicious death (which MPD confirmed when they requested Car 710), they are required to call the Hennepin County Medical Examiner's office "as soon as possible."

82. However, in yet another act of gross negligence, **the MPD waited 1.5 hours** before calling the Hennepin County Medical Examiner 's office ("HCME"). The Medical Examiner's Investigation Report states that they received notification of the "death" at 10:30 a.m. when MPD Sgt. Karakostas telephoned the Medical Examiner's office.

83. While still at the scene, MPD Sgt. Karakostas spoke to the Hennepin County Medical Examiner 's office. The ME's office made the determination to send two death investigators to the scene.

84. Based upon information and belief, the two death investigators sent to the scene were Carrie Notch and Colby Whitmore, neither of whom have medical degrees or medical training.

85. The HCME death investigators arrived on scene at 11:03 a.m. on December 15, 2013.

86. While at the scene, the HCME death investigators called Dr. Mitchel Morey, Assistant Medical Examiner and Board Certified Forensic Pathologist with the Medical Examiner's Office, to discuss the case.

87. Dr. Morey, in an act of gross negligence, made the cursory determination that a medical doctor's visit to the scene was not necessary. He did so with full knowledge that the condition in which Jake was found was consistent with that of a person in a state of severe hypothermia, and in complete contravention of the medical standard of care, which is to bring a victim of severe hypothermia into the hospital to begin a medically monitored warming process.

88. Instead of mandating that a medical doctor visit the scene, or ordering that Jake's body be immediately transported to the Emergency Room, Dr. Morey permitted Jake to continue lying outside and exposed to the cold.

89. The responding police officers and the Medical Examiner's Office acted contrary to statutory authority and unreasonably under the circumstances when they willfully and deliberatively deviated from the standard protocols for properly assessing and stabilizing hypothermia victims.

90. Jake was not the first victim of hypothermia in the region. Minneapolis and Hennepin County's emergency responders are on notice that cold weather-related deaths can occur. In the winter preceding Jake's death, exposure to cold was a factor in 41 deaths in the State of Minnesota. Previous winters also saw dozens of hypothermia and cold weather related deaths in the state.[4] In the month of Jake's death, there was much publicity about the polar fronts that hit the state and the dangers they posed. The Minneapolis-St. Paul metropolitan region has been ranked as the coldest metropolitan region in the United States.[5] On average in the Minneapolis metropolitan region, subzero cold occurs 24-25 days each year, while subfreezing temperatures occur 151 days a year. The average December-February temperature is 18.7 degrees.

91. After his autopsy, the Hennepin County Medical Examiner later reported Jake's immediate cause of death to be hypothermia. Date and time of death: 12/15/2013, 8:48 a.m.

## CLAIM I:

## NEGLIGENCE

[4] In 2009-2010, there were 31 cold weather related deaths in Minnesota. There were 24 such deaths in 2010-2011 and 13 in the winter of 2011-2012.

[5] Using 30-year average temperatures from NOAA's National Climatic Data Center.

**Against City of Minneapolis Fire Department and Individual Fire Department Personnel: Shana D. York, Anthony J. Buda, Raul A. Ramos, and Individuals To Be Determined**

92. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

93. Under Minnesota law, a duty arises when an individual, whether voluntarily or as required by law, has "custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection." *Harper v. Herman*, 499 N.W.2d 472, 474 (Minn. 1993); Restatement (Second) of Torts § 314A (1965).

94. The City of Minneapolis Fire Department ("MFD") owed a duty to Jake Anderson to administer emergency medical assistance and treatment based on the MFD's internal guidelines and the fact that individual Fire Department personnel had custody of Jake Anderson under circumstances in which Jake was deprived of opportunities of self-protection.

95. MFD personnel breached that duty by failing to recognize Jake as a victim of hypothermia and by willfully and deliberately denying proper medical assessment and treatment to Jake.

96. As a result of these breaches, Jake was neglected and died.

97. The City of Minneapolis Fire Department's Standard Operating Procedures[6] state that when members of the fire department respond to an emergency medical call, the responders have an obligation "to assess and treat the patient." "Responsibility for the patient continues until a higher medical authority (paramedic, registered nurse, and/or physician) assumes care." MFD personnel may discontinue ambulance/EMS response "ONLY when the patient…. is breathless, pulseless, and **cold in a warm environment** with lividity … or rigors, and/or signs of obvious mortal trauma." If there is any doubt about whether or not a patient meets the criteria, MFD guidelines instruct to **"ALWAYS err on the side of safety and have EMS continue to the scene."**

98. MFD also has a standard operating procedure ("SOP") for hypothermia treatment, which requires fire department responders to do a pulse check for 30-45 seconds, and contains a contingency for steps to be taken if no pulse is detected.

99. The MFD guidelines and SOPs issued by the city of Minneapolis are consistent with the well-settled guiding medical principle that "a patient is not dead until he is warm and dead."[7,8] This medical principle is the standard of care.

---

[6] The *Patient Care Guidelines – General Administrative and Response Obligations* are among the Standard Operating Procedures prescribed and enforced by the Fire Chief and approved by the Minneapolis City Council for the government of the department, pursuant to Title 9, Chapter 173 of the Minneapolis Charter and Code of Ordinances.

[7] Hilmo, J., Naesheim, T., and Gilbert, M. "Nobody is dead until warm and dead: prolonged resuscitation is warranted in arrested hypothermic victims also in remote areas—a retrospective study from northern Norway." *Resuscitation*. 2014; 85: 1204–1211.

[8] Paal P, Milani, M, Brown D, Boyd J, and Ellerton J. "Termination of cardiopulmonary resuscitation in mountain rescue." *High Alt Med Biol.* 2012;13:200–208.

100. Minneapolis Fire Department personnel fell below their guidelines and obligatory standard of care (a) by failing to properly assess and treat Jake's hypothermia, which caused or contributed to Jake's eventual death, and (b) by failing to provide emergency medical assistance and treatment to Jake while he was still alive.

101. When MFD responders arrived at the scene, they superficially assessed Jake's body without ever moving him from his position, lying face down on a snowy pile of rocks slumped over a metal rail, and summarily declared that Jake "had no pulse and no breathing and was frozen indicating obvious death."

102. The Fire Department personnel knew or should have known that hypothermia can occur as a result of exposure to cold air temperatures and wind conditions such as were present in Minneapolis on the night and early morning of December 14-15, 2013, and that hypothermia victims may appear stiff and cold with no apparent vital signs, but can be revived if proper medical assistance is provided.

103. A responsible and reasonable MFD responder, acting in his or her individual and professional capacity as a medical provider arriving on scene, would have immediately transported Jake to the hospital to warm him, and then, once warm, would have assessed Jake's vital signs before declaring him dead.

104. Instead, with no implementation of their Standard Operating Procedures and Hypothermia protocol, MFD responders declared Jake dead after only two and a half minutes of arriving on the scene.

105. The action taken by the MFD is a breach of the department guidelines cited above, and therefore a violation of law as codified in Title 9, Chapter 173, with which all members of the fire department are required to know and are obligated to follow. MFD responders willfully disregarded the potential for hypothermia and discontinued their medical response, effectively leaving Jake to die in the cold. This conduct on the part of the MFD caused or contributed to Jake's death.

106. The following actions by MFD responders violated the guidelines and SOPs governing the department:

a. MFD responders did not properly assess and treat Jake Anderson and did not follow their own protocol when applied to these facts;

   i. "Hypothermia victims may appear cold and stiff and their body temperature and pulse rates may be alarmingly low, even when the victim is still alive." Declaring Jake "frozen indicating obvious death" demonstrated a total lack of comprehension for how to properly diagnose and treat hypothermia. An 'obvious death' is defined as "something as apparent as beheading, animal predation, or skin slippage." It should never have been assumed that Jake was

"obviously dead" until he was "warm and dead". According to well-settled medical standard, two and a half minutes would not have been enough time to evaluate Jake's condition, given that his vital signs may not even have been discernable until he had been sufficiently warmed.

b. The responders discontinued ambulance service response in spite of the fact that Jake's condition, which was presented as hypothermia, and which warranted treatment and implementation of Defendants' Hypothermia Protocols. MFD guidelines instruct responding personnel to "**ALWAYS err on the side of safety and have EMS continue to the scene**."

    i. Jake was not cold in a warm environment, and there were no signs of obvious mortal trauma. The MFD breached the duty of care it owed to Jake by discontinuing EMS response. This breach occurred, notwithstanding the fact that Jake should have been immediately transported to the hospital to begin warming.

c. MFD responders failed to follow the department's procedures for treating hypothermia.

107. By failing to properly assess Jake's hypothermic conditions and failing to provide immediate treatment, the MFD fell below their standard of care and breached their duty to Jake and were thereby negligent in causing and contributing to Jake's death.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require and for all remedies as prayed in the Prayer for Relief, infra.

## CLAIM II:

## NEGLIGENCE

**Against County of Hennepin, Hennepin Healthcare Systems, Inc. & HCMC, HCMC Ambulance Services/Emergency Medical Services and Individual Ambulance Services Personnel: Daniel F. Shively and Anthony A. Vanbeusekom, and Individuals To Be Determined**

108. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

109. Hennepin County, Hennepin Healthcare Systems, Inc. & HCMC, and HCMC Ambulance Services/Emergency Medical Services ("EMS") owed a duty of care

to Jake Anderson, breached that duty, and that breach resulted in injury and ultimately Jake's death.

110. All ambulance providers operating within Hennepin County, Hennepin Healthcare Systems, Inc. & HCMC are subject to operational policies and protocols developed by Hennepin County's Emergency Medical Services Advisory Council, as codified and stipulated in Hennepin County Ordinance 9, which regulates ambulance services in the county and incorporates Minn. Stat. Chapter 144E and Minn. R. Chapter 4690 relating to ambulance services.

111. The stated purpose of County Ordinance 9 is to "ensure that emergency medical services are available to provide rapid and appropriate medical treatment," "ensure that an appropriately equipped and staffed ambulance is dispatched to the scene," and to "meet reasonable public expectations for the quality and safety of medical emergency services provided throughout the County."

112. The EMS Advisory Council has issued a "Standing Order on Hypothermia" which identifies, step by step, the action to be taken by HCMC paramedics arriving on the scene of a hypothermia victim. Steps include:

- Remove wet garments.
- Protect against further heat loss and wind chill (use blankets and insulating equipment).
- Maintain the patient in a horizontal position.

- Avoid rough movement and excess activity.
- Monitor the patient's cardiac rhythm.
- Assess responsiveness, breathing and pulse.
- Do a pulse check for 30-45 seconds (**clinical signs of death may be misleading**). Ambulance responders are then guided in another series of actions depending on whether pulse and breathing are present or are not present, but in no event do the guidelines suggest that it is appropriate to assume a patient has died before the patient has been rescued from the cold.

113. All emergency medical services personnel are or should be knowledgeable about the medical principle that "a patient is not dead unless and until they are warm and dead." Having knowledge of this principle and putting it into practice is even more pronounced for emergency personnel working in the City of Minneapolis and in Hennepin County, **the coldest metropolitan area in the 48 contiguous states**.

114. The HCMC ambulance services personnel arriving on scene had a duty to provide "rapid and appropriate" medical treatment to Jake, but willfully, indifferently and egregiously, provided no treatment at all.

115. The conditions in which Jake was discovered were conditions known to cause hypothermia, and yet the HCMC EMS did not follow any of its standing orders for hypothermia patients.

116. HCMC EMS fell deplorably below its standard of care by (1) failing to remain on the scene to properly treat Jake as a hypothermia victim; and, (2) by failing to protect him against further heat loss to save his life.

117. A reasonable EMS provider arriving on scene would have immediately removed Jake from the cold and would have implemented the protocols and procedures, referenced supra at Paragraphs 112-113, and immediately taken Jake to a hospital to begin warming him.

118. The HCMC EMS personnel at the scene knew or should have known that a patient is not dead until he is warm and dead and should have immediately transported Jake to a hospital.

119. EMS responders did not follow their standing orders on hypothermia, nor did they initiate any rescue efforts. This violation of the protocol governing ambulance service responders demonstrates that the HCMC EMS responders acted unreasonably under the circumstances.

120. These negligent actions by the EMS responders caused or contributed to Jake's death.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages, including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish

defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

**CLAIM III:**

**NEGLIGENCE**

**Against City of Minneapolis Police Department and Individual Police Department Personnel Daniel Tyra, Shannon Miller, Dustin Anderson, Scott Sutherland, Sgt. D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Kris Tyra, Josh Betts, Kari Quast, Arlene Johnson and Matthew Ryan, and Individuals to be Determined**

121. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

122. The Minneapolis Police Department ("MPD") owed a duty of care to Jake, breached that duty, which resulted in injury and death to Jake.

123. The City of Minneapolis and members of its police force knew or should have known of the cold weather conditions affecting the Minneapolis region on December 14-15, 2013 and that hypothermia can occur as a result of exposure to cold

temperatures and wind conditions such as were present in Minneapolis on the night of December 14-15, 2013.

124. The police officers responding to the scene were not properly trained, or, if properly trained, failed to follow their training regimen and protocol, to recognize and properly treat hypothermia victims; and thereby, caused and/or contributed to Jake's death by negligently failing to provide proper medical treatment.

125. Section 10-108 of the Minneapolis Police Department Policy and Procedure Manual, which derives its authority from the City of Minneapolis Charter and Code of Ordinances, commands that it is the "primary responsibility of an officer in any situation… to take all steps necessary to preserve life." "EMS shall be requested at the scene of an apparent death unless a physician is present or there is not even a remote possibility that the person is alive."

126. Police officers arriving at the scene owed a duty to Jake to take all steps necessary to preserve Jake's life, according to their own internal guidelines.

127. MPD responders also had a duty to Jake to keep EMS paramedics on the scene to provide medical assistance if there is "even a remote possibility" that Jake was still alive.

128. MPD officers directed EMS to leave the scene two minutes after arriving, before any hypothermia treatment protocols or rescue efforts had been administered.

129. The MPD officers then took control over the scene, where they remained for more than two hours while Jake continued to lie in the cold, without being given his chance to survive.

130. The MPD officers fell below their standard of care by directing EMS to leave the scene without providing medical care to Jake, by not recognizing Jake as a victim of severe hypothermia needing treatment, and by leaving Jake in the cold during the approximately two hours the MPD was in control of the scene.

131. A reasonable police officer under the circumstances would have followed the department mandate to "take all necessary steps to preserve life" and undertaken efforts to rescue Jake from the cold, or ensured that the EMS providers initiated hypothermia treatment measures, and would have immediately taken Jake to a hospital to begin warming.

132. As a result of these breaches by responders of the Minneapolis Police Department, Jake was neglected and died.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys' fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or

further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

**CLAIM IV:**

**Gross Negligence**

**Against all City, County, Hennepin Healthcare Systems, Inc. and HCMC Defendants**

133. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

134. Gross negligence occurs when a person "does not pay the slightest attention to the consequences, or uses no care at all."[9]

135. The conduct of members of the Minneapolis police and fire departments, and the Hennepin Healthcare Systems, Inc. & HCMC EMS and Hennepin County Medical Examiner's Office equates to gross negligence.

136. Emergency responders did not use any care at all by allowing Jake to remain lying in the cold slumped over a fence without any attempt to rescue him or

[9] The legal basis for this standard is identified in the Minnesota Jury Instruction Guide as *State v. Chambers*, 589 N.W.2d 466, 478 (Minn. 1999) (defining gross negligence in Minnesota as the "absence of even scant care"); see also *State v. Bolsinger*, 221 Minn. 154, 21 N.W.2d 480, 485 (Minn. 1946) (the "absence of even slight care"). Minnesota Courts have also defined gross negligence as "negligence in the highest degree," *High v. Supreme Lodge* of the World, 214 Minn. 164, 7 N.W. 2d 675 (Minn. 1943), and, as "substantially and appreciably higher in magnitude than ordinary negligence." *Ackerman,* 435 N.W.2d at 840.

provide medical treatment or response, or take him to a hospital to initiate warming procedures to save his life.

137. Based on the cold weather conditions at the scene and the condition of Jake's body, each of the emergency responders should have known that Jake was a victim of hypothermia and should have immediately initiated rescue and warming efforts.

138. Emergency responders should know the standard of care that a person is not dead until they are warm and dead, and that for victims of hypothermia, clinical signs of death may be misleading. The responders knew or should have known that it can be futile to evaluate vital signs before a body has had time to rewarm. In this instance, doing nothing is not acceptable, and indeed, is grossly negligent.

139. Not a single responding official gave Jake any life preserving treatment. He was left for two hours in the cold while the Minneapolis Police Department had control over the scene. Accordingly, the First Responders showed willful indifference and complete disregard for Jake's life; and, had no regard for the consequences of leaving Jake in the cold.

140. From the facts regarding Minnesota weather stated in ¶ 91 of this Complaint, all from substantive, authoritative governmental agencies, it is reasonable to assume that First Responders in the Minneapolis area are on substantial notice of the medical dangers posed by cold weather.

141. Emergency responders in Minneapolis should *always* recognize potential hypothermia victims when they arrive to a scene and should *always* know that they must immediately begin treating a victim as a patient in need of advanced life support and protecting him/her from further heat loss, as the protocols that govern their departments legally require.

142. The emergency responders from the Minneapolis Fire and Police Departments, HCMC EMS and Hennepin County Medical Examiner 's office were all grossly negligent for failing to recognize and treat Jake as a hypothermia victim.

143. Their conduct may rightly be defined as "not paying the slightest attention to the consequences, or uses no care at all" as they determined that Jake was dead after only 2 minutes and 38 seconds of cursory assessment; an assessment which fell considerably below the standard of care for a *bona fide* medical professional, in such a circumstance where a victim was presenting as hypothermic.

144. Responders should not have presumed that Jake was dead when he was found. Conversely, they should have presumed that he was still alive and in a severe hypothermic state and required immediate medical attention to have a chance to survive.

145. Rather than making any such rescue effort at all, each responder deliberately failed to assess for and recognize the symptoms of hypothermia and failed to treat Jake by presuming he was dead and deciding not to implement their department's respective hypothermia protocols.

146. It was grossly negligent for each responding official to stand idly by, as Jake lay in a severe hypothermic state, and not render the assistance each of the responders was individually and collectively obligated to provide.

147. As a result of these grossly negligent actions or failures to act, Jake died of hypothermia.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

.

**CLAIM V:**

**NEGLIGENCE PER SE FOR VIOLATION OF LOCAL, STATE AND FEDERAL LAWS; SPECIFICALLY, TTLE 9 OF THE CITY OF MINNEAPOLIS CHARTER AND CODE OF ORDINANCES, HENNEPIN COUNTY ORDINANCE 9, MINN. STAT. CHAPTER 144E, MINN. R. CHAPTER 4690 AND CDC REGULATIONS**

**Against all City, County and**

**Hennepin Healthcare Systems, Inc. & HCMC Defendants**

148. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

149. Negligence *per se* is a form of ordinary negligence that results from violation of a statute and may exist when the reasonable-person standard is supplanted by a standard of care established by the legislature. *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981).

150. The City of Minneapolis and Hennepin County each adopted ordinances and guidelines (which are amplified in Claims One and Two, *supra*), specifically instructing emergency medical personnel how to recognize, treat, and care for hypothermia patients like Jake Anderson. As a matter of law, it is both reasonable and axiomatic to assume that both the City and County enacted such Ordinances because these governing bodies intended that they be implemented and followed.

151. Elected and appointed officials from Hennepin County and the City of Minneapolis established these guidelines specifically to protect hypothermia patients and ensure that emergency officials in the field provide proper medical treatment and DO NOT assume that a patient found frozen is necessarily dead.

152. In Jake's case, the City's Fire and Police Department personnel, Hennepin Healthcare Systems, Inc. & HCMC Ambulance Service providers, and the Hennepin

County Medical Examiner 's Office all violated their own laws promulgating administrative guidelines and protocols governing their respective departments; each of which had been enacted for public safety reasons to protect hypothermia patients like Jake.

153. Had the emergency personnel arriving to the scene followed the guidelines and protocols set forth to protect hypothermia victims, Jake would not have been promptly declared dead, but rather would have received proper assessment and immediate treatment and would have been transported to a medical center to begin warming and revival efforts. He would have been given his chance to live and would have been alive today to tell his story.

154. The ordinances and protocols established by local government officials were created specifically with the intent of protecting individuals like Jake Anderson.

155. The emergency responders' violations of such ordinances and protocols establish *per se* that the emergency responders deviated from their standard of care and caused the neglect that led to Jake's death.

156. The emergency responders also acted contrary to the guidelines for hypothermia recognition and treatment set forth by the Centers for Disease Control and Prevention ("CDC"). Specifically, the guidelines state:

> A person with severe hypothermia may be unconscious and may not seem to have a pulse or to be breathing. In this case, handle the victim gently, and get emergency assistance immediately. Even if the victim appears dead, CPR should be provided. CPR should

> continue while the victim is being warmed, until the victim responds or medical aid becomes available. In some cases, hypothermia victims who appear to be dead can be successfully resuscitated.

157. The federal guidelines list late hypothermia symptoms such as "no shivering, blue skin, dilated pupils, slowed pulse and breathing and loss of consciousness." The guidelines mandate moving the victim to a warm room or shelter, warming the center of the victim's body first using blankets, clothing, towels or sheets, keeping the victim dry and wrapped in a warm blanket, and if no pulse, beginning CPR.

158. The CDC information is available to all EMT groups nationwide, and is interpreted as a mandated standard of care for EMT providers.

159. Defendants' willful failure to follow the guidelines constitutes a per se violation of federal law and an established standard of care that is to be followed by all EMT providers nationwide.

160. Defendants failed to recognize the symptoms of Jake's late stage hypothermia, and failed to take any steps to treat Jake's hypothermia.

161. As a result of Defendants' failures to follow their department's own protocols found in local ordinances and state law, as well as federal law promulgated through the CDC guidelines, Defendants caused or contributed to Jake's death.

162. Therefore, the City of Minneapolis, County of Hennepin, and Hennepin Healthcare Systems, Inc. & HCMC are liable for the *per se* negligence that caused Jake's death.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## CLAIM VI:

## NEGLIGENT HIRING

### Against All City, County and

### Hennepin Healthcare Systems, Inc. & HCMC Defendants

163. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

164. The City of Minneapolis, County of Hennepin, Hennepin Healthcare Systems, Inc. & HCMC, the Minneapolis Fire Department, Minneapolis Police Department, HCMC Ambulance Services/EMS, and Hennepin County Medical Examiner are, and at all relevant times, were responsible for the hiring, firing, training, duty assignments, and supervision of City Police Officers, Fire and Medical emergency

responders, and Medical examiners charged with the emergency response tasks determined by the City, the County and Hennepin Healthcare Systems, Inc. & HCMC.

165. These City, County and Hennepin Healthcare Systems, Inc. & HCMC Defendants had a duty to properly hire, train and supervise their personnel in recognizing hypothermia, and the need for emergency medical care when a victim displays symptoms of hypothermia.

166. The City, County and HCMC Defendants, at all relevant times, knew that individuals hired as City of Minneapolis, Hennepin County and Hennepin Healthcare Systems, Inc. & HCMC employees and emergency responders would be placed in a position of power in relation to individuals in their custody, and that employees who abused that power and neglected individuals in their custody, could cause deprivation of rights, injuries and damages to those individuals in their custody.

167. The City, County and Hennepin Healthcare Systems, Inc. & HCMC Defendants owed Jake Anderson, and other similarly situated individuals in the City and County's custody, a duty to investigate applicants for positions as police department, fire department, ambulance services, and assistant medical examiner employees to ensure that no personnel hired would threaten the rights, safety or well-being of individuals in their custody whom they are charged to treat and protect.

168. These duties were breached, as not one of the responders provided medical care to Jake as he lay in a hypothermic state.

169. It is foreseeable that by failing to properly hire, train and supervise emergency response personnel in the recognition and treatment of hypothermia, a tragedy such as Jake's would occur.

170. The City, County and Hennepin Healthcare Systems, Inc. & HCMC failed to exercise ordinary care in hiring, training and supervising the employees who neglected to provide medical assistance to Jake in his hypothermic state.

171. As a proximate result of the City, County and Hennepin Healthcare Systems, Inc. & HCMC's negligence in the hiring, retention and supervision of the individual officers, responders and investigators, Jake suffered the injuries and damages set forth above and as a result died a tragic death.

172. The actions and omissions of the City of Minneapolis, County of Hennepin and Hennepin Healthcare Systems, Inc. & HCMC were taken with reckless disregard for the rights and safety of Jake Anderson.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or

further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

**CLAIM VII:**

**VICARIOUS LIABILITY**

**Against the City of Minneapolis, County of Hennepin, Hennepin Healthcare Systems, Inc. & HCMC, Minneapolis Police Department, Minneapolis Fire Department, HCMC Ambulance Services, Hennepin County Medical Examiner**

173. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

174. The City of Minneapolis is liable for the torts of its agents.

175. The City of Minneapolis is therefore liable for the police officers' and fire department officers' conduct because they were acting within the scope of their employment when they caused and contributed to Jake's injuries.

176. The officers' conduct occurred during working hours and while conducting official business.

177. The officers' conduct is imputable to the City of Minneapolis as its agents under the Vicarious Liability Doctrine.

178. Hennepin County, Hennepin Healthcare Systems, Inc. & HCMC, and Hennepin County Medical Examiner's Office are liable for the conduct of its paramedics

and deputy medical examiners because these individuals were acting within the scope of their employment when they caused or contributed to Jake's injuries.

179. The paramedics' and assistant medical examiners' willful conduct occurred during working hours and while conducting official business.

180. The paramedics' and assistant medical examiners' conduct is imputable to the County, Hennepin Healthcare Systems, Inc. & HCMC and Hennepin County Medical Examiner's Office as its agents under the vicarious liability doctrine.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## CLAIM VIII:

## MEDICAL NEGLIGENCE

## Against Hennepin County Medical Examiner 's Office and Individual Defendant Dr. Mitchel Morey, MD

181. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

182. The Hennepin County Medical Examiner (HCME) and HCME individual pathologist Mitchel Morey, MD was negligent in providing professional medical care to Jake Anderson, and the Medical Examiner's negligence was a direct cause of injury and death to Jake.

183. The Hennepin County Medical Examiner deviated from the acceptable standard of care, including skill and learning ordinarily possessed and exercised by physicians in good standing and under similar circumstances.

184. The Medical Examiner and his agents knew or should have known that symptoms of severe hypothermia include faint or lack of heartbeat, no breathing, no movement, skin cold, stiff arms and legs. Further, they knew or should have known that a victim of hypothermia may be unconscious and appear to have no pulse or breathing.

185. The description of Jake Anderson's condition relayed by Police Department personnel and by the ME's death investigators to the Medical Examiner, should have caused the Medical Examiner to direct the on-scene personnel to apply the standard of care for treating hypothermia in the field and to immediately transport Jake Anderson to a hospital emergency room to begin warming procedures.

186. Instead of insisting on efforts to rewarm Jake's body, Defendant Dr. Mitchel Morey determined that "a medical doctor's visit to the scene was unnecessary" and instead sent two death investigators to the scene.

187. The applicable standard of care for treating hypothermia is to provide immediate medical treatment and ALS (advanced life support) rescue efforts and to immediately bring the victim to Hennepin County Medical Center to initiate warming treatment.

188. A deviation from that standard of care occurred here, as the Medical Examiner did not instruct responders on the scene to rewarm Jake Anderson, but rather summarily supported the MFD's pronouncement of death, despite the fact that Jake was found cold in a cold environment.

189. Accordingly, the ME should know that to a reasonable degree of medical certainty the applicable standard of care that "a person is not dead until he is warm and dead."

190. Such deviation from the standard of skill and learning was grossly negligent and/or negligent and caused Jake's death.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves in excess of $75,000, and against each defendant for actual, compensatory, and consequential damages including pain and suffering; for prejudgment interest; for cost of suit and for such other, different or further relief as the interests of justice or

equity may require. Plaintiffs will seek punitive damages should the facts support such damages; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## CLAIM IX:

## MEDICAL NEGLIGENCE

### Against Individual Emergency Responders Defendants Shana D. York, Daniel F. Shively, Anthony A. Vanbeusekom, Raul A. Ramos, and Anthony Buda, et al to be Determined

191. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

192. Individual emergency response officials Defendants Shana D. York, Daniel F. Shively, Anthony A. Vanbeusekom, Raul A. Ramos, and Anthony Buda were negligent in providing professional medical care to Jake Anderson, and these Defendants' negligence was a direct cause of injury and death to Jake.

193. Individual Defendants Shana D. York, Daniel F. Shively and Anthony A. VanBeusekom are certified Emergency Medical Technicians and/or Paramedics. Defendants Raul A. Ramos and Anthony Buda are Minneapolis Fire Department professionals, charged with providing emergency medical care of persons within their custody and to victims of accidents. Each of these Defendants has received specialized medical training, and as paramedics or emergency medical responders, they are tasked with performing medical functions to patients in the field.

194. Defendants Shana D. York, Daniel F. Shively, Anthony A. Vanbeusekom, Raul A. Ramos, and Anthony Buda are "Minnesota health care providers" as defined by Minn. Stat. § 145.61 subdivisions 2 and/or 4, and thereby fall within the ambit of Minn. Stat. § 541.076 providing for health care provider actions alleging malpractice, error, mistake, or failure to cure based on contract or tort.

195. Each individual defendant deviated from the standard of care, including skill and learning ordinarily possessed and exercised by emergency response personnel in similar circumstances.

196. The individual defendants knew or should have known that symptoms of severe hypothermia include faint or lack of heartbeat, no breathing, no movement, skin cold, stiff arms and legs. Further, they knew or should have known that a victim of hypothermia may be unconscious and appear to have no pulse or breathing.

197. That observation of Jake Anderson should have caused the individual emergency response personnel to apply the known protocol and standard of care for treating hypothermia in the field and to transport Jake Anderson to the Emergency Room to begin warming procedures.

198. Instead of initiating efforts to rewarm Jake's body, individual defendants stood idly by, breaching their professional medical duty to treat Jake Anderson.

199. The applicable standard of care for treating hypothermia is to provide immediate medical treatment and ALS rescue efforts and to immediately bring the victim to HCMC to initiate warming treatment.

200. A deviation from that medical standard of care occurred here, as the individual defendants, all emergency response personnel from the City of Minneapolis Fire Department and HCMC Ambulance Services/Emergency Medical Services, arrived on scene and refused to treat Jake Anderson, presuming him to be dead despite obvious environmental and bodily conditions to the contrary, and with full knowledge that a victim of hypothermia may not be presumed dead and pronounced dead until determined as "cold and dead in a warm environment."

201. The individual defendants, all Minnesota health care providers as defined by Minn. Stat. § 145.61 subdivisions 2 and 4 , were medically negligent in their unreasonable, improper, and complete failure to treat Jake Anderson.

202. For the reasons cited above, the individual defendants/health care providers' actions fell below the recognized medical standard of care in violation of Minnesota's Medical Malpractice statute, and are individually liable for damages resulting from Jake Anderson's resulting injuries and death.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves in excess of $75,000, and against each defendant for actual, compensatory, and consequential damages including pain and suffering; for prejudgment interest; for

cost of suit and for such other, different or further relief as the interests of justice or equity may require. Plaintiffs will seek punitive damages should the facts support such damages; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

**CLAIM X:**

**MEDICAL NEGLIGENCE**

**Against Individual Defendants Daniel Tyra, Shannon Miller, Dustin Anderson, Scott Sutherland, Sgt. D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Kris Tyra, Josh Betts, Kari Quast, and Arlene Johnson et al. to be Determined**

203. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

204. Individual Defendants Daniel Tyra, Shannon Miller, Dustin Anderson, Scott Sutherland, Sgt. D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Kris Tyra, Josh Betts, Kari Quast, and Arlene Johnson et al. to be determined are officers employed by the Minneapolis Police Department and are charged with the grave responsibility "to take all steps necessary to preserve the life of any person within their custody." These steps include providing medical care until EMS providers take control of the scene.

205. The individual police officers at the scene neglected their duty to provide medical treatment to Jake Anderson, despite obviously frigid temperatures and observations that Jake appeared frozen.

206. The individual defendants knew or should have known that symptoms of severe hypothermia include faint or lack of heartbeat, no breathing, no movement, skin cold, stiff arms and legs. Further, they knew or should have known that a victim of hypothermia may be unconscious and appear to have no pulse or breathing.

207. That observation of Jake Anderson should have caused the individual police officers to apply the known protocol and standard of care for treating hypothermia in the field and to ensure that Jake's body was transported to the Emergency Room to begin warming procedures.

208. Each individual defendant deviated from the standard of skill and learning ordinarily possessed and exercised by police officers in similar circumstances.

209. The individual officer's unreasonable failure to treat Jake Anderson resulted in death to Jake, and the individual officers are liable for damages as a result of their failure to treat.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves in excess of $75,000, and against each defendant for actual, compensatory, and consequential damages including pain and suffering; for prejudgment interest; for cost of suit and for such other, different or further relief as the interests of justice or

equity may require. Plaintiffs will seek punitive damages should the facts support such damages; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## CLAIM XI:

## CIVIL RIGHTS VIOLATION BASED ON 42 U.S.C. §1983

## Against the City of Minneapolis and the County of Hennepin

### Municipal Liability Based on Failure to Train and Supervise

210. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

211. In order to state a claim under Section 1983, a plaintiff must allege: 1) a violation of a right secured by the Constitution and laws of the United States; and 2) the commission of the deprivation by a person acting under color of state law." *Buzzanco*, 173 F. Supp.2d at 381 (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

212. The City of Minneapolis and members of its police and fire departments, and Hennepin County and its ambulance service providers are state actors, acting under color of law, and violated Jake Anderson's right to life and bodily integrity in violation of the Fourteenth Amendment to the United States Constitution.

213. The Minneapolis Fire and Police Departments and Hennepin County Ambulance Service Providers denied medical assistance to Jake Anderson when he was found in a severe hypothermic state.

214. The City of Minneapolis and Hennepin County failed to train and supervise members of its police and fire departments and EMS/Ambulance Service Providers in assessing, recognizing, and properly treating a hypothermia victim and when to provide medical care to citizens when responding to emergency calls.

215. The training program and supervision was inadequate, exhibiting deliberate indifference to the constitutional rights of persons in the City of Minneapolis.

216. Because the City and County have issued official department guidelines on how to treat victims of hypothermia, there is an obvious need to train members of the fire and police department and ambulance services in assessing, recognizing, and properly treating hypothermia victims in the field and to ensure that such medical providers apply the City and County's hypothermia protocols in emergency response situations such as in the case of Jake Anderson.

217. As a direct result of the emergency response officials' actions in leaving Jake slumped over a fence in the cold for over two and a half hours, rather than providing immediate emergency medical care in accordance with the official policies on hypothermia treatment, Jake Anderson tragically died.

218. The emergency officials' actions in summarily declaring Jake dead even though he was found cold in a cold environment, and with symptoms corresponding to that of a person suffering from hypothermia, was so outrageous as to be deliberatively indifferent to the likelihood that this type of tragedy would occur.

219. The City of Minneapolis and Hennepin County are liable under 42 U.S.C. §1983 for the deprivation of Jake Anderson's rights as to his life and bodily integrity as a result of their failure to properly train and supervise members of its fire and police departments, and its ambulance services in treating hypothermia victims in the City of Minneapolis.

## Constitutional Violation Based on State Created Danger

220. Officials with the Minneapolis Fire and Police Departments and HCMC Ambulance Services created a danger when they affirmatively failed to protect Jake Anderson when he was found in a severe hypothermic state.

221. Members of the fire and police departments and ambulance services had control over the scene and should have taken action to treat and revive Jake Anderson as he lay helpless in a severe hypothermic state.

222. To make a claim for state-created danger in the Eighth Circuit, a plaintiff must prove the following five elements[10]:

- they were members of a limited, precisely definable group
- [the government's] conduct put them at significant risk of serious, immediate, and proximate harm
- the risk was obvious or known to [the government]
- [the government] acted recklessly in conscious disregard of the risk, and
- in total, [the government's] conduct shocks the conscience.

[10] *Hart v. City of Little Rock*, 432 F.3d 801 (8th Cir. 2005).

223. Jake was a member of a limited, definable group: He was the only hypothermia victim present at the scene, the responding officers owed an affirmative duty to protect him, and responding officials had exclusive control over the scene where Jake was still alive.

224. The conduct of the emergency responders put Jake at significant risk of serious, immediate, and proximate harm, including dying which he ultimately did, due to this constitutional deprivation.

225. The official acts of the police, fire department, and ambulance service responders in deliberately and affirmatively denying Jake the medical treatment and medical access he needed, cost Jake his chance of survival and ultimately caused his death. The emergency responders' affirmative denial of medical care put Jake at significant risk of harm. But for the actions of the responding officials in denying treatment and rescue efforts, Jake could have survived. Instead, Jake died tragically as a result of his continued exposure to the cold.

226. The risk of Jake dying of hypothermia absent medical response and treatment was obvious or known to the emergency responders.

227. The cold weather conditions at the scene were obvious, and emergency responders are required to know and comply with the official guidelines regarding hypothermia response and treatment, including, immediate transport to a hospital to

initiate warming procedures. Hypothermia victims require immediate medical treatment. Absent that treatment, when left out in the elements, death will result.

228. The emergency responders acted recklessly in conscious disregard of the risk that Jake would die absent medical response and intervention. The emergency personnel responding to the scene failed to properly identify Jake as a hypothermia victim and failed to render medical aid to him.

229. In total, such deprivation and action of the emergency response personnel shocks the conscience.

230. There are many documented instances in the medical literature of hypothermia victims, who like Jake, were found frozen stiff, with hardly a pulse to register, only to be properly re-warmed, revived and to live. These survivors had the benefit of being revived by responders who knew how to rescue and treat the victim.

231. It shocks the conscience that the officials whose very duty is to provide rapid medical treatment to all persons experiencing a medical emergency stood by as Jake lay dying. The responders did not even take the requisite time to properly warm Jake's body before declaring him dead. Hypothermia victims may not register a discernable pulse for minutes at a time. Those trained in emergency medical care know that a person is not "dead until they are warm and dead."

232. Therefore, it is shocking that each of the responders affirmatively agreed to do nothing to treat Jake as he lay in the freezing cold when they had the opportunity to save him and give him a chance to survive.

233. The state actors responding to the scene thus created a danger by affirmatively denying treatment to Jake, which permanently and predictably deprived him of his life.

WHEREFORE, Plaintiffs respectfully request judgment in their favor pursuant to 42 U.S.C. § 1983 with interest, costs, attorney fees, expert fees, punitive damages except as to the municipality, and other such relief as the Court may award in an amount in excess of $75,000. Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## CLAIM XII:

## NEGLIGENT UNDERTAKING

**Against Minneapolis Fire Department, Minneapolis Police Department, County of Hennepin, Hennepin Healthcare Systems, Inc. & HCMC Ambulance/ Emergency**

**Medical Services, Hennepin County Medical Examiner's Office, and Individual Defendants Emergency Response Personnel TBD**

234. Plaintiffs reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

235. Defendants owed a special duty to Jake by undertaking, gratuitously or for consideration, to render services necessary for the protection of Jake Anderson.

236. Liability is imposed if (1) Defendants' failure to act increased the risk of harm to Jake; or (2) the harm was suffered because Jake Anderson relied on the undertaking. *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 571 (Minn. 1979); Restatement (Second) of Torts § 324A (1965).

237. Here, fire department personnel, police officers, ambulance service providers, and agents of the Hennepin County Medical Examiner 's office all arrived on the scene and ostensibly, undertook to render services necessary for the protection of Jake Anderson.

238. Defendants failed to allow medical assistance after taking control of the scene and witnessing Jake Anderson in a severe hypothermic state.

239. Defendants' failure to act to provide necessary treatment increased the risk of harm to Jake, leading to Jake's death. If Defendants had attempted rescue and warming efforts, Jake would have at least had a chance to live and may have survived.

240. A reasonable emergency response officer in a similar circumstance would have attempted rescue and warming efforts. Failure to act to preserve Jake's life was a breach of the duty Defendants owed to Jake.

241. The Defendants' conduct was a complete derogation of duty, inasmuch as they willfully deviated from the standard of an emergency responder, acting in his or her professional capacity as a professional medical provider, and acted contrary to the standard hypothermia and patient care protocols governing their respective departments.

242. As a result of Defendants' negligent undertaking, Jake was injured and died.

WHEREFORE, Plaintiffs respectfully request relief and judgment in favor of themselves and against defendants jointly and severally for actual, compensatory and consequential damages including pain and suffering according to proof in excess of $75,000; for punitive or exemplary damages against defendants, in an amount sufficient to punish defendants and deter others from similar wrongdoing; for attorneys fees and expert fees; for prejudgment interest; for costs of suit and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

**CLAIM XIII:**

**WRONGFUL DEATH**

**Against all Defendants**

243. The Andersons must establish the following four elements to recover under a wrongful death claim:

- a proper appointment of a trustee pursuant to MN Stat. §573.02
- the fact of death
- caused by the wrongful act of the defendant
- causing pecuniary loss to a surviving next of kin

244. The Andersons are entitled to bring an action to recover pecuniary damages for loss of income, contributions, services, advice, comfort and protection as well as medical expenses and funeral costs.

245. Jake's death occurred on December 15, 2013.

246. Jakes death was proximately caused by the deliberate failures of the emergency service personnel who arrived on the scene and deviated from the standard protocols in failing treat Jake as he lay in a severe hypothermic state.

247. The EMS, fire and police department personnel, and especially the M.D. Medical Examiner, all deprived Jake of his chance to survive.

248. Minnesota law recognizes a principle known as the "loss of chance" doctrine. Under the "loss of chance" doctrine, a patient may recover damages when a physician's negligence causes the patient to lose a chance of recovery or survival. *See Dickhoff v. Green*, 836 N.W.2d 321, 333 (Minn. 2013).

249. Jake could have had a chance to survive if any one of the emergency responders had been alert to the conditions and symptoms of hypothermia, and taken immediate action to implement the hypothermia guidelines and protocols in place at the time.

250. Jake's beneficiaries have incurred medical and funeral expenses for which they are entitled to compensation.

251. The Andersons have also suffered loss of monies that would have been contributed to or earned for the benefit of Jake's survivors, loss of guidance, advice, counsel and companionship, and the reasonable value of loss of benefits of family and household services, assistance and care.

WHEREFORE, Plaintiffs respectfully request judgment in their favor with interest, costs, attorney fees, expert fees, punitive damages except as to the municipality, and other such relief as the Court may award in excess of $75,000. Defendants are to be prohibited from continuing to maintain their illegal policy, practice, or custom and are to be ordered to promulgate an effective policy against such practices and to adhere thereto and for such other, different or further relief as the interests of justice or equity may require; and for those remedies prayed for in Plaintiffs' Prayer for Relief, infra.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants, and each of them, as follows:

a. For compensatory damages in excess of $75,000 for each Plaintiff according to proof at the time of trial;
b. For special damages and any and all available equitable remedies according to proof;
c. For Punitive/Exemplary damages according to proof;
d. For any and all relief available pursuant to Minnesota Statutes §573.02;
e. For any and all relief available pursuant to 42 U.S.C. §1983;
f. For pre-judgment and post judgment interest;
g. For costs and reasonable attorneys' fees; and
h. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: December 7, 2016

*/s/Robert R. Hopper*

Robert R. Hopper, Esq. (#208769)
**ROBERT R. HOPPER & ASSOCIATES, LLC**
333 South 7th Street, Suite 2450
Minneapolis, MN 55402
T: (612) 455-2199
F: (612) 455-1689
E: robert.hopper@robertrhopper.com
***Attorneys for Plaintiffs***