**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

WILLIAM ANDERSON,
As trustee for the next-of-kin of Jacob William Anderson (deceased),

*Plaintiff,*

vs.

CITY OF MINNEAPOLIS,

COUNTY OF HENNEPIN,

HENNEPIN HEALTHCARE SYSTEM, INC.,

DR. BRIAN MAHONEY, M.D. AS THEN-MEDICAL DIRECTOR OF THE HCMC AMBULANCE SERVICE,

INDIVIDUAL FIRE DEPARTMENT PERSONNEL IN THEIR INDIVIDUAL CAPACITIES: SHANA D. YORK, ANTHONY J. BUDA, RAUL A. RAMOS, AND JOHN DOE INDIVIDUALS TO BE DETERMINED,

INDIVIDUAL HCMC AMBULANCE SERVICES PERSONNEL IN THEIR INDIVIDUAL CAPACITIES: DANIEL F. SHIVELY AND JOHN DOE INDIVIDUALS TO BE DETERMINED,

INDIVIDUAL MEDICAL EXAMINER'S OFFICE PERSONNEL, IN HIS INDIVIDUAL CAPACITY: MITCHEL MOREY, MD,

INDIVIDUAL POLICE OFFICERS IN THEIR INDIVIDUAL CAPACITIES: DANIEL J. TYRA, SHANNON L. MILLER, DUSTIN L. ANDERSON, SCOTT T. SUTHERLAND, D. BLAURAT, EMILY

Case No. CIVIL NO. 16-CV-04114 (SRN-FLN)

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

| |
|---|
| DUNPHY, CHRISTOPHER KARAKOSTAS, MATTHEW GEORGE, JOSEPH MCGINNESS, CALVIN PHAM, ARLENE M. JOHNSON, MATTHEW T. RYAN, AND JOHN DOE INDIVIDUALS TO BE DETERMINED,<br><br>*Defendants.* |

## INTRODUCTION

This case seeks redress for the preventable death of Jacob William Anderson. The deliberate indifference of Hennepin County, the City of Minneapolis and the individual Defendants proximately caused the deprivation of Jacob Anderson's right to life, thereby violating his federal civil rights while acting under the color of state law. The deliberate indifference to Jacob's life is unfathomable when understood within the robust consensus of clearly established authorities outlining the duties and obligations which defendants are required to discharge in their role as emergency responders, as first and foremost they are entrusted with the responsibility of saving lives.

Jacob "Jake" Anderson was a handsome, vibrant young man with a promising future. In Fall of 2013, he was a first semester freshman at the University of Minnesota in Minneapolis, a member of Phi Kappa Alpha fraternity, a University of Minnesota lacrosse player, and a friend to many. On the night of December 14, 2013, Jake attended an "ugly sweater party" with his friends. Early the next morning, on December 15, 2013, he was found outside, in zero to subzero temperatures, in a severe hypothermic state. When first responders arrived, they summarily pronounced him dead, without fully

assessing his condition and without following medical protocols for the treatment of a hypothermia victim. Jake was declared dead, due to hypothermia, on December 15, 2013.

This is an action seeking money damages for the deprivation of Mr. Anderson's Constitutional rights resulting from the deliberate indifference of Hennepin County ("County"), the City of Minneapolis ("City"), and the individual Defendants who are employees of the County and City acting in their individual capacities at the scene of the incident on December 15, 2013. All of these defendants are jointly and severally, as well as collectively, liable for depriving Mr. Anderson of his Constitutional right to life as well as his chance to survive.

For his First Amended Complaint, William Anderson as trustee for the next-of-kin of Jacob William Anderson states and alleges as follows:

**PARTIES**

1. William Anderson was appointed as Trustee for the Next-of-Kin of Jacob Anderson on March 9, 2017 by Hennepin County District Court Judge Mel I. Dickstein. A copy of that Order and Oath and Consent of Trustee are attached hereto as Exhibit 1.

2. Plaintiff Trustee brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the Constitution, and 28 U.S.C. §§ 1331 and 1343(3). The

aforementioned statutory and Constitutional provisions confer original jurisdiction of this Court over this and all other causes of action.

3. Jacob Anderson ("Jake") was at all times material herein a citizen of the United States and a resident of Hennepin County. He was born on October 6, 1994, making him 19-years-old at the time of his death. Jake was the son of William and Kristi Anderson. Jake had two siblings, an older sister, Emily, and a younger brother, Luke.

4. Defendant County of Hennepin ("Hennepin County" or "County") is a "public corporation," which can be sued under Minnesota Statute § 373.01(1). Hennepin County is, and at all relevant times was, a political entity legally responsible for and charged with the control and supervision of all personnel of Hennepin County's Ambulance Services, including Hennepin EMS. Hennepin County is governed by a board of County Commissioners. The Minnesota Emergency Medical Services Regulatory Board (EMSRB). EMSRB maintains legal descriptions for all primary service areas in the state. Hennepin County EMS was assigned to the area where Jake Anderson was found.

5. Hennepin Healthcare System, Inc. (herein "HHS") operates as a subsidiary of Hennepin County, pursuant to Minn. Stat. § 383B.901. Any allegations against or reference to Hennepin County includes HHS.

6. Defendant City of Minneapolis ("Minneapolis" or "City") is a municipal corporation and a Minnesota political subdivision organized under the laws of the State of Minnesota. Minneapolis is governed by a City Council.

7. Defendant Dr. Brian Mahoney, M.D. ("Dr. Mahoney" or "Then Medical Director") was, in December 2013, the Medical Director of the Hennepin County Medical Center ambulance service ("HCMC Ambulance Service"), with a business address at 701 Park Avenue, Minneapolis, Minnesota 55415. At all times relevant Defendant Dr. Mahoney was a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as director and supervisor of the Hennepin County Medical Center ambulance service personnel. Dr. Mahoney is sued in his official and individual capacity.

8. Defendant Mitchel Morey, MD, has been a staff pathologist and Assistant Medical Examiner with the Hennepin County Medical Examiner's office at all times relevant to this matter. Dr. Morey was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of state law as an Assistant Medical Examiner. Dr. Morey is sued in his official and individual capacity.

9. Defendant Shana D. York ("York") is a captain with the Minneapolis Fire Department. Upon information and belief, York was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of state law as an officer of the City's Fire Department. York is sued in her individual capacity.

10. Defendant Anthony J. Buda ("Buda") is an officer with the Minneapolis Fire Department. Upon information and belief, Buda was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of state law as an officer of the City's Fire Department. Buda is sued in his individual capacity.

11. Defendant Raul A. Ramos ("Ramos") is an officer with the Minneapolis Fire Department. Upon information and belief, Ramos was at all times material herein a citizen of the United States, a resident of Minnesota, and acting under color of state law as an officer of the City's Fire Department. Ramos is sued in his individual capacity.

12. Upon information and belief, Defendant Daniel F. Shively ("Shively") was at all times material herein a paramedic with Hennepin EMS, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a County paramedic. Shively is sued in his individual capacity.

13. Upon information and belief, Defendant Daniel J. Tyra ("Tyra") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Tyra is sued in his individual capacity.

14. Upon information and belief, Defendant Shannon L. Miller ("Miller") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Miller is sued in his or her individual capacity.

15. Upon information and belief, Defendant Dustin L. Anderson ("Anderson") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Anderson is sued in his individual capacity.

16. Upon information and belief, Defendant Scott T. Sutherland ("Sutherland") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Sutherland is sued in his individual capacity.

17. Upon information and belief, Defendant D. Blaurat ("Blaurat") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Blaurat is sued in his or her individual capacity.

18. Upon information and belief, Defendant Emily Dunphy ("Dunphy") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Dunphy is sued in her individual capacity.

19. Upon information and belief, Defendant Christopher Karakostas ("Karakostas") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and

acting under color of state law as a City Police Officer. Karakostas is sued in his individual capacity.

20. Upon information and belief, Defendant Matthew George ("George") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. George is sued in his individual capacity.

21. Upon information and belief, Defendant Joseph McGinness ("McGinness") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. McGinness is sued in his individual capacity.

22. Upon information and belief, Defendant Calvin Pham ("Pham") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Pham is sued in his individual capacity.

23. Upon information and belief, Defendant Arlene M. Johnson ("Johnson") was at all times material herein an officer with the Minneapolis Police Department, a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Johnson is sued in her individual capacity.

24. Upon information and belief, Defendant Matthew T. Ryan ("Ryan") was at all times material herein an officer with the Minneapolis Police Department, a citizen of

the United States, a resident of the State of Minnesota, and acting under color of state law as a City Police Officer. Ryan is sued in his individual capacity.

25. Upon information and belief, Defendants John Doe 2-4 were at all times material herein, citizens of the United States, residents of the State of Minnesota, and acting under color of state law as directors and supervisors of the City's and/or County's emergency services personnel. Does 2-4 are sued in their individual capacities.

26. Defendants John Doe 5-7 were at all times material herein, citizens of the United States, residents of the State of Minnesota, and acting under color of state law as City and/or County emergency services personnel. Does 5-7 are sued in their individual capacities.

27. Defendants John Doe 8-10 were at all times material herein, citizens of the United States, residents of the State of Minnesota, and acting under color of state law as City and/or County medical staff employees. Does 8-10 are sued in their individual capacities.

## JURISDICTION

28. Plaintiff Trustee brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the Constitution, and 28 U.S.C. §§ 1331 and 1343(3). The aforementioned statutory and Constitutional provisions confer original jurisdiction of this Court over this cause of action. Plaintiff invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to hear and adjudicate state law claims. Each and all of

the acts (or omissions to act) alleged herein were done by defendants, or their officers, agents, and employees, under color and pretense of the statutes, ordinances, regulations, customs and usages of the City of Minneapolis and/or Hennepin County, Minnesota, the State of Minnesota; and, under color and pretense of applicable federal law as pleaded herein.

29. This case is initiated in the United States District Court for the District of Minnesota, pursuant to 28 U.S.C. §§ 1391 as the judicial district in which all relevant events, acts, and omissions occurred and in which Defendants maintain offices and/or reside. Venue is therefore proper.

## FACTUAL ALLEGATIONS

30. Jacob William Anderson (herein "Jake" or "Patient Anderson") was a 19-year-old freshman at the University of Minnesota, Twin Cities, studying at the College of Liberal Arts. He was a member of Phi Kappa Alpha fraternity and played for the University of Minnesota Lacrosse Team. He had aspirations to become a pediatrician.

31. Jake was a friendly and social young man. He had made many new friends at his fraternity, on the lacrosse team, in his dormitory and in the classroom.

32. On the night of December 14, 2013, Jake attended an "Ugly Sweater party" with several other University of Minnesota students. He was seen leaving the party by other attendees at or around 11:15 p.m.

33. Based on information and belief, and for unexplainable reasons, Jake did not return to his dormitory that evening.

34. The temperature outside on the night of December 14, 2013 and early morning of December 15, 2013, was approximately 0º F (zero degrees Fahrenheit). Some reports indicate that the wind chill temperature was -15º F (fifteen degrees below zero).

35. Early on the morning of December 15, 2013, an amateur photographer named James Jason Hardy discovered Jake lying face down, slumped over a metal rail in a remote area near the 10th Ave. SE Bridge in Minneapolis on the northeast side of the Mississippi River. Jake was discovered near a road that serves as an access to a steam and coal plant.

36. Jake was obviously in a severe hypothermic state when Mr. Hardy discovered him.

37. It is unknown when, how, or why Jake arrived at this remote location.

38. At 8:44 a.m. on December 15, 2013 Mr. Hardy called 911 Emergency Service. The dispatcher, Carol A. Lawrence, assigned the Minneapolis Police Department ("MPD"), Minneapolis Fire Department ("MFD"), and HCMC Ambulance Services/Emergency Medical Services ("EMS") (collectively, "Emergency Responders" or "Responders") to the scene.

**<u>The Pathophysiology of Hypothermia</u>**

1. The functional changes in the body associated with or resulting from hypothermia (i.e., the pathophysiology) and the medical standard of care that applies to hypothermia victims has been well settled for decades.

2. Two highly regarded HCMC Emergency Department Medical Doctors recently authored an evidence-based medical article addressing the importance of the effective treatment of hypothermia patients in the field.[1] The authors state that medical literature is "full of extraordinary survival stories of patients with accidental hypothermia . . . [these cases] have expanded our understanding of what the human body can endure."[2]

3. Hypothermia occurs when the body loses heat faster than it can produce heat and the body temperature falls below 95° F (35° C). Left untreated, it can be life threatening.

4. In a state of severe hypothermia, the body has effectively stopped trying to keep itself warm and some final steps are taken to avoid death. The heart rate and breathing slow so that they are hardly detectable. Only one or two breaths per minute may be taken. The skin is very pale and icy cold to the touch. The limbs are stiff. The pupils of the eyes dilate (open wide) and are unreactive to light. For all intents and purposes, a person with severe hypothermia may appear to be dead. Though hypothermia can lead to death, it also slows down the dying process. For a period of time,

---

[1]See Exhibit 2: Rischall, Megan L., MD, and Andrea Rowland-Fisher, MD. "Evidence-Based
[2] *Id.* at 2.

hypothermia has the effect of preserving the body and suspends functions, actually keeping the person alive.

5. In severe hypothermia cases, muscle and joint stiffness may simulate rigor mortis.

6. Superficial frostbite involves just the skin; the exterior will be white and frozen but the tissue below the surface is soft and resilient before rewarming. Systemic hypothermia may also be accompanied by localized cold injury, such as deep frostbite injuries, which involve underlying structures, e.g., certain tissues (muscles, tendons, etc.). Before rewarming, the injured parts will have white and waxy appearance and will feel hard and frozen solid, often compared to wood.

7. Consciousness is commonly lost below a core temperature of about 30º C, (86° F ); there is also as a reduction in blood flow. At a core temperature of around 28° C (82.4° F) heartbeat irregularities may occur.

8. Victims of severe hypothermia may appear dead, but can be revived when properly treated and rewarmed.

9. The initial treatment goal in all hypothermic patients is removal from the cold environment, removal of cold or frozen clothing and providing the victim with warm, and humidified supplemental oxygen, if available, all to prevent further heat loss.

10. If the patient has moderate, severe or profound hypothermia, active re-warming should be initiated by applying heat to the chest, armpit and back.

11. Hypothermic patients who are comatose or in cardiac arrest should be assumed to have severe or profound hypothermia. Airway management will likely be necessary, and prehospital personnel (emergency first responders, paramedics, EMT or EMS) should intubate (insert a tube through the mouth and into the airway and connect to a ventilator to assist breathing) or use other invasive means to open the airway, if possible. Prehospital providers should assess for pulse and initiate CPR at a standard rate of 100 compressions per minute, if no pulses are palpable after 1 minute after preliminary assessment.[3]

12. There are no temperature cutoffs for resuscitation, as there are case reports of patients surviving neurologically intact with core body temperatures as low as 13.7°C (56.66) °F in accidental hypothermia, and 9°C (48.2 °F) in the operating room. Guidelines recommend that prehospital providers initiate resuscitation in all cases of hypothermia unless there is an obvious lethal injury or the patient has been buried in an avalanche for more than 35 minutes and has snow impacted in the airway. In all other cases, evacuation, resuscitation, and transport should be initiated immediately, provided that doing so does not endanger prehospital responders.

13. Evidence abounds in widely-available medical literature, treatment guidelines, and many other sources of information confirming the effects of hypothermia

[3] Rischall, Megan L., MD, and Andrea Rowland-Fisher, MD. "Evidence-Based Management Of Accidental Hypothermia In The Emergency Department." *Emergency Medicine Practice.* U.S. National Library of Medicine, 18 Jan. 2016. Web. 6 Feb. 2017. *Id.*

on the body. Such evidence positively establishes that patients discovered in severe states of hypothermia can be successfully resuscitated and survive neurologically intact.[4]

14. Hypothermic patients should be immediately transported to the nearest hospital. When possible, a hypothermic patient who is comatose or who has abnormal or unstable blood pressure, should be immediately transferred to a hospital with an intensive care unit which has extracorporeal circulation capabilities (i.e. an ECMO machine that warms and circulates the blood outside the body and recirculates it back into the body).

15. HCMC is a leader in medical and surgical critical care and has Extracorporeal Life Support (i.e. ECMO) machine/capabilities. ECMO is an advanced treatment available to help patients recover from critical illness, including severe hypothermia. ECMO is the most efficient means medical doctors have for reheating hypothermic patients and for providing circulatory and respiratory support during resuscitation.

16. HCMC and its ECMO machine (Extracorporeal Membrane Oxygenation) are only a 5 (five) minute ambulance ride from where Jake Anderson was found.

[4] There are case reports of patients surviving intact with body temperatures as low as 13.7°C in accidental hypothermia, and 9°C I the operating room. *See* Rischall, ML and Roland-Fisher A, Evidence-Based Management of Accidental Hypothermia in The Emergency Department. *Emergency Medicine Practice.* Vol. 18, No. 1 (Jan. 2016) (available ebmedicine.net) (*Citing* Gilbert M, Busund R, Skagseth A, et al. Resuscitation from accidental hypothermia of 13.7 degrees C with circulatory arrest. *Lancet*. 2000; 355(9201): 375-376.; and Niazi SA, Lewis FJ. Profound hypothermia in man; report of a case. *Ann Surg.* 1958; 147(2):264-266.)

17. HCMC medical emergency professionals, including its first responders, Medical Director and Medical Examiner, are or should be aware of the pathophysiology of severe hypothermia and its treatment. In early December 2013, just prior to Jake's death, HCMC reported on its website that in 2013, the hospital treated 78 patients with complications from hypothermia.[5] The post states:

> Depending on the severity of hypothermia, treatment in the emergency department includes aggressive, supportive critical care that may require that the patient is placed on a ventilator. Re-warming is a key part of the medical management. This is accomplished using a variety of techniques that include both external and internal rewarming methods.
>
> "Severe hypothermia can result in organ damage and permanent medical issues," warns Dr. [Doug] Brunette [an emergency physician at HCMC], "however, if the patient didn't have a respiratory or cardiac arrest, there's a good chance for complete recovery without long-term effects." [Dr. Brunette is an emergency physician at HCMC.

**<u>Liability of Minneapolis Fire Department (MFP) Responders</u>**

18. At 8:54 a.m., the MFD, including individual defendants York, Buda, and Ramos, were the first emergency unit to arrive on the scene and approach Jake Anderson.

19. Based on information and belief, at least some MFD responders arriving on scene were certified Emergency Medical Technicians.[6]

---

[5] https://hcmcnews.org/2013/12/04/cold-truths-about-hypothermia/

[6] Emergency Medical Technicians provide prehospital emergency medical care and transportation for critical and emergent patients who access the emergency medical services (EMS) system. Emergency Medical Technicians function as part of a comprehensive EMS response system, under medical oversight.

20. A witness at the scene describes MFD's assessment of Jake's condition as consisting of a mere 30 second pulse check at his wrist, which was frostbitten and cold to the touch. Such conditions make it extremely difficult to detect a pulse, even if one were present. Nevertheless, based on this brief, cursory assessment, the MFD responders hastily pronounced Jake DOA (Dead on Arrival).

21. Jacob Anderson's death was declared by the MFD at 8:57:24 a.m.; just three minutes after the MFD arrived at the scene where Jake was found.

22. Because the MFD responders declared Jake DOA, the unit then cancelled EMS response, also at 8:57:24 a.m, though the MFD report confirms that HCMC ambulance did arrive on the scene despite being cancelled.

23. The MFD Incident Report narrative states, "Patient [Anderson] had no pulse and no breathing and was **frozen indicating obvious death**," as an explanation for why they declared Jake dead and why they canceled EMS response "per protocol."

24. The MFD prepared an Incident Report to document their response to the scene. In sections C and D of the MFD "300D" Incident Report, the scene was coded as a "Type: EMS – DOA (No BLS Provided)," indicating that no Basic Life Support (BLS) was provided and the MFD declared Jake dead on arrival. In a blatant admission, this report confirms that MFD provided no medical treatment to Jake, indicating the MFD responders' deliberate indifference to Jake's medical needs. .

*MFD Standard Operating Procedures*

25. The Minneapolis Fire Department's Fire Chief specifically prescribed a Standard Operating Procedure for assessing and treating hypothermia victims in the field.[7]

26. Per City of Minneapolis Charter and Code of Ordinances, Title IX, Ch. 173.140, all regulations prescribed by the fire chief for the governing of the department are "subject to approval by the city council," and "all members of the fire department shall be subject to and strictly comply with all rules, regulations and orders made and issued from time to time by the chief." (Code 1960, § 640.140). This Minneapolis Fire Department SOP titled "Hypothermia" was approved by the Minneapolis City Council.

27. The MFD Standard Operating Procedures 2010 Patient Care Guidelines[8] mandate that MFD responders, including Defendants York, Buda and Ramos, rewarm the patient and begin CPR if no pulse is detected. The guidelines in no manner, whatsoever, permit the MFD to declare a patient Dead on Arrival (DOA) if the patient is found frozen and cold in a cold environment.

Specifically, the § 9-105.01 Guidelines (2010) state in bold lettering:

- "**Begin CPR immediately when patient is found cold in a cold environment (hypothermia).**";

---

[7] See, e.g. MFD Standard Operating Procedures 2010 Patient Care Guidelines (revised 10/12/2010, in effect on 12/15/2013). at § 9-104.03.04

[8] §§ 9-105.01 "Dead on Arrival (DOA)" and 9-104.03.04 "Hypothermia" of the MFD Standard Operating Procedures 2010 Patient Care Guidelines (Revised 10/12/2010, effective on 12/15/2013)

- "**Apply AED when a breathless, pulseless patient does NOT have signs of obvious trauma consistent with death.**";
- **"When in doubt, always begin or continue CPR!"**

The § 9-104.03.04 Guidelines (2010) similarly mandate:

- "VITAL SIGNS – Obtain respiratory rate, pulse, B/P and perfusion status, Do pulse check for 30-45 seconds, If no pulse start CPR attach AED"
- "REWARM PATIENT – Remove wet garments and cover patient with blankets, Handle patient gently, If available apply warm packs to neck, armpits, groin"
- "**Assist Paramedics** – IV Set Up, Airway O2 Assist w/ ET BVM, Vital Signs, Assist w/ warming, Transport (gentle movement)"
- "be aggressive w/ hypothermic arrests!"
- "Active rewarming of frozen parts is seldom recommended in the field."

28. *MFD Standard Operating Procedures* 2010 Patient Care Guidelines[9], further provide that MFD personnel **may not cancel ambulance response prior to their arrival** unless the patient falls within specific parameters; these parameters state that to declare death and cancel EMS, patient must be "**Cold in a warm environment**" and/or have signs of "obvious mortal trauma." The 'obvious mortal trauma' to which the Department refers is characterized as a mortal injury as apparent as a beheading, or indication of animal predation, or skin slippage.

[9] § 9-102.01 "Discontinuing Ambulance Response on Medical Calls" (Revised 10/12/2010, effective 12/15/13).

29. According to the MFD's standard operating procedures and protocols, all MFD responders are required to provide ongoing Advanced Life Support and other medical treatment to victims until ambulance services personnel arrive on scene.[10]

30. The MFD thus ignored and contravened their own § 9-102.01 response obligations to assess and treat Jake Anderson until the County paramedics (EMS) arrived on scene and assumed medical care.

31. Furthermore, according to the MFD's Standard Operating Procedures, when MFD personnel make the determination to cancel an ambulance response, a **300A** incident report should be filed.

32. However, as further evidence of the MFD Defendants' deliberate indifference to Jake's medical needs and incompetent handling of Jacob Anderson's case, the MFD Defendants filed the aforementioned erroneous **300D** incident report instead.

33. The MFD responders, including Defendants York, Buda and Ramos, failed to provide a proper medical assessment of Jake Anderson and failed to identify him as a hypothermia victim, despite the below freezing weather conditions in which he was found and despite the fact that his body exhibited well-known symptoms of hypothermia.

34. Based on information and belief, the MFD responders at the scene, including Defendants York, Buda and Ramos, had or should have had actual knowledge

[10] See, e.g. MFD Standard Operating Procedures 2010 Patient Care Guidelines § 9.102.01 "Response Obligations" (revised 10/12/2010, in effect on 12/15/2013).

that cold weather conditions can lead to moderate to severe cases of survivable hypothermia.

35. The MFD responders at the scene, including Defendants York, Buda and Ramos, breached their obligation to properly assess and treat Jake Anderson. Specifically, based upon eyewitness testimony at the scene, the MFD assessed his body for no more than one minute and thirty seconds before erroneously and summarily determining that Jake was dead.

36. Individuals with emergency medical training, including Defendants York, Buda and Ramos, knew or should have known that a determination of death cannot be made unless a patient is warm and dead.

37. Jake Anderson was not discovered "cold in a warm environment", and had no signs of obvious mortal trauma, as confirmed in numerous official reports from the scene.

38. There was no medically supported evidence whatsoever upon which the MFD could have reasonably concluded that Jake Anderson had "no pulse," "no breathing," and was "frozen" indicating "obvious death."

39. Pursuant to the pathophysiology of hypothermia, along with multitudes of medical literature, and numerous national and international hypothermia medical protocols, a "frozen" body **does not** indicate obvious death.

40. Individuals with emergency medical training, including Defendants York, Buda and Ramos, knew or should have known, based upon their education and the well-settled medical literature, that hypothermia patients have erratic heart rates and that a pulse may be difficult to detect for minutes at a time, on victims who are still alive.

41. The actions of Defendants York, Buda and Ramos entirely contravened the mandated actions referenced in the guidelines above. Rather than performing a thorough assessment and initiating rewarming efforts, applying an AED (automated external defibrillator), and/or initiating CPR until EMS arrived on scene, the MFD performed a hasty and superficial pulse check and summarily pronounced Jake dead on arrival, despite having actual knowledge that Jake was found cold in a cold environment.

42. MFD knew or should have known that severe hypothermia is considered a "medical emergency" by all medical authorities and in the medical literature, and must be assessed and treated as such, especially by emergency first responders.

43. The MFD, knew or should have known that Jake Anderson was severely hypothermic, thereby consciously disregarded not only a substantial risk— but a great risk— that serious harm would result if they left Jake exposed to the freezing cold.

44. Based on the circumstances, education and medical knowledge possessed by emergency medical technicians in the field, the MFD had absolutely no medical or statutory authority to pronounce patient Anderson dead. By making this death declaration

and cancelling EMS response, Defendants York, Buda and Ramos deprived Jake Anderson of his right to life and chance of survival.

45. Emergency first responders are by definition charged with the responsibility of saving lives. The actions of Defendants York, Buda and Ramos are shocking and so far outside the accepted norm and standard of care for a reasonable medical emergency responder as to constitute deliberate indifference to Jake Anderson's civil liberties.

46. MFD Defendants York, Buda and Ramos acted with gross negligence contrary to legal and medical authority, under the circumstances, when they deliberately deviated from the standard protocol for properly assessing and stabilizing a hypothermia victim in need of emergency medical assistance.

**Liability of Hennepin County EMS (EMS) and Dr. Mahoney, Then Medical Director of HCMC Ambulance Service**

47. The EMS ambulance unit was next to arrive on scene at 8:56 a.m., 1 minute and 24 seconds before MFD responders cancelled EMS response at 8:57:24 a.m.

48. Based on information and belief, the EMS responders on scene included Defendant Daniel F. Shively and now retired Hennepin EMS paramedic Anthony A. VanBeusekom.

49. Based upon eyewitness reports from the scene and on information and belief, the EMS paramedics, including Defendant Shively, arrived to the scene, exited the ambulance, and approached patient Anderson.

50. The EMS responders, including Defendant Shively, established patient contact with and assumed custody of Jake Anderson at the time they responded to the scene and exited their vehicle to approach Jake.

51. Based on information and belief, the EMS unit, including Defendant Shively remained on scene for approximately two minutes. .

52. Based on information and belief, Defendant Shively and the now-retired EMS responder Van Beusekom walked from the ambulance to where patient Anderson was located and back to the ambulance again, failing to medically examine or assess Jake Anderson, or provide medical treatment. Because EMS responders failed to determine that Jake was a severe hypothermia victim, EMS responders then failed to transport him to the HCMC Emergency Room.

53. Based on public records related to this matter, EMS responders were already present at the scene before the MFD unit canceled them.

54. Based upon information and belief, EMS responders were complicit with the MFD responders' hasty determination that Jake was DOA and did not conduct their own assessment of his condition, or check for vital signs or core body temperature.

55. EMS, including Defendant Shively, filed a Patient Care Report[11] stating that they were "canceled by other units on scene" and did not supply any information about the status of Jake Anderson, except to state that there was a "frozen body near [the] river."

56. These EMS responders were overseen by the then HCMC ambulance service Medical Director, Defendant Dr. Mahoney.

*Responsibilities and Legal Duties of HCMC ambulance service Medical Director*

57. The HCMC ambulance service Medical Director is an M.D., a licensed physician in Minnesota, having experience in, and knowledge of, emergency care of acutely ill or traumatized patients, and is familiar with and has legal responsibility for the design and operation of local, regional, and state emergency medical services systems, including Hennepin County EMS.

58. At the time of the Incident, Defendant Dr. Brian Mahoney, M.D., was the Medical Director for the HCMC ambulance services.

59. In this official role, Dr. Mahoney provided medical direction to the HCMC Ambulance Services in accordance with Minnesota Statutes, Chapter 144E and Minnesota Rules, Chapter 4690, accepting responsibility for certain responsibilities as stated in Minnesota Statutes, section 144E.265, Subdivisions 2 and 3 and as restated in

[11] *See Hennepin-EMS Report Case #{2D39C087-AA1B-4133-9E5C-43F8E4928F89}, Incident # 13072733* (12/15/2013 09:03).

the Medical Directive Statement, posted on the State of Minnesota's Emergency Medical Services Regulatory Board's website, as well as in Minnesota BLS Ambulance EMS Standard Operating Procedures Patient Care Guidelines.

60. According to the above-referenced sources, Dr. Mahoney's responsibilities as HCMC ambulance service Medical Director included, but were not limited to:

a. Approving standards for training and orientation of personnel that impact patient care.
b. Approving standards for purchasing equipment and supplies that impact patient care.
c. Establishing standing orders for pre-hospital care.
d. Approving written triage, treatment, and transportation guidelines for adult and pediatric patients.
e. Participating in the development and operation of continuous quality improvement programs including, but not limited to, case review and resolution of patient complaints.
f. Establishing procedures for the administration of drugs.
g. Maintaining the quality of care according to the above standards and procedures established.

61. Annually, Dr. Mahoney as then Medical Director, or a designee, was tasked with assessing the practical skills of each person on the HCMC ambulance service roster and signed a statement verifying the proficiency of each person. The statements are to be maintained in the ambulance services files. Based on information and belief, Dr. Mahoney or a designee verified the proficiency of Defendant Shively and HCMC paramedic Anthony VanBeusekom.

62. Dr. Mahoney, as then-Medical Director, agreed to maintain the quality of care of HCMC's emergency medical services, overseeing implementation of patient care guidelines, training and ensuring the proficiency and professionalism of the individual paramedics staffed by the County.

63. Where, as here, HCMC EMS paramedics so egregiously mishandle a patient care situation, by failing to conduct a proper medical assessment, and refusing treatment to a patient relying on their care for survival, Dr. Mahoney as then- Medical Director shares in the responsibility for such improper conduct by providing inferior training or supervision, or by vouching for the skills of a person who is not competent to handle certain patient care situations.

*Responsibilities and Legal Duties of EMS*

64. In general, when EMS arrives on the scene of a medical emergency, they are considered the highest on-scene medical authority over the City's Fire and Police Department emergency responders.[12] EMS Paramedics, including Defendant Shively, know and understand their role as the highest medical authority at the scene of a medical emergency. In short, the paramedics know that when there is a medical emergency, it is "their scene."

[12] MFD Standard Operating Procedures – 2010 Patient Care Guidelines § 9-102.01 (10/12/2010) and MPD Policy and Procedure Manual § 7-311.01 (6/3/97).

65. As the highest on-scene medical authority, and as emergency medical personnel with an absolute duty to assess and treat Jake Anderson (source of duties detailed infra), the on-scene EMS paramedics had an opportunity to reverse and correct the MFD's false declaration of Jake's death.

66. All EMS Paramedics nationwide have well-established duties to patients in the field. An essential tenet of EMS is "to do no harm." EMS professionals in Hennepin County have a ***legal duty to act***, meaning specifically:

- Responding to calls in an expeditious, but safe, manner;
- Performing a thorough assessment of both the patient and the situation;
- Providing the appropriate treatment; and
- Transporting to an appropriate receiving facility when transport is warranted.

67. Once patient contact is made, a paramedic has *an absolute duty to perform a thorough assessment and to act on the findings thereof. See Wright v. City of Los Angeles*, 219 Cal. App. 3d 318, 344, 268 Cal. Rptr. 309 (Ct. App. 1990) and *Hackman v. American Medical Response*, 2004 WL 823206 (Cal. App. 4 Dist.) (Unpublished Opinion).

68. Based on information and belief, EMS paramedics are required to perform a full and complete assessment on every patient when they respond to the scene of a medical emergency. EMS then have an absolutely duty to provide – or attempt to provide – treatment, and a legal requirement to transport patients who warrant transport to an appropriate receiving facility.

69. These duties are well-established and are derived originally from U.S. federal statute and agency regulations.

70. This well-settled statutory scheme and its promulgated regulations are considered the "gold standard" for EMT, EMS and Paramedic practices, and have been accepted and implemented nationwide and specifically adopted in Minnesota. In addition to the mandates found in federal law, Minnesota law is equally established with required actions regarding hypothermia treatment and response.

71. Based upon information and belief, this national curriculum is used at Hennepin County Medical Center which is a federally designated EMS/Paramedic Training Center, and from which the Hennepin EMS unit responding to Jake's scene, and individual Defendant Shively, were based.

72. Based upon information and belief, Minnesota accepts federal grant funding from the Emergency Medical Services Regulatory Board, which also regulates Emergency Medical Services training centers, as well as individual Emergency Medical Technician and paramedic licensing.

73. Pursuant to Hennepin County Ordinance 9 "Operation of Ambulance Services," all Hennepin County ambulance providers are subject to the standards and protocols developed and approved by the Hennepin County Emergency Medical Services Advisory Council, which includes the Advanced Life Support Protocols, and the

Standing Order on Hypothermia. (*See* Hennepin Co. Ordinance 9, Section II: Scope; and Section V: Personnel and Operating Standards.)

74. The Hennepin County EMS System Protocol 3455– Standing Order on Hypothermia (10/8/2009) instructs Hennepin EMS Paramedics to, among other mandated actions:

- Monitor the patient's cardiac rhythm.
- Assess responsiveness, breathing and pulse.
- Do a pulse check for 30-45 seconds (*clinical signs of death may be misleading)*.
- Transport for active internal rewarming **[for body temperature less than 86ºF]**
- Begin CPR (If certain criteria are met)
- For VF/Pulseless VT, defibrillate once as prescribed by current AHA ACLS guidelines.
- Obtain IV access

75. Based on information and belief, no medical assessment was performed by the Defendant EMS, including a determination of Jake's core body temperature. to even confirm whether any of the above-referenced conditions were present,

76. Thus, any conclusion that patient Anderson was dead and did not warrant medical treatment was made erroneously, prematurely and without medical authority for such a conclusion.

77. Based upon information and belief, the paramedics, including Defendant Shively, had actual knowledge of Protocol 3455 of the Hennepin County EMS System Standing Order on Hypothermia (10/8/2009) which confirms that "clinical signs of death

may be misleading," and had a legal obligation to follow its directives for responding to hypothermia patients with whom they have made contact in the field. Defendant Shively owed this duty to Jacob Anderson.

78. Based upon information and belief, paramedics on the scene, including Defendant Shively, knew or should have known at the time of their response that cold weather conditions, such as were present on the morning of December 15, 2013, can lead to moderate to severe cases of survivable hypothermia.

79. The EMS at the scene, including Defendant Shively, were complicit with and summarily accepted the MFD's conclusion that Jake Anderson was "dead on arrival", paying no heed to their own duty to perform a full and complete patient assessment, ignoring their specific knowledge regarding hypothermia victims in the field, and failing to transport Jake Anderson to the HCMC Emergency Room; thereby totally casting aside the well-established medical principle that "a patient cannot be declared dead until he is warm and dead."

80. Based upon public records related to this matter, the EMS at the scene including Defendant Shively, failed to conduct an independent assessment for patient Anderson's pulse, breath, or airway ice formation. By failing to perform these basic field assessments as required by their protocol for a hypothermia victim, the EMS paramedics had no medical basis upon which to support the MFD's finding that Jacob Anderson was "frozen indicating obvious death." EMS paramedics, including Defendant Shively, thus

collaborated with the erroneous, medically unsupported, and arbitrary conclusion that Jacob Anderson was dead on arrival, despite the known fact that Mr. Anderson was found cold in a cold environment.

81. The EMS responders, including Defendant Shively, affirmatively abandoned Jake Anderson, deprived him of his Constitutional right to life and bodily integrity, and denied his chance of survival.

82. A reasonable official would understand that abandoning a patient in serious need of emergency medical attention violates the patients rights.

83. The EMS's affirmative act of abandoning Jake Anderson is so far outside the norm and accepted standard of practice for reasonable emergency first responders, that it shocks the conscience and demonstrates a conscious disregard for Jake's constitutional right to life.

84. For otherwise healthy, fit, younger victims of cold weather exposure, such as Jake Anderson, the outlook for recovery is generally good in the absence of apnoea or circulatory arrest; the medical literature confirms that rewarming generally leads to full recovery of a hypothermia victim.[13] (Also see Hypothermia, Paragraphs 39-55, supra.)

85. Regardless of whether MFD canceled EMS response, the EMS responders' presence on the scene required the EMS responders to comply with their duties to assess, treat, provide emergency medical services and transport the patient, as necessary. The

[13] M.L. Mallet, Pathophysiology of accidental hypothermia. *Q J Med 2002*; 95:775-785.

EMS responders had an opportunity to correct the false death diagnosis at the scene, but instead, acted complicity with the MFD and chose to abandon Jake, leaving him further exposed to the cold.

86. The *Hennepin County EMS System Required Documentation Policy* (approved by the Hennepin County EMS Council 10/13/2005), states that the basic documentation required if an ambulance arrives on scene is "A description of location, the scene of events, number of persons involved, and number of persons offered medical evaluation or documentation of the persons on scene who indicate no medical evaluations were necessary." The *Hennepin County EMS System Required Documentation Policy* (10/13/2005) also requires that "Patient Contact be fully documented." 'Patient Contact' is defined, in part, as contact with "someone who has an observable injury or illness." Hypothermia is a medical emergency and thus must be treated as such.

87. Based on this local regulatory law, EMS had a duty to issue a full Patient Care Report because (a) they arrived on scene before they were canceled; and (b) there was at least one patient with an "observable injury or illness."

88. As the preceding paragraphs indicate, the EMS paramedics should have filed a full Patient Care Report in compliance with its *Required Documentation Policy* (10/13/2005). Instead, EMS filed a limited report with no patient care findings or details. In doing so, EMS failed to follow its own internal standard operating procedures in such circumstance and thereby, is a violation of a clearly established law.

89. EMS responders including Defendant Shively, had or should have had actual knowledge about the dangers of moderate to severe hypothermia during the winter in Minnesota.

90. In a similar situation, in a well-publicized case just a week earlier in Duluth, MN (on December 6, 2013) a young female college student, Alyssa Lommel, was found frozen by passersby after being exposed to dangerously low temperatures for more than 9 (nine) hours. Ms. Lommel had been dropped off at her home at about midnight, passed out and remained on the doorstep until 9:30 am the following morning. The passersby called 911. Emergency services arrived, assessed Ms. Lommel's condition, and immediately took Ms. Lommel to the hospital. Unlike Jake Anderson, Ms. Lommel survived over 9 (nine) hours of exposure to temperatures of -17 º F (minus seventeen degrees Fahrenheit) because she received proper EMS medical treatment and emergency care. (See also Exhibit 3.)

91. In another similar situation, on February 21, 2015, Justin Smith, 25, of McAdoo, PA, survived -4º F (minus 4) temperatures after 12 hours of exposure. He was found lifeless and frozen solid. He had no pulse, no blood pressure and appeared to be dead. EMS arrived, and Gerald Coleman, M.D., the emergency department physician on duty at the local hospital at the time Justin was found ordered that they perform CPR. "My clinical thought is very simple: You have to be warm to be dead," said Dr. Coleman. Mr. Smith is alive today to tell his story. Kaplan, Sarah. "Being Frozen 'to Death' Saved

This Man's Life. It Could save Others,' Too." *The Washington Post*. 20 Jan. 2015. Web. 24 Oct. 2016. (See also Exhibit 4.)

92. The conduct of the EMS paramedics, including Defendant Shively, constitutes gross negligence, as the individual responders fell deplorably below their standard of care by failing to perform a medical assessment of Jake Anderson at the scene; by failing to provide any medical treatment at all; and, by failing to transport Jake to the HCMC Emergency Room, all while possessing actual knowledge that hypothermia victims must receive immediate emergency medical care.

**Liability of Minneapolis Police Department**

93. The last emergency medical provider to arrive on scene was the Minneapolis Police Department (MPD). MPD officers arrived on scene at 8:57 a.m.

94. Arriving MPD officers noted in their reports of the incident that the Fire and EMS units were already at the scene when police units arrived.

95. Based on information and belief and public records available, the MPD officers arriving on the scene included Defendants Daniel Tyra, Shannon Miller, Dustin Anderson, Scott Sutherland, Sgt. D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Arlene Johnson and Matthew Ryan.

96. According to Police reports of the incident, HCMC paramedics and MFD cleared the scene of the "DOA" call.

97. At 9:02 a.m. MFD responders relinquished control of the scene to Defendant MPD officers. MFD then left the scene.

98. MPD on the scene notified their dispatcher that Car 710 was requested at the scene. Car 710 is called onto a scene for all suspicious deaths or homicides, mandated by MPD Policy.[14]

99. MPD officers at the scene observed Jake and reported that "it appeared this person was frozen to death."[15]

100. Based upon information and belief, MPD officers on scene permitted the EMS and Fire units to depart the scene without performing further medical assessment of patient Anderson.

101. Based upon information and belief, MPD officers on scene consented to the MFD's death declaration despite acknowledging that Jake was "frozen" and found lying on or near piles of snow.[16]

102. MPD notified the Hennepin County Medical Examiner's office of Jake's "death" at 10:30 am.

*MPD Duties*

[14] (Minneapolis Police Department Policies and Procedures § 10-109 Homicide or Suspicious Death Scene (07/17/01).
[15] See Minneapolis Police Case Number MP-13-415155, Supplement 1 of Officer D. Tyra, 12/15/13 12:33.
[16] *Id.*

103. The purpose and duty of all police department officers is to "protect and to serve" the citizens of their communities. The *MPD Policy and Procedure Manual,* § 10-108 "Death Determination" (07/17/2001) commands that it is "the primary responsibility of an officer in any situation…to take all steps necessary to preserve life" and "EMS shall be requested at the scene of an apparent death unless a physician is present or there is not even a remote possibility that the person is alive."

104. The MPD Defendants had a duty to keep EMS on the scene to provide medical assistance because there was a remote possibility that Jake was still alive; Jake had no obvious signs of death or mortal trauma; and, well-established medical principles make plain that no death determination could have been made in the circumstances in which Jake was found, absent efforts to rescue and rewarm.

105. MPD failed to direct EMS paramedics to remain on the scene and administer aid to Jake Anderson.

106. According to MPD policy, in the event of a homicide or suspicious death (which MPD confirmed when they requested Car 710), they are required to call the Hennepin County Medical Examiner's office "as soon as possible." [17] See also Minn. Stat. 390.11, which states that "all sudden or unexpected deaths and all deaths that may be due entirely or in part to any factor other than natural disease processes must be promptly reported to the coroner or medical examiner for evaluation."

[17] Id. at § 10-110 Notification of the Medical Examiner (07/17/01).

107. However, based on public records related to this matter, the MPD waited 1.5 hours after requesting car 710 before they called the Hennepin County Medical Examiner's office ("HCME").

108. The Medical Examiner's Investigation Report states that the Medical Examiner's Office received notification of the presumed 'death' at 10:30 a.m. when Defendant MPD Sgt. Karakostas telephoned the Medical Examiner's office.

**Liability of Hennepin County Medical Examiner's Office**

109. From the scene, Defendant Karakostas spoke to the Hennepin County Medical Examiner's office and reported Mr. Anderson's frozen body. Based on public records related to this matter, an authority from the Medical Examiner's office made the determination to send two death investigators to the scene.

110. Based upon public records related to this matter, the two death investigators dispatched to the scene were Carrie Notch and Colby Whitmore, neither of whom have medical degrees or medical training.

111. The two HCME death investigators arrived on scene at 11:03 a.m.

112. While at the scene, the HCME death investigators telephoned Defendant Dr. Mitchel Morey, M.D., Assistant Medical Examiner and Board Certified Forensic Pathologist with the Medical Examiner's Office, to discuss the case.

113. On this call, Defendant Morey made the cursory determination that a medical doctor's visit to the scene was not necessary, despite the fact that he knew or should have known as a Pathologist and as a medical doctor, that the condition in which Jake was found was consistent with that of a person in a state of severe hypothermia.

114. This determination that a medical doctor's visit to the scene was not necessary was in complete contravention of the medical standard of care, which is to bring a victim of severe hypothermia into the hospital to begin a medically monitored warming process.

115. Defendant Morey ignored his specialized knowledge and training, both as a Medical Doctor and as a Medical Examiner staff Pathologist, who understands the nuances of life and death, and proceeded to summarily accept what he was told by the first responders and to diagnose death, notwithstanding his knowledge as an MD and as a Pathologist.

116. Dr. Morey has actual knowledge, based on his medical training, that a severe hypothermia victim cannot be pronounced dead until he is warm dead. By treating Jake Anderson as dead, rather than as a patient who had succumbed to the effects of severe hypothermia, Defendant Dr. Morey deprived Jake of yet another opportunity to receive medical treatment and transport.

117. Instead of mandating that a medical doctor visit the scene, or ordering that Jake's body be immediately transported to the HCMC Emergency Room, Dr. Morey

permitted Jake to continue lying outside and exposed to the cold, and ultimately directed Jake's body to be placed in a body bag.

118. When Defendant Mitchel Morey, M.D., rendered his misdiagnosis of Jake's condition as death, a doctor-patient relationship was formed, even though Jake was unconscious. (Just as, when an unconscious accident victim is brought to the emergency room, not "knowingly" seeking the services of a physician. Yet, the special relationship is created when the ER doctor begins treatment. Mutual consent is implied in this type of instance.)

119. The ME's Office acted improperly and contrary to statutory and other well-settled and clearly established legal authority, by rendering a death diagnosis and effectively terminating care to Jake when he was still in need of appropriate medical care.

120. Jacob Anderson was not the first victim of severe hypothermia in the region. Minneapolis and Hennepin County's emergency responders have actual knowledge that cold weather-related deaths can occur. In the winter preceding Jake's death, exposure to the cold was a factor in 41 deaths in the State of Minnesota. Previous winters also saw dozens of hypothermia and cold weather related deaths in the state.[18] In the month of Jake's death, there was much publicity about the "polar fronts" that hit the state and the dangers they posed. The Minneapolis-St. Paul metropolitan region has been

[18] In 2009-2010, there were 31 cold weather related deaths in Minnesota. There were 24 such deaths in 2010-2011 and 13 in the winter of 2011-2012.

ranked as the coldest metropolitan region in the United States.[19] On average in the Minneapolis metropolitan region, subzero cold occurs 24-25 days each year, while subfreezing temperatures occur 151 days a year. The average December-February temperature is 18.7 degrees.

121. After performing Mr. Anderson's autopsy, the Hennepin County Medical Examiner's office reported Mr. Anderson's immediate cause of death to be hypothermia based on evidence of cold weather exposure. Defendant Dr. Mitchel Morey signed the autopsy report on February 25, 2014. The reported date and time of death: 12/15/2013, 8:48 a.m.

**The Cumulative Actions of All Defendant Responders**

122. Clearly established federal, state and local authority at the time of the Jake's tragic death provided sufficient guidance to the Defendants that their conduct in mishandling the 911 medical call regarding Jake, and refusing to provide emergency medical treatment after he was discovered, was unconstitutional.

123. The arbitrariness of leaving Jake lying in the cold, while other hypothermia victims in the state of Minnesota have been rescued and successfully resuscitated, or at least attempted to be resuscitated by emergency services workers, are striking facts when applied to Jake Anderson's case.

[19] Using 30-year average temperatures from NOAA's National Climatic Data Center.

124. With over a dozen individual emergency responders at the scene, and no apparent need for split-second decision making (i.e. Jake was not in a dangerous location calling for instantaneous action), the individual Defendants had an opportunity to deliberate about the proper course of action to be taken, and discuss what their obligations are in such a circumstance where Jake Anderson was found, cold in a cold environment, without an opportunity to exercise responsibility for his own welfare due to the continuing effects of hypothermia on his body.

125. The Defendant Responders had time to make an unhurried judgment in this situation. There was no need to make a split-second, rushed decision as to whether to declare Jake dead or to follow department protocols for assessing and treating Jacob as a victim of survivable hypothermia victim.

126. Defendant Responders knew of the potential for hypothermia in cold weather conditions, and had evidentiary support before them that Jacob was in a hypothermic state at the time of their response to the scene.

127. At all times relevant herein, Jake Anderson was in the custody of the Defendant Responders at the scene, beginning with the arrival of the MFD at 8:54 a.m.

128. The facts show that the Defendants consciously disregarded Jake and created a great risk of serious harm when they left him exposed to the cold where he was found, without providing any medical treatment and a very abbreviated medical assessment.

129. From the facts, set forth in the preceding paragraphs, it can also be determined that the Defendant Responders' conduct in this instance followed an established City and County custom of arbitrarily treating or neglecting hypothermia victims in the field. Jake Anderson was not the first hypothermia victim who was not given proper medical treatment by the City and the County's emergency response services.

130. The individual Defendants' conduct resulted from the City and County's failure to provide proper training despite a need for such training.

131. Jake Anderson was found unconscious, suffering from severe hypothermia. He could not advocate for himself. He could not request medical attention. He relied on the responding MFD, EMS and MPD and HCME Defendants to save, or attempt to save his life, which they did not do.

132. Instead the Defendant emergency responders summarily pronounced Jake dead, in complete and total contravention of their medical knowledge and their duties to provide appropriate medical assessment and response. In doing so, the Defendant Responders failed to implement their legally obligated standard operating procedures, and in particular, their respective department protocols for treating hypothermia victims.

133. The City and County Defendants improperly and arbitrarily left Jake Anderson outside in the freezing cold, despite the known risk of serious harm that could

result in refusing to treat or transport Jake as a victim of hypothermia. These actions caused his constitutional deprivation of life and bodily integrity.

134. Evidence presented in the preceding paragraphs provides a reasonable basis to presume that Jake Anderson could have survived this tragic incident if given a chance to receive the care he needed. Instead, the Responders callously failed Jake Anderson and never even attempted to resuscitate him by taking him to be rewarmed. Jake was never offered a chance to survive – despite all of the medical literature showing great success from rewarming a hypothermia victim. Instead of attempting to save Jake's life, these Defendant Responders made Jake worse off, by failing to treat him as a victim of hypothermia, leaving him exposed to the cold; and, therefore allowing Jake to die while in their custody.

## CLAIMS FOR RELIEF

### COUNT I

**42 U.S.C. § 1983 – Violation of Due Process Under the Fourteenth Amendment**
***(Against Individual MFD Defendants, the Individual EMS Defendants, the Individual MPD Defendants, Defendant Mitchel Morey, MD, and Dr. Brian Mahoney, M.D. (collectively "Defendant Responders"))***

135. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth verbatim.

136. The Due Process Clause of the Fourteenth Amendment protects individuals against deprivations of life, liberty and property by government entities.

137. This claim arises against all of the Individual MFD Defendants, all of the Individual EMS Defendants, all of the Individual MPD Defendants, Defendant Mitchel Morey, MD, and the then HCMC Ambulance Service Medical Director Defendant Brian Mahoney, M.D. (collectively "Defendant Responders") for their deliberate indifference to Jake's medical needs, which caused the deprivation of Jake's Constitutional rights to life, liberty and personal security under the Fourteenth Amendment to the U.S. Constitution.

138. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceedings for redress . . .

139. Plaintiff Trustee in this action is, and Jacob Anderson was, a citizen of the United States and all Defendants to this claim are a "person" for purposes of 42 U.S.C. § 1983.

140. The right to life is a fundamental right guaranteed by the United States Constitution and was clearly established at all times material hereto.

141. The Individual Defendant Responders at all times relevant hereto, were acting under color of state law.

142. Hypothermia is a serious medical emergency but a treatable medical condition.

143. The Defendant Responders had a duty to provide for the safety and general well-being of Jake Anderson, including protecting him from the known dangers of prolonged exposure to the cold, while he was a patient in the custody of the Defendant first responders.

144. Defendants acted with deliberate indifference to Jake's life-threatening medical needs and his serious risk of succumbing to the effects of hypothermia, by failing to treat or transport Jake after he was discovered suffering from severe hypothermia.

145. Defendants knew of and disregarded an obvious and serious risk to Jake's health and safety by discounting the signs of hypothermia and acting with reckless disregard for whether Jake's rights would be violated by the Defendants' failure to provide medical treatment to Jake.

146. The Defendant Responders established custody of Jake, a limited and defined individual victim of hypothermia, when each responder arrived at the scene of Jake's medical emergency and assumed a duty to protect and provide for Jake's safety and well-being.

147. Because Jake was in the custody of the Defendant Responders and unable to protect himself, and because he relied completely and exclusively on the Defendant Responders for protection, the Defendants had an affirmative duty to provide medical care to Jake, including providing a thorough medical assessment, pre-hospital treatment and transporting him to the nearest hospital for treatment.

148. The moment James Jason Hardy, the photographer who discovered Jake and called 911, requested police and emergency medical service, the Defendants assumed known duties to first respond to, and then assess, treat, and transport patients with emergency medical needs. The Defendants' breaches of these known duties were conducted within the scope of their official duties of employment.

149. Responders had a duty to not put Jake in a worse position than he was in before they arrived. By falsely presuming Jake was dead (when that medical determination could not be made) rather than taking him to the emergency room to be warmed, and by continuing to leave Jake exposed to the freezing temperatures, Defendants put Jake in a more dangerous position than the one in which they found him.

150. The Defendant Responders created the danger Jake was in by allowing Jake to remain exposed to the freezing temperatures, while in Defendants' custody, with no means of helping himself and with no other means of transporting himself to the hospital where he could receive medical treatment.

151. The Defendants failed to provide Jake with adequate protection against further exposure to the dangers of hypothermia, thereby depriving him of a clearly established substantive due process right to life and and bodily integrity.

152. Any reasonable emergency medical service provider would have known of these rights at the time of the complained of conduct. These rights are underscored in the

context of emergency first responders because of a responder's absolute duty to respond to emergency medical situations and provide Basic and Advanced Life Support to save patient's lives.

153. In Jake's case, rather than saving his life, the Individual Defendants took affirmative steps to put Jake at a greater risk of serious, immediate and proximate harm by increasing his vulnerability to the danger of hypothermia. Specifically, they did so by continually discarding established department protocol,[20] which require responders to thoroughly assess any patient found cold in a cold environment, and begin appropriate treatment (generally to begin CPR and rewarming efforts); the Responders collaborated in refusing and failing to transport Jake for active internal rewarming; and Responders summarily pronounced and/or accepted Jake's death declaration, contravening the well-settled medical science and, in particular, the pathophysiology of hypothermia found within the medical science and literature, a summary of which is captured in this Complaint in Paragraphs 39-55, *supra*.

154. This affirmative conduct by the Defendants, while they maintained custody of Jake and control over the scene, cut off any alternative avenue of rescue to save Jake's life.

[20] See *Hennepin County EMS System Protocol 3455*, created 10/18/2009, and in full effect December 15, 2013; *Minneapolis Fire Department Standard Operating Procedures 2010 Patient Care Guidelines §§ 9-105.01 and 9-104.03.04*, revised 10/12/2010, and in full effect December 15, 2013.

155. In a callous and cold manner and with conscious disregard for Jake's life and safety, each of the Defendant Responders abandoned Jake, leaving him exposed to the cold and increasing the danger that led to his tragic death.

156. Defendants knew or should have been aware of the below-freezing temperatures in which Jake was found; and knew or should have been aware that for hypothermic patients like Jake, clinical signs of death may be misleading, that patients cannot be declared dead if found cold in a cold environment, that a first responder cannot determine whether or not a patient's chest wall is frozen unless a proper assessment is performed, and that a proper pulse check for a victim of hypothermia requires the use of a stethoscope for a longer amount of time than for a patient whose core body temperature is in a normal range. Responders also knew or should have been aware that even when such procedures are administered at the scene, a person cannot be declared dead unless he is warm and dead and Defendants' duty to transport is still required.

157. But for the Defendants' failures to properly address Jake Anderson's medical needs and life-threatening condition, he could still be alive today.

158. The dangers and risks to Jake's life and safety were obvious, foreseeable, and known to the Defendants, who took the affirmative step of declaring Jake dead, contrary to known medical principles and stated medical and legal protocol, which drastically increased Jake Anderson's vulnerability to the danger of the cold and ultimate loss of life.

159. The Individual Defendants are not entitled to qualified immunity, as, when viewed in their totality, the numerous herein complained of actions were conscience shocking and placed Jake in serious, immediate and proximate harm.

160. The Responders engaged in these complained of actions with deliberate indifference to Jake's federally protected rights to life and bodily integrity under the Fourteenth Amendment.

161. As a direct and proximate result of Defendants' unlawful conduct, Jake was neglected and died of hypothermia brought about by unnecessary prolonged exposure to the cold, now entitling Plaintiff Trustee to seek compensatory and special damages, in amounts to be determined at trial.

162. Plaintiff is entitled to compensatory, economic, and special damages; and, punitive damages all as provided for, pursuant to 42 U.S.C. § 1983, against individual Defendants because their conduct involves reckless and callous indifference to Jacob Anderson (and successor's) federally protected rights.

163. The Defendants named in this Count subjected Jake Anderson to these deprivations of his rights in such a manner so as to render these Defendants liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

164. Plaintiff Trustee is entitled to recovery of his costs, including reasonable attorneys fees, under 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983 – Special Relationship Violations Under the Fourteenth Amendment**
***(Against Individual MFD Defendants, the Individual EMS Defendants, the Individual MPD Defendants, Defendant Mitchel Morey, MD, and Dr. Brian Mahoney, M.D.)***

165. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

166. While under the custody and care of Defendant Emergency Responders, who at all times relevant hereto, were acting under color of state law in their capacity as fire department officials, police officers, and/or emergency medical services paramedics, Jacob Anderson was in a state of severe hypothermia and unable to make decisions for himself.

167. A special custodial relationship arose and attached when Jake Anderson was in the Defendant Responders' custody and unable to seek other aid, and that special relationship created an affirmative duty to protect his life and provide him with care.

168. The factual circumstances rendering Jacob Anderson in a special relationship with Defendant Responders include the following:

- From the moment the 911 dispatcher called for emergency medical response and the Defendant MFD responders, HCMC EMS paramedics, and MPD officers responded to the scene, they individually assumed a duty directed at Jake Anderson to provide for his safety and general well-being, including performing a thorough medical assessment, and treating and transporting as necessary. In this instance, a thorough and proper medical assessment would have revealed the need to treat Jake as an emergency medical patient with severe hypothermia, necessitating transport to the HCMC Trauma and Critical Care Facility to warm him.
- Each of the Responders, at all times relevant, had actual knowledge that not acting in accordance with these duties may result in serious harm to Jake Anderson.
- The individual Defendant MFD responders, HCMC EMS paramedics, and MPD officers each came into contact with Jake Anderson. The Fire Department responders were the first to approach him, followed by the EMS paramedics, and finally the police officers who assumed control over the scene

until the Hennepin County Medical Examiner's Office took over.

- The Defendant then HCMC Ambulance Service Medical Director Dr. Brian Mahoney, M.D. by and through his responsibility for selecting appropriate emergency training to ensure quality patient care pursuant to Minn. Stat. § 144E.265, and supervisory role over all Defendant EMTs and EMS Paramedics, is responsible for the willfully indifferent conduct of these defendants.
- Defendant Dr. Mitchel Morey, by and through his responsibility as a Medical Doctor and as a Medical Examiner Staff Pathologist and, by the on-scene presence of agents of the Medical Examiner's Office attending to Jake, expressly or impliedly formed a special relationship with Jake. Because of Dr. Morey's special knowledge of the pathophysiology of hypothermia as an MD and as an ME, and understanding the nuances between life and death, deprived Jake of his right to life and bodily integrity.
- Throughout the time Defendant Responders had control of the scene, Jake Anderson was unable to advocate or make

decisions for himself. He relied on the Defendants to adequately perform their promised duties of care to protect his life and provide him with competent medical care.

169. The special relationship that existed mandated the Defendant emergency responders' constitutional duties to provide for the care, protection and safety of Jake Anderson.

170. Likewise, Defendant Dr. Mahoney, through his responsibility for managing EMS first responders and ensuring quality patient care in prehospital settings, was mandated to provide similar constitutional duties of care, protection and safety to Jake.

171. Notwithstanding that special relationship, the Defendants engaged in the following actions toward Mr. Anderson:

- Each of the Defendants affirmatively collaborated in the unjustifiable declaration that Mr. Anderson was dead on arrival.
- Defendants failed to conduct a thorough medical assessment on Jake despite evidence that individuals from each responding emergency unit took Jake Anderson into their custody at the scene:

- Upon information and belief, the EMS paramedics performed no medical assessment at all while in contact with Jake;
- Upon information and belief, the MFD responders' so-called medical assessment consisted of a pulse check and check for vital signs for so short a period of time that it would have been medically impossible to determine whether Jacob Anderson was dead or alive;
- The MPD officers did not perform a medical assessment on Jake's body, but rather took MFD's death declaration as fact and failed to keep the Paramedic response team at the scene to confirm MFD's pronouncement, despite having actual knowledge that Jake was discovered cold in a cold environment.

- Defendant Responders acted contrary to all stated protocols and guidelines – federal, state, and local – regarding emergency medical care and hypothermia patients in particular;

- Defendant responders and Dr. Morey acted contrary to well-settled medical science, including the well-established pathophysiology of hypothermia.
- Defendant Dr. Mahoney failed to properly train, supervise or otherwise properly manage all emergency responders, but especially the EMS paramedic responders.

172. As detailed above, the Individual Defendants deprived Jake of his constitutional right to life by failing to satisfy their duties of care, protection, and safety to Jake.

173. The callous unreasonableness and deliberate indifference of the Defendant Responders' actions shocks the conscience:

- Jake was young and otherwise healthy, his symptoms of hypothermia were or should have been well-known and appreciated by experienced and trained medical care providers, especially in Hennepin County – one of the coldest metropolitan regions in the United States.
- Jake was discovered a mere five minutes from Hennepin County Medical Center, the region's best Level 1 Trauma Center.
- Just one week prior to Mr. Anderson's tragic preventable death, Alyssa Jo Lommel was found suffering from severe hypothermia after nine hours of

exposure to temperatures as low as -17 (minus seventeen) degrees Fahrenheit. The medical responders in Ms. Lommel's case reasonably performed their duties of response, assessment, treatment and transport and because of their care and vigilance, she is alive today. The sad fact is, medical responders in this state seem to arbitrarily save some lives and neglect others' lives.

174. As a direct and proximate result of Defendant Responders' unlawful conduct, Mr. Anderson's medical needs were ignored and mishandled, and he died of hypothermia. Due to Defendants' reckless and grossly negligent conduct, Plaintiff Trustee is entitled to compensatory and special damages, in amounts to be determined at trial.

175. Plaintiff Trustee is entitled to compensatory, economic, and special damages; and, punitive damages against individual Defendant Responders because their conduct involves reckless and callous indifference to Jacob Anderson (and successor's) federally protected rights.

176. The Defendants named in this Count subjected Jake Anderson to these deprivations of his rights in such a manner so as to render these Defendants liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

177. Plaintiff Trustee is entitled to recovery of his costs, including reasonable attorneys fees, under 42 U.S.C. § 1988.

**COUNT III**
**42 U.S.C. § 1983 – Deliberately Indifferent Training and Supervision**
***(Against Defendants City of Minneapolis, County of Hennepin and Dr. Brian Mahoney, M.D.)***

178. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth verbatim.

179. Plaintiff Trustee in this action is, and Jacob Anderson was, a citizen of the United States and the individual Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

180. At the time of the complained of events, Jacob Anderson, now proceeding through the Plaintiff Trustee for the next of kin of Jacob Anderson, had a clearly established substantive due process right under the Fourteenth Amendment to life, liberty and bodily integrity.

181. The Due Process Clause of the Fourteenth Amendment protects individuals like Jake Anderson against deprivations of life, liberty and property by government entities.

182. Defendants City, County, and the then HCMC Ambulance Service Medical Director Dr. Brian Mahoney, M.D. knew or should have known of these rights at the time of the complained of conduct, as they were clearly established at that time.

City of Minneapolis

183. The City has a policy, custom, practice and pattern of inadequate training and supervision of its emergency response officers employed by the City's Fire and Police Departments.

184. The City's emergency and medical response personnel are tasked with expediently and competently responding to emergency calls for medical help.

185. These personnel can reasonably expect to confront situations in which their proficient response to an emergency call may be the difference between someone's life or death.

186. The individual MFD and MPD Responders named in this suit improperly handled the Jake Anderson call on December 15, 2013 by disregarding Jake's

hypothermic symptoms and prematurely pronouncing his death even though he was discovered cold in a cold environment.

187. The City of Minneapolis had actual or constructive notice that its failure to adequately train and supervise its emergency response officers in the proper assessment and treatment of hypothermia victims in the field, was substantially certain to lead to the deprivation of a person's life without due process.

188. The City knew that its emergency response officers would confront a situation involving a victim of severe hypothermia. Cold weather deaths are well-documented in the state of Minnesota, and the City of Minneapolis is no exception.

189. Regardless, the City consciously chose to disregard this inevitable harm and not alter its training program or improve the adequacy of its supervision of its employees.

190. The inadequate training of the individual MFD and MPD Responders, combined with the inadequate training of the County's EMS Responders and the personnel employed by the County Medical Examiner's Office prior to Jake's death, demonstrates a long-standing pattern of inadequate training on the part of the City with regard to emergency services personnel and their preparedness to deal with hypothermia assessment and response.

191. Prior and subsequent to Jake Anderson's death in December 2013, the City was aware that the deprivation of a citizen's life without due process was a predictable

and obvious consequence of its inadequate training of hypothermia assessment and response and negligent supervision of its emergency response employees.

192. Knowing that emergency workers in the state had a history of mishandling hypothermia calls and having specifically developed protocols for treating hypothermia victims in the field, there was an obvious need for the City to train its employees in properly applying these written protocols, including training MFD and MPD emergency response officers in how to assess and treat hypothermia victims in the field in order to prevent the tragic result of prematurely declaring a hypothermia victim dead.

193. The City showed deliberate indifference and recklessness with regard to its inadequate training and supervision of the individual MFD and MPD Responders.

194. The City's inadequate training and supervision of these individuals shows the City's conscience shocking indifference to harming its citizens who rightfully rely upon the City's emergency services.

195. The City's deliberate indifference in adequately training and supervising these individuals deprived the Andersons of Jake Anderson's life without due process.

196. Defendant City's and Defendant County's collective actions in mishandling Mr. Anderson's emergency situation, as evidenced through the incompetent response of the Defendant MFD responders, MPD officers, EMS paramedics, Dr. Mahoney, and Dr. Morey demonstrates a practice of mishandling hypothermic emergencies/Ambulance Response.

Hennepin County

197. The County has a policy, custom, pattern and practice of inadequate training and supervision of its emergency response officers employed by the County's Emergency Medical Services.

198. The County's emergency medical services personnel are tasked with expediently and competently responding to emergency calls for medical help.

199. These personnel can reasonably expect to confront situations in which their proficient response to an emergency call may be the difference between someone's life or death.

200. The individual EMS Responders named in this suit improperly handled the Jake Anderson call on December 15, 2013 by disregarding Jake's hypothermic symptoms and prematurely pronouncing his death even though he was discovered cold in a cold environment, with known symptoms of hypothermia.

201. The County had actual or constructive notice that its failure to adequately train and supervise its emergency medical response paramedics in the proper assessment and treatment of hypothermia victims in the field, was substantially certain to lead to the deprivation of a person's life without due process.

202. The County knew that its emergency response officers would confront a situation involving a victim of severe hypothermia. Cold weather deaths are well-documented in the state of Minnesota, and the Hennepin County is no exception.

203. Regardless, the County consciously chose to disregard this inevitable harm and not alter its training program or improve the adequacy of its supervision of its EMS employees.

204. The inadequate training of the individual EMS Responders, combined with the inadequate training of the City's MFD and MPD Responders, demonstrates a long-standing pattern of inadequate training on the part of the County with regard to emergency services personnel and their preparedness to deal with hypothermia assessment and response.

205. Prior and subsequent to Jake Anderson's death in December 2013, the County was aware that the deprivation of a citizen's life without due process was a predictable and obvious consequence of its inadequate training of hypothermia assessment and response, and an obvious consequence of its negligent supervision of its EMS employees.

206. Knowing that emergency workers in Hennepin County had a history of mishandling hypothermia calls, and having specifically developed protocols for treating hypothermia victims in the field, there was an obvious need for the County to train its employees in properly applying these written protocols, including training EMS paramedics in how to assess and treat hypothermia victims in the field in order to prevent the tragic result of prematurely declaring a hypothermia victim dead.

207. The County showed an arbitrary and deliberate indifference, as well as recklessness with regard to its training and supervision of the individual EMS Responders.

208. The County's inadequate training and supervision of these individuals shows the County's conscience shocking indifference to harming its citizens who rightfully rely upon the County's emergency services.

209. The County's deliberate indifference to adequately training and supervising these individuals deprived Jake Anderson's right to life.

Dr. Brian Mahoney, Then Medical Director of HCMC Ambulance Service

210. Dr. Mahoney, as the Medical Director for HCMC Ambulance Service at all times relevant to this incident, had a legally based supervisory relationship to the Emergency Medical Technicians and paramedics employed by the County.

211. It is the responsibility of the Medical Director to ensure quality patient care to citizens who rely on the services of the County's emergency medical response system.

212. The Medical Director is, and Dr. Mahoney therefore was, statutorily obligated to approve training standards for EMS personnel that impact patient care, and establish and maintain standing orders for the prehospital care of emergency patients like Jake Anderson pursuant to Minn. Stat. § 144E.265 Subd. 2.

213. The Medical Director is, and Dr. Mahoney therefore was, legally obligated to assess the practical skills of each person on the ambulance service roster, and has signed a statement verifying the proficiency of each person pursuant to Minn. Stat. § 144E.265 Subd. 3.

214. Hennepin EMS's improper handling of the Jake Anderson call was the result of improper training and negligent supervision on the part of Dr. Mahoney as Medical Director over the individual EMS paramedics.

215. Dr. Mahoney failed to properly supervise, train and instruct the individual EMS paramedics who left the scene of a hypothermic patient without assessing or treating him based on the improper assumption that he was dead.

216. Despite the fatal mishandling of Jake Anderson's call, Dr. Mahoney verified the competence of the individual Defendant EMS Responders.

217. Dr. Mahoney's grossly inadequate training and supervision of these individuals shows Dr. Mahoney's indifference to harming citizens who rely on the County's quality emergency care.

218. Quality patient care in Hennepin County demands that emergency medical responders be trained thoroughly in hypothermia assessment and treatment. It is never acceptable to leave a frozen patient helplessly lying in the cold.

219. The training program established and overseen by Dr. Mahoney was inadequate to train the EMS Responders in Jake Anderson's case in how to properly

handle a hypothermia call, and the HCMC emergency medical response employees were inadequately supervised by Dr. Mahoney.

220. Dr. Mahoney disregarded the inevitable harm that would result from mismanaging and improperly training and supervising the HCMC EMS personnel in handling hypothermia calls.

221. Dr. Mahoney's deliberate indifference in supervising and failing to train the EMS Responders deprived Jake Anderson of his right to life.

222. Defendant City's and Defendant County's collective actions in mishandling Mr. Anderson's emergency situation, as evidenced through the incompetent response of the Defendant MFD responders, MPD officers, EMS paramedics, Dr. Mahoney, and Dr. Morey demonstrates a practice of mishandling hypothermic emergencies.

223. As a direct and proximate result of the City's, County's, and Dr. Mahoney's conduct, Jake Anderson was abandoned by the emergency medical personnel who had an obligation to protect his life and who could have saved him, but instead neglected him and allowed Jake to die of exposure to the cold, entitling his next of kin to compensatory and special damages, in amounts to be determined at trial.

224. The Individual Defendants named in this Count subjected Jake Anderson to these deprivations of his rights in such a manner so as to render these Defendants liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing

standard of proof set forth in Minn. Stat. § 549.20.

225. Plaintiff Trustee is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interests and costs as allowable by federal law.

**COUNT IV**
**42 U.S.C. § 1983 – Municipal Liability for Negligent Performance of Duty by State Actor**
***(Against the Individual MFD Defendants, the Individual EMS Defendants, the Individual MPD Defendants, and Defendant Mitchel Morey, MD)***

226. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth verbatim.

227. Jake Anderson had an interest under the Due Process Clause of the Fourteenth Amendment to be free from state actions that deprived him of life, liberty, or property, including but not limited to the arbitrary mishandling of a medical emergency by state actors.

228. Defendant Responders and Defendant HCME personnel Mitchel Morey, MD directly, knowingly, proximately and intentionally failed to perform an effective medical examination of Jacob Anderson, and failed to follow established medical and professional protocols, found within a plethora of clearly established law related to the treatment of hypothermia victims like Jake Anderson.

229. Defendants collectively undertook to respond to the scene of Jake Anderson's medical emergency and had an absolute duty to properly execute their duties

and responsibilities as employees of the City and the County; specifically, they have a duty to properly and adequately provide emergency medical response according to the policies and procedures set forth by the departments that employ them.

230. By the Defendant Responders' conscious disregard, deliberate indifference and recklessness in executing its procedures for responding to the scene of a medical emergency, Jake was deprived of his right to life and chance of survival.

231. The City and the County are responsible for ensuring competent and qualified performance of the duties and responsibilities of its employees.

232. The Individual Defendants failed to properly conduct their duties when they erroneously and haphazardly pronounced Jake dead after he was discovered cold in a cold environment with known symptoms of survivable hypothermia, without any reasonable medical support for their untimely declaration of Jake's death.

233. The Defendants named in this Count subjected Jake Anderson to these deprivations of his rights in such a manner so as to render these Defendants liable for punitive damages as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

234. Plaintiff Trustee is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interests and costs as allowable by federal law.

**COUNT V**
**Gross Negligence**
***(Against all Defendants)***

235. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth verbatim.

236. Gross negligence occurs when a person "does not pay the slightest attention to the consequences, or uses no care at all."[21]

237. The conduct of the individual Defendants seamlessly captures this meaning of gross negligence. Each Individual Defendant Responder is tasked with providing competent emergency medical care, and citizens of the City of Minneapolis and Hennepin County depend on these Responders to provide quality patient care to save and protect their lives.

238. The Defendant Responders did not use any care at all by arriving on scene and allowing Jake Anderson to remain lying in the freezing cold without any attempt to rescue him, provide thorough and proper medical assessment and treatment, or transport him to a hospital to begin warming procedures to save his life.

---

[21] This standard is identified in the Minnesota Jury Instruction Guide following *State v. Chambers*, 589 N.W.2d 466, 478 (Minn. 1999) (defining gross negligence in Minnesota as the "absence of even scant care"). Minnesota Courts have also defined gross negligence as "negligence in the highest degree," *High v. Supreme Lodge* of the World, 214 Minn. 164, 7 N.W. 2d 675 (Minn. 1943), and, as "substantially and appreciably higher in magnitude than ordinary negligence." *Ackerman,* 435 N.W.2d at 840.

239. Based on the cold weather conditions at the scene, which were actually known to Defendants, and the fact that Jake's body was exhibiting known symptoms of hypothermia, each of the individual Defendants, including the MFD, MPD and EMS responders, and Dr. Morey, should have known that Jake Anderson was a victim of hypothermia and should have immediately initiated rescue and warming efforts.

240. The Defendants should never have pronounced Jake's death without warming his body, and especially without conducting a reasonably thorough medical assessment. Prematurely pronouncing Jake's death completely contravened medical literature regarding survivable hypothermia.

241. The Defendants had actual or constructive knowledge of the well-settled medical axiom that "a person is not dead until they are warm and dead," and should have knowledge of the well-established federal and local hypothermia treatment guidelines which state that "for victims of severe hypothermia, clinical signs of death may be misleading." In this instance, prematurely diagnosing and/or accepting Jake's death declaration was grossly negligent.

242. Despite the officially promulgated department policies mandating otherwise, not a single emergency responder initiated any life preserving treatment to Jake Anderson, nor was he transported to the HCMC emergency room, just five minutes from where he was found, to be re-warmed.

243. Accordingly, the Defendants demonstrated a willful neglect of duty, a callous indifference to human life, and complete disregard for their duties to Jake, who was in serious need of medical assistance in the face of a medical emergency.

244. Defendants, including the individual emergency responders and Dr. Morey, showed no regard for the consequences of leaving Mr. Anderson exposed to the cold rather than transporting him to the HCMC Trauma Center, as they either promptly left the scene or stood idly by, doing absolutely nothing to attempt to save Jake's life.

245. Based on Minnesota weather patterns and the fact that the Defendants live and work in the Minneapolis/Hennepin County region, Defendants are on substantial notice of the medical dangers posed by cold weather.[22]

246. The Defendants were all grossly negligent in falling below their standard of care to assess and treat Jake Anderson while he was in their custody and in serious need of medical response.

247. The City and County are liable for the grossly negligent conduct of the individual responders, as the responders were acting in the scope of their employment at the scene.

[22] Accordingly, emergency responders in Minneapolis should *always* recognize potential hypothermia victims when they arrive to a scene, and should *always* know that they must immediately begin treating a victim as a patient in need of advanced life support and begin protecting him/her from further heat loss, as the protocols that govern their departments legally require.

248. It was grossly negligent for the Defendants to prematurely declare Jake's death and depart the scene and/or stand idly by as Jake lay in a severe hypothermic state. The responders were individually and collectively obligated to provide emergency medical response, and instead erroneously and arbitrarily left Jake for dead.

249. As a result of the Defendants' grossly negligent conduct, Jake Anderson was deprived of his constitutional right to life and chance to survive; and ultimately died of hypothermia.

**<u>COUNT VI</u>**
**Negligent Undertaking**
***(Against all Defendants)***

250. Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as if fully set forth verbatim.

251. Defendants owed a special duty to Jake by responding to the scene and thereby undertaking to render emergency medical services necessary for the protection of Jake's life.

252. Liability is imposed if Defendants' failure to act increased the risk of harm to Jake; or harm was suffered because Jake Anderson relied on the undertaking.[23]

[23] *Walsh v. Pagra Air Taxi, Inc.*, 282 N.W.2d 567, 571 (Minn. 1979); Restatement (Second) of Torts § 324A (1965).

253. Here, the Defendants responded to the scene ostensibly to undertake to render emergency medical services necessary for the protection of Jake Anderson.

254. Defendants failed to provide medical treatment after taking control of the scene and witnessing Jake Anderson in a severe hypothermic state.

255. Defendants' negligent medical assessment fell considerably below the standard of care, and the responders' collective failure to provide necessary treatment and transport increased the risk of harm to Jake, leading to Jake's eventual death.

256. If Defendants had properly assessed Jake after responding to the scene, and initiated rescue and warming efforts pursuant to their hypothermia protocols and the emergency services they were legally obligated to provide, Jake would have at least had a chance to live and may have survived.

257. A reasonable emergency response officer would have followed through on his or her duties to provide a thorough medical assessment and provide medical treatment and transport. Defendants' failure to act once they had undertaken to provide assistance to Jake was a breach of the duty Defendants owed to Jake.

258. Jake was in the exclusive custody of the Defendant responders and had no other means of rescue. He was therefore relying on the Defendants' undertaking to provide reasonable emergency medical response.

259. By responding to the scene after being dispatched by the 911 operator, the Defendants undertook to provide emergency medical response to Jake Anderson. Once

they established control of the scene, and Jake reasonably relied on their care, Defendants deviated from their standard of care and failed to act to protect Jake's life.

260. In doing so, the Defendants breached their duty to deliver emergency medical services and thereby acted contrary to the patient care protocols governing their respective departments.

261. The City and County are liable for the negligent acts of the individual defendant responders, who were acting in the scope of their employment when responding to the scene.

262. As a result of Defendants' negligent undertaking, Jake was damaged through the deprivation of his right to life and chance to survive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendants, and each of them, as follows:

1. That this Court find that Defendants committed acts constituting violations of the Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. §1983.

2. As to Count I, a money judgment against all Individual Defendants (Then HCMC Ambulance Service Medical Director Dr. Brian Mahoney, M.D., Shana D. York, Anthony J. Buda, Raul A. Ramos, Daniel F. Shively, Mitchel Morey, MD, Daniel J. Tyra,

Shannon L. Miller, Dustin L. Anderson, Scott T. Sutherland, D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Arlene M. Johnson, Matthew T. Ryan, And John Does 2-8) for compensatory and punitive damages in the amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, and for such other and further relief as this Court deems just and proper;

3. As to Count II, a money judgment against all Individual Defendants for compensatory and punitive damages in the amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, and for such other and further relief as this Court deems just and proper;

4. As to Count III, a money judgment against Defendant City of Minneapolis, Defendant Hennepin County and Defendant Then HCMC Ambulance Service Medical Director Dr. Brian Mahoney, M.D, for compensatory damages in the amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, and for such other and further relief as this Court deems just and proper;

5. As to Count IV, a money judgment against all Individual Defendants for compensatory and punitive damages in the amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, and for such other and further relief as this Court deems just and proper;

6. As to Count V, a money judgment against all Defendants for compensatory damages in the amount to be determined by the jury, for attorney fees, interest and costs as allowed by law, for punitive damages against the individual Defendants, and for such other and further relief as this Court deems just and proper;

7. As to Count VI, a money judgment against all Defendants for compensatory damages in the amount to be determined by the jury, for attorney fees, interest and costs as allowed by law, for punitive damages against the individual Defendants,

8. Also as to Counts III and IV, appropriate injunctive relief necessary to cease the unconstitutional policies, practices, and customs described herein.

9. For such other and further relief as this Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: March 24, 2017

*/s/Robert R. Hopper*
Robert R. Hopper, Esq. (#208769)
**ROBERT R. HOPPER & ASSOCIATES, LLC**
333 South 7th Street, Suite 2450
Minneapolis, MN 55402
T: (612) 455-2199
F: (612) 455-1689
E: robert.hopper@robertrhopper.com
***Attorneys for Plaintiff***