# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **William Anderson,** <br> *As Trustee for the Next-of-Kin of Jacob William Anderson (deceased)* | **File No. 16-cv-04114 (SRN/FLN)** |
| **Plaintiff,** | |
| **v.** | |
| **City of Minneapolis; County of Hennepin; Hennepin Healthcare System, Inc.; Dr. Brian Mahoney, M.D.,** *as then-Medical Director of HCMC Ambulance Service***; Shana D. York, Anthony J. Buda, Raul A. Ramos, and John Doe individuals to be determined,** *Individual Fire Department Personnel in Their Individual Capacities***; Daniel F. Shively and John Doe individuals to be determined,** *Individual HCMC Ambulance Services Personnel in Their Individual Capacities***; Mitchel Morey, M.D.,** *Individual Medical Examiner's Personnel, in His Individual Capacity***; Daniel J. Tyra, Shannon L. Miller, Dustin L. Anderson, Scott T. Sutherland, D. Blaurat, Emily Dunphy, Christopher Karakostas, Matthew George, Joseph McGinness, Calvin Pham, Arlene M. Johnson, Matthew T. Ryan, and John Doe individuals to be determined,** *Individual Police Officers in Their Individual Capacities***,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

Robert R. Hopper, Robert R. Hopper & Associates, 333 South 7th Street, Suite 2450, Minneapolis, MN 55402, for Plaintiff.

Ivan M. Ludmer, Minneapolis City Attorney's Office, 350 South 5th Street, Room 210, Minneapolis, MN 55415, for Defendants City of Minneapolis; Individual Fire Department Personnel in Their Individual Capacities; Individual Police Officers in Their Individual Capacities: Daniel J. Tyra, Shannon L. Miller, Dustin L. Anderson, Scott T. Sutherland, D. Blaurat, Emily Dunphy, Christopher Karakostas, and Arlene M. Johnson.

Tracey N. Fussy, Minneapolis City Attorney's Office, 350 South 5th Street, Room 210, Minneapolis, MN 55415, for Defendant City of Minneapolis.

Michael B. Miller, Hennepin County Attorney's Office, 300 South 6th Street, Suite A-2000, Minneapolis, MN 55487, for Defendants County of Hennepin; Hennepin Healthcare System, Inc.; Daniel F. Shively, Individual HCMC Ambulance Services Personnel in His Individual Capacity; Mitchel Morey, M.D., Individual Medical Examiner's Personnel, in His Individual Capacity; and Dr. Brian Mahoney, M.D., as then-Medical Director of HCMC Ambulance Service.

Ann E. Walther and Erik Bal, Rice, Michels & Walther, LLP, 10 South 2nd Street NE, Suite 206, Minneapolis, MN 55413, For  Individual Police Officers in Their Individual Capacities Matthew George, Joseph McGinness, Calvin Pham, and Matthew T. Ryan.

SUSAN RICHARD NELSON, United States District Judge

This is a very tragic case. Jacob Anderson, 19 years old at the time and a student at the University of Minnesota, was found in the frigid early morning hours of December 15, 2013, lying face down, slumped over a metal rail in a remote location in Minneapolis.  The first responders declared him dead on the scene. The autopsy report states that the cause of death was hypothermia. The Plaintiff, Mr. Anderson's father and trustee for Jacob's next-of-kin, brings this lawsuit against a number of authorities and first responders, arguing that their actions in failing to take immediate measures to provide medical treatment to his son for hypothermia, including warming him, in hope that he was still alive, is actionable under 42 U.S.C. § 1983.

This matter is before the Court on: (1) a Motion to Dismiss Plaintiff's Second Amended Complaint filed by Defendants County of Hennepin ("the County"), Hennepin

Healthcare System, Inc. ("HHS"), Daniel Shively, Dr. Mitchel Morey, and Dr. Brian Mahoney (collectively, "County Defendants") (Cty. Defs.' Mot. [Doc. No. 96])[1]; (2) a Motion to Dismiss Plaintiff's Second Amended Complaint filed by Defendants City of Minneapolis ("the City"), Shana D. York, Anthony J. Buda, Raul A. Ramos, Daniel J. Tyra, Shannon L. Miller, Dustin L. Anderson, Scott T. Sutherland, D. Blaurat, Emily Dunphy, Christopher Karakostas, and Arlene M. Johnson (collectively, "City Defendants") (City Defs.' Mot. [Doc. No. 103]); and (3) identical Motions to Dismiss Plaintiff's Second Amended Complaint filed by Minneapolis Park and Recreation Board ("MPRB") Defendants Joseph McGinness and Calvin Pham [Doc. No. 108], and Mathew Ryan and Mathew George [Doc. No. 123]. Although this Court has great sympathy for Jacob's family, for the reasons set forth below and as detailed herein, these motions must be granted.

## I.      BACKGROUND

### A.  Factual Background

This Court assumes—as it must when evaluating a facial attack to jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and when ruling on a motion to dismiss under Rule 12(b)(6)—that all facts pleaded in the complaint are true. *See Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008); *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015); *see also infra*, Sections II.A.1 and II.B.1.

---

[1] The County Defendants submitted a letter after filing their Motion, clarifying that the Motion was brought on behalf of Mahoney as well, even though his name was inadvertently omitted from the briefing. (*See* Letter to District Judge [Doc. No. 102].)

In the early morning hours of December 15, 2013, a passerby found then 19-year-old Jacob Anderson ("Anderson") lying face down, slumped over a metal rail in a remote location near a bridge in Minneapolis, Minnesota. (Second Am. Compl. [Doc. No. 86] at 11, ¶ 35.)[2] It was a very cold morning, with some reports indicating a wind chill temperature of -15° Fahrenheit. (*Id.* at 11, ¶ 34.) The circumstances of how Anderson arrived at this location are unknown. (*Id.* at 11, ¶ 37.) The night before, on December 14, he attended an "ugly sweater party" with his friends, fellow University of Minnesota students. (*Id.* at 10, ¶ 32.) Although Anderson was seen leaving the party at around 11:15 p.m., he did not return to his University of Minnesota dormitory that night. (*Id.* at 10–11, ¶¶ 32–33.)

After spotting Anderson, the passerby called 911. (*Id.* at 11, ¶ 38.) The 911 dispatcher sent to the scene the Minneapolis Fire Department ("MFD"), Hennepin County Medical Center ("HCMC") Ambulance Services/Emergency Medical Services, and the Minneapolis Police Department ("MPD"). (*Id.*) What followed was a succession of responses by emergency personnel from the County, the City, and the MPRB that form the basis of this suit.

MFD was the first to arrive on the scene at 8:54 a.m. (*Id.* at 16, ¶ 18.) Responders from the MFD included Defendants York, Buda, and Ramos (collectively, "Individual MFD Defendants"). (*Id.*) At least some of the Individual MFD Defendants were certified Emergency Medical Technicians who provide prehospital emergency medical care and transportation for patients who access emergency medical services. (*Id.* at 17, ¶ 19 & n. 6.)

---

[2] The Second Amended Complaint utilizes paragraph numbers 1–38 twice. To avoid confusion, citations to paragraphs within that range contain a page number as well.

According to a witness on the scene, the Individual MFD Defendants assessed Anderson by conducting "a mere 30 second pulse check at his wrist, which was frostbitten and cold to the touch." (*Id.* at 17, ¶ 20.) After this assessment, MFD pronounced Anderson "dead on arrival." (*Id.*) The time was 8:57:24 a.m.—only three and a half minutes after MFD arrived on the scene. (*Id.* at 17, ¶ 21.)

The incident report that MFD prepared provides additional details. The report indicates that no "BLS," or basic life support, was provided. (*Id.* at 17, ¶ 24.) The report also states that Anderson "had no pulse and no breathing and was frozen indicating obvious death." (*Id.* at 17, ¶ 23.) It also indicates that the ambulance was "cancelled" at 8:57:24 a.m., and that police were called "per protocol." (*Id.* at 17, ¶¶ 22–23.)

At 8:56 a.m., about a minute and a half before MFD declared Anderson as "dead on arrival" and cancelled ambulance services, an HCMC ambulance unit arrived on the scene.[3] (*Id.* ¶¶ 47, 53.) The HCMC responders included Defendant Shively and Anthony A. Van Beusekom (collectively "Individual HCMC Defendants").[4] (*Id.* ¶ 48.) When they arrived, Shively and Van Beusekom walked from the ambulance to Anderson's location and back to the ambulance again, but did not medically examine or assess Anderson or provide him with medical treatment. (*Id.* ¶ 52.) These Defendants "did not conduct their own assessment of [Anderson's] condition, or check for vital signs or core body temperature," or check for

---

[3] It is unclear why, after HCMC had already arrived on the scene, MFD cancelled ambulance services. (*See* Second Am. Compl. 17, ¶ 23.)

[4] Despite being mentioned in the body of the Second Amended Complaint, Van Beusekom is neither listed on the cover page nor described in the "Parties" section. (*See id.* at 3–9, ¶¶ 1–27.) He also does not appear as a party in ECF.

"pulse, breath, or airway ice formation." (*Id.* ¶ 54.) The Individual HCMC Defendants remained on the scene for approximately two minutes. (*Id.* ¶ 51.) After the incident, Shively prepared a report, which states that the HCMC ambulance had been "cancelled by other units on the scene." (*Id.* ¶ 55.) The report further states that there was a "frozen body near [the] river." (*Id.*) The Individual HCMC Defendants are overseen by the HCMC ambulance service Medical Director, who at that time was Defendant Mahoney. (*Id.* ¶ 56.)

The last of the emergency responders to arrive were from the MPD and MPRB. (*Id.* ¶ 93.) These responders, who arrived at 8:57 a.m., included Defendants Tyra, Miller, Anderson, Sutherland, Blaurat, Dunphy, Karakostas, and Johnson (collectively "Individual MPD Defendants"), as well as MPRB Defendants George, McGinness, Pham, and Ryan.[5] (*Id.* ¶ 95.) Shortly after these Defendants arrived, MFD "relinquished control of the scene" and left. (*Id.* ¶ 97.) MPD then called for a "Car 701," which must be requested to the scene when the incident involves a suspicious death or homicide. (*Id.* ¶ 98.) About an hour and a half later, at 10:30 a.m., MPD also notified the Hennepin County Medical Examiner's Office ("Medical Examiner's Office") of Anderson's death. (*Id.* ¶ 102.)

Upon being notified, the Medical Examiner's Office sent two death investigators to the scene. (*Id.* ¶ 109.) Once on the scene, these investigators called the Assistant Medical Examiner, Defendant Morey, to discuss the case. (*Id.* ¶ 112.) Morey is a medical doctor and a board-certified forensic pathologist. (*Id.*) On this call, Morey determined that a medical

---

[5] Although the Second Amended Complaint lists George, McGinness, Pham, and Ryan as MPD officers, (*see id.* ¶ 95), these Defendants aver that they are actually employed by the MPRB, (*see* McGinness & Pham's Mem. [Doc. No. 112] at 2 n.2; Ryan & George's Mem. [Doc. No. 126] at 2 n.2).

doctor's visit to the scene was not necessary, and the Medical Examiner's Office took no further action while the investigators were on the scene. (*Id.* ¶ 113.)

Eventually, the Medical Examiner's Office performed an autopsy on Anderson's body. (*Id.* ¶ 121.) The autopsy report, which was signed by Morey, indicates that Anderson's immediate cause of death was hypothermia. (*Id.*) The date and time of death are listed as December 15, 2013, 8:48 a.m. (*Id.*)

On the basis of the aforementioned facts, the present action was initiated.

## B. Procedural Background

### 1. Plaintiff's Complaints

On December 8, 2016, a few days short of the three-year anniversary of Anderson's death, Anderson's parents, William Anderson ("William") and Kristi Anderson ("Kristi"),[6] filed the First Complaint against the various entities and individuals who responded to Anderson's death. (*See* First Compl. [Doc. No. 1] ¶¶ 4–30.) In addition to listing William and Kristi as plaintiffs in their individual capacities, the First Complaint also listed William in his capacity as personal representative of Anderson's estate. (*Id.* ¶¶ 1–3.) Though not relevant here, that First Complaint alleged one count under federal law and twelve counts under state law. (*Id.* ¶¶ 92–251.)

On March 9, 2017, by then more than three years and two months after Anderson's death, William was appointed trustee for the next-of-kin of Anderson. (Second Am. Compl. at 3, ¶ 1.) On March 24, 2017, the First Amended Complaint was filed, now listing as sole

---

[6] This Court always prefers to refer to litigants by their last names. However, because Jacob Anderson is referred to as "Anderson" throughout this Order, his parents William and Kristi Anderson will be referred to by their first names to avoid confusion.

plaintiff William in his capacity as trustee. (*See* First Am. Compl. [Doc. No. 43] ¶ 1.) On April 19, 2017, William filed a Second Amended Complaint, again in his capacity as trustee. (*See* Second Am. Compl.) That is now the operative pleading in this case, and it is in his capacity as trustee for Anderson's next-of-kin that William is referred to as "Plaintiff" throughout this Order.

The Second Amended Complaint alleges six counts under federal and state law. As the underlying basis for all claims is Defendants' alleged failure to recognize Anderson as a severe hypothermia victim and to render the medical help that Plaintiff alleges might have saved Anderson's life. The Second Amended Complaint generally alleges that Defendants "summarily pronounced [Anderson] dead, in complete and total contravention of their medical knowledge and their duties to provide appropriate medical assessment and response." (*Id.* ¶ 132.) Plaintiff alleges that this constitutes a failure to implement Defendants' "legally obligated standard operating procedures, and in particular, their respective department protocols for treating hypothermia victims." (*Id.*)

Counts I through IV allege violations under 42 U.S.C. § 1983 ("§ 1983"). (*See id.* ¶¶ 135–234.) Count I alleges a violation of Due Process under the Fourteenth Amendment. (*Id.* ¶ 135–64.) This Count alleges that the Individual MFD, HCMC, MPD and MPRB Defendants, as well as Morey and Mahoney, were deliberately indifferent to Anderson's life-threatening medical needs, which caused the deprivation of Anderson's constitutional rights to life, liberty, and personal security under the Fourteenth Amendment. (*See id.*) Count II, asserted against these same Defendants, alleges "special relationship" violations under the Fourteenth Amendment. (*See id.* ¶¶ 165–77.) Plaintiff claims that "a special

custodial relationship arose and attached when Jake Anderson was in [these Defendants']
custody and unable to seek other aid," and that such "special relationship created an
affirmative duty to protect [Anderson's] life and provide him with care." (*Id.* ¶ 167.)

Count III is asserted against the City, the County, and Mahoney, and alleges
deliberately indifferent training and supervision. (*See id.* ¶¶ 178–225.) Plaintiff claims that
the City "has a policy, custom, practice and pattern of inadequate training and supervision"
of the emergency response personnel employed by MFD and MPD. (*Id.* ¶ 183.) Plaintiff
claims that the County also has a policy, custom, pattern, and practice of inadequate training
and supervision of its emergency response personnel. (*Id.* ¶ 197.) Count III also makes
claims against Mahoney, alleging that HCMC's "improper handling" of Anderson was the
result of his improper training and negligent supervision of the Individual HCMC
Defendants as then-Medical Director. (*Id.* ¶ 214.)

Count IV alleges municipal liability for negligent performance of duty by a state
actor and is asserted against the Individual MFD, HCMC, MPD and MPRB Defendants as
well as Morey. (*See id.* ¶¶ 226–34.) This Count alleges that these Defendants "failed to
properly conduct their duties when they erroneously and haphazardly pronounced
[Anderson] dead after he was discovered cold in a cold environment with known symptoms
of survivable hypothermia, without any reasonable medical support for their untimely
declaration of [Anderson's] death." (*Id.* ¶ 232.)

Counts V and VI allege claims under state law against all Defendants. Count V
asserts gross negligence, alleging that Defendants should have known that Anderson was
the victim of hypothermia based on their extensive medical training, and that their failure to

provide Anderson with medical treatment contravened established medical standards for treating survivable hypothermia. (*Id.* ¶¶ 238–40.) Finally, Count VI alleges negligent undertaking, claiming that a special duty arose when Defendants undertook to render emergency medical services to Anderson, and that Defendants breached this special duty by failing to render any such emergency medical assistance. (*Id.* ¶¶ 255–57.)

### 2. Defendants' Motions to Dismiss

On May 16, 2017, the County Defendants filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. The County Defendants argue that this Court lacks subject matter jurisdiction over the entire case because Plaintiff failed to comply with the requirements of Minnesota's wrongful death statute, Minn. Stat. § 573.02, which they argue governs all of his claims. (*See* Cty. Defs.' Mem. [Doc. No. 98] at 9–13.) According to the County Defendants, that statute required Plaintiff to be appointed trustee within three years of Anderson's death. (*Id.*) Thus, because Plaintiff failed to comply with that requirement, they argue that he lacks standing to sue. (*Id.*) In the alternative, the County Defendants also move to dismiss under Rule 12(b)(6), arguing that Plaintiff has failed to properly plead his claims, and that, in any event, they are entitled to immunity. (*See id.* at 15–31.)

On May 17, 2017, the City Defendants also filed a Motion to Dismiss under Rules 12(b)(1) and 12(b)(6). Although the City Defendants frame their arguments slightly differently, like the County Defendants, they argue that this Court lacks subject matter jurisdiction because Plaintiff "failed to bring the lawsuit within three years of Anderson's death, a condition precedent under Minnesota's wrongful death statute, Minn. Stat.

10

§ 573.02." (*See* City Defs.' Mem. [Doc. No. 105] at 1–2, 7–11.) In the alternative, the City Defendants also argue that Plaintiff's claims must be dismissed under Rule 12(b)(6) because the Second Amended Complaint "fail[s] to assert sufficient facts to establish negligence or a constitutional deprivation," (*id.* at 2, 12–23), and because Plaintiff's claims are barred by various doctrines of immunity, (*see id.* at 12–15).

On May 17, 2017, Defendants McGinness and Pham also moved to dismiss the Second Amended Complaint under Rules 12(b)(1) and 12(b)(6). In a footnote, McGinness and Pham indicated that Defendants George and Ryan would join their Motion if Plaintiff timely served George and Ryan. (McGinness & Pham Mem. at 2 n.2.) On June 21, 2017, Defendants George and Ryan filed a Motion to Dismiss, and a Memorandum in Support, that is identical to the one filed by McGinness and Pham. (*Compare* McGinness & Pham Mem., *with* George & Ryan Mem.) Accordingly, the Court will address these four Defendants' arguments collectively—referring to Defendants as the MPRB Defendants— but will only cite to McGinness and Ryan's briefing.

Like the County and City Defendants, the MPRB Defendants argue that this Court should dismiss the Second Amended Complaint because "Plaintiff failed to secure appointment as a wrongful death trustee within the three-year statute of limitations period," and as such lacks standing to assert any of the claims in this action. (McGinness & Pham Mem. at 7.) And again like the City and County Defendants, the MPRB Defendants argue that the Second Amended Complaint fails to state a claim upon which relief may be granted, and that even if it did, immunity bars the claims. (*See id.* at 7–15.)

## II.    DISCUSSION

Defendants' Rule 12(b)(1) Motions to Dismiss implicate subject matter jurisdiction, so this Court will consider them first. *See Frey v. City of Herculaneum*, 44 F.3d 667, 670 (8th Cir. 1995) ("We may not consider the parties' arguments as to whether the complaint states a cause of action until we have determined whether the plaintiffs have standing to recover under section 1983."); *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) ("Federal jurisdiction is limited by Article III of the Constitution to cases or controversies; if a plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction.").

### A.  Rule 12(b)(1) Motions

#### 1.  Standard of Review

Federal courts deciding a Rule 12(b)(1) motion must distinguish between a "facial attack" and a "factual attack" to jurisdiction. *Branson*, 793 F.3d at 914. Here, the parties bring a facial attack to jurisdiction, so "the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* (quoting *Osborn* , 918 F.2d at 729 n. 6). On a motion to dismiss under Rule 12(b)(6), this Court "accept[s] as true the non-moving party's factual allegations and grant[s] the non-moving party all reasonable inferences from the pleadings." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 981 (8th Cir. 2008).

Because Plaintiff's federal and state law claims implicate different issues, the Court will address them separately.

## 2.  Jurisdiction over § 1983 Claims

Defendants argue that this Court lacks subject matter jurisdiction over Plaintiff's § 1983 claims because he failed to comply with the requirements set forth in Minnesota's survival and wrongful death statutes, Minn. Stat. §§ 573.01–.02. (*See* Cty. Defs.' Mem. at 9–13; City Defs.' Mem. at 7–11; McGinness & Pham Mem. at 5–7.)[7] Specifically, Defendants contend that those statutes "govern" even his § 1983 claims and required him to bring this action in his capacity as trustee within three years of Anderson's death. (*See* City Defs.' Mem. at 7–11.) Because he failed to do so, Defendants argue, he lacks standing to sue. (*Id.*) In essence, Defendants' position calls for this Court to consider the extent to which it must look to Minnesota's survival law to determine whether it has jurisdiction over Plaintiff's federal claims.

The Supreme Court has repeatedly recognized that there are certain gaps in federal civil rights law. To fill those gaps, 42 U.S.C. § 1988 ("§ 1988") instructs courts "to turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are "not inconsistent with the Constitution and laws of the United States.'" *Robertson v. Wegmann*, 436 U.S. 584, 588 (1978) (alteration in original) (quoting 42 U.S.C. § 1988). One of the gaps in federal law relates to the survival of civil rights actions under § 1983. *Id.* at 589. In *Robertson v. Wegmann*, the Supreme Court held that under § 1988's "borrowing" mandate, "state statutory law, modifying the common law, provides the principal reference point in determining survival of civil rights actions" so long

---

[7]  As stated above, although Defendants frame their arguments slightly differently, in effect, their position is the same.  Accordingly, the Court addresses their Motions collectively, but will cite primarily to the City Defendants' Memorandum.

as that state law is not inconsistent with the Constitution or federal law. *Id.* at 589–90 (footnote omitted). In that case, the Supreme Court concluded that a Louisiana federal district court should have looked to Louisiana state survival law to determine whether an existing § 1983 action survived the plaintiff's death, and, if so, who would be the proper party to continue prosecuting the action. *Id.* at 590–92.

The Eighth Circuit has consistently construed *Robertson* as requiring federal courts to apply state law to determine "who" may bring a § 1983 action upon the death of the injured party. For example, in *Andrews v. Neer*, the Eighth Circuit stated:

> Under § 1983, state actors who infringe the constitutional rights of an individual are liable to the party injured. The appropriate plaintiff is obvious when a party survives his injuries, but the language of § 1983 makes no mention of permissible plaintiffs when the injured party dies. . . . [I]n this situation we look to state law to determine who is a proper plaintiff, as long as state law is not inconsistent with the Constitution or federal law.

253 F.3d 1052, 1056 (8th Cir. 2001) (internal citations and quotation marks omitted) (citing *Robertson*, 436 U.S. at 588–90). In that case, the Eighth Circuit considered whether a daughter could bring a § 1983 action arising out of the death of her father. *Id.* at 1056–58. The relevant Missouri wrongful death statute provided that "the spouse or children or the surviving lineal descendants" could sue for damages when injuries sustained by the decedent caused the decedent's death. *Id.* at 1058 (quoting Mo. Rev. Stat. § 537.080). The Eighth Circuit held that "[it] look[s] to Missouri's wrongful death statute solely for the purpose of establishing whether Andrews[,] [the decedent's daughter,] ha[d] standing to bring th[e] § 1983 action." *Id.* at 1058 n.4. The Eighth Circuit held that the Missouri wrongful death statute gave "Andrews standing as an individual to assert an action for

14

personal injuries to her father resulting in his death," and as such she "ha[d] standing to bring th[e] § 1983 action." *Id.* at 1058. Similarly, in *Williams v. Bradshaw*, the Eighth Circuit considered whether the plaintiff had standing to bring § 1983 claims arising out of her mother's death. 459 F.3d 846, 847–49 (8th Cir. 2006). The Eighth Circuit noted that "[u]nder Arkansas law a wrongful-death action may be brought only by a personal representative or, if there is no personal representative, by the decedent's heirs at law." *Id.* at 848 (citing Ark. Code. Ann. § 16-62-102(b)). Accordingly, the Eighth Circuit concluded that the plaintiff lacked standing to file her original complaint because she was not a personal representative and had not included as plaintiffs all of the decedent's heirs. *Id.* at 849.

These cases clearly counsel that this Court must look to Minnesota's survival and wrongful death statutes solely for the purpose of ascertaining "who" may bring a § 1983 action under the circumstances of this case. Minn. Stat. § 573.01 provides that "[a] cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02." Minn. Stat. § 573.02 ("§ 573.02"), in turn, provides that a duly-appointed trustee may bring two types of actions. Subdivision 1, titled "Death action," provides in relevant part that

> When death is caused by the wrongful act or omission of any person . . . , *the trustee* appointed as provided in subdivision 3 may maintain an action therefor if the decedent might have maintained an action, had the decedent lived, for an injury caused by the wrongful act or omission.

Minn. Stat. § 573.02, subdiv. 1 (emphasis added). Similarly, subdivision 2, titled "Injury action," provides that

> When injury is caused to a person by the wrongful act or omission of any person . . . and the person thereafter dies from a cause unrelated to those injuries, *the trustee* appointed in subdivision 3 may maintain an action for special damages arising out of such injury if the decedent might have maintained an action therefor had the decedent lived.

Minn. Stat. § 573.02, subdiv. 2 (emphasis added). Because this statutory scheme gives a trustee standing to bring claims sounding in wrongful death, personal injury on behalf of the decedent, or both, under *Robertson* and its progeny, that trustee also has standing to bring § 1983 claims. Here, Plaintiff was appointed trustee for Anderson's next-of-kin by a judge in Hennepin County, and thus this Court holds that he has standing to bring the § 1983 claims.

Defendants would have this Court reach a different conclusion, but their arguments are unavailing. They turn this Court's attention to the three-year statute of limitations for wrongful death actions under § 573.02, subdivision 1. (*See* City Defs.' Mem. at 7–11.) In relevant part, that subdivision provides that "[a]n action to recover damages for a death caused by the alleged professional negligence of a physician . . . [or his or her employee] shall be commenced within three years of the date of death," and that "[a]ny other action under this section," except one arising from murder, "may be commenced within three years after the date of death provided that the action must be commenced within six years after the act or omission." Minn. Stat. § 573.02, subdiv. 1. Defendants assert that as interpreted by Minnesota state courts, the statute's three-year suit-commencement period is not an ordinary statute of limitations, but rather a "separate jurisdictional condition precedent on wrongful death actions" that functions to deprive Plaintiff of standing in this case. (*See* City Defs.' Mem. at 8.)

In support of their position, Defendants primarily rely on the Minnesota Supreme Court case of *Ortiz v. Gavenda*, 590 N.W.2d 119 (Minn. 1999) (en banc). In *Ortiz*, the Minnesota Supreme Court considered whether the amendment and relation back principles generally applicable to pleadings applied to wrongful death claims brought under § 573.02. 590 N.W.2d at 120. In that case, the plaintiff brought a wrongful death action against the parties involved in a vehicle collision that resulted in her husband's death. *Id.* The plaintiff filed her original complaint less than two years after the death of her husband, but did not obtain trustee status until more than three years had elapsed since his death. *Id.* at 120–21. After her appointment as trustee, the plaintiff sought to amend her original complaint to reflect the appointment, and because the statute of limitations had run, she argued that the amendment should relate back to the date of the original complaint. *Id.* at 121. The Minnesota Supreme Court disagreed. The court noted that "the limitation provisions in a statutorily created cause of action are jurisdictional, requiring dismissal for failure to comply," and not subject to any exceptions. *Id.* at 122. The court held that because the plaintiff had not filed her original complaint in her capacity as trustee, that initial complaint was a "legal nullity," and thus nothing existed to which the attempted amendment could "relate back." *Id.* at 123 (quoting *Regie de l'assurance Auto. du Quebec v. Jensen*, 399 N.W.2d 85, 92 (Minn. 1987)). The plaintiff's claims were thus time-barred. The Minnesota Supreme Court concluded by noting that for over 100 years, it has consistently interpreted "Minn. Stat. § 573.02's time limit as a strict condition precedent to maintaining a wrongful death action." *Id.*

While *Ortiz* and related cases are relevant to Plaintiff's ability to bring his state law claims, *see infra*, they are not dispositive of this Court's analysis of § 1983 standing. The opening paragraph of *Ortiz* expressly states that its review is limited to whether principles associated with *statutes of limitations*—amendment and relation back—apply to the wrongful death statute. 590 N.W.2d at 120. This issue is wholly distinct from standing. *See Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 490 (8th Cir. 2004) ("Generally, courts apply the relation-back doctrine with reference to statutes of limitations.").[8] *Ortiz* is thus inapposite, because as explained above, *Andrews*, *Williams*, and related cases indicate that courts borrow from state survival law only to determine "who" may assert § 1983 claims arising from another's death. *See, e.g.*, *Archer v. Preisser*, 723 F.2d 639, 640 (8th Cir. 1983) (per curiam) (concluding that Iowa law granted standing to bring a survival action only to the legal representative or successor in interest of the deceased, and thus a guardian for the decedent's children did not have standing to bring a § 1983 action).

In fact, in a highly relevant case, the Eighth Circuit recently considered whether a father appointed as a special administrator of his deceased son's estate could bring a § 1983 action in Minnesota. *Estate of Guled v. City of Minneapolis*, 869 F.3d 680 (8th Cir. 2017). The Eighth Circuit held that he could not, as he was not a wrongful death trustee under

---

[8] That Minnesota courts label compliance with the three-year statute of limitations a "strict condition precedent" to bringing suit is of no consequence. "The fundamental aspect of standing is that it focuses on *the party* seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. . . . In other words, when standing is placed in issue in a case, the question is whether the *person* whose standing is challenged is a *proper party* to request an adjudication of a particular issue . . . ." *Flast v. Cohen*, 392 U.S. 83, 99–100 (1968) (emphasis added).

18

§ 573.02. *Id.* at 683–85. The Court held that "[t]he wrongful death statute—not the probate statute—governs § 1983 standing." *Id.* at 684 (citing *Robertson*, 436 U.S. at 589). The Court went on to hold that "only a person who has standing to bring a claim under § 573.02 has standing to bring a § 1983 action," and because the plaintiff was not a wrongful death trustee under § 573.02, he did not have standing to pursue a § 1983 claim. *Id.* Although the Eighth Circuit did not have occasion to consider the relevance of § 573.02's three-year statute of limitations to the case, nothing in its analysis indicates that this issue would have been relevant to the issue of § 1983 standing. In fact, the court noted that "[b]ecause the three-year statute of limitations on [plaintiff's] Minnesota wrongful death claim had expired, [he] (through counsel) filed a complaint in federal district court under 42 U.S.C. § 1983." *Id.* at 683. Albeit stated in dictum, this shows the distinct difference between a wrongful death *state* action and a § 1983 suit.[9] The *Guled* court plainly stated that "[a]s a trustee, [plaintiff] would have standing to pursue a § 1983 claim." *Id.* at 685. In short, neither in *Guled* nor in any other precedent has the Eighth Circuit indicated that state survival law is relevant for anything other than ascertaining *who* may assert a § 1983 claim after a decedent's death. Stated more broadly, this Court finds no support in federal case law

---

[9] Significantly, if the three-year suit commencement period implicated federal subject matter jurisdiction, as Defendants contend, the Eighth Circuit could have raised the issue *sua sponte*. A "court has a special obligation to consider whether it has subject matter jurisdiction in every case. This obligation includes the concomitant responsibility to consider *sua sponte* [the court's subject matter] jurisdiction . . . where . . . [the court] believe[s] that jurisdiction may be lacking." *Hart v. United States*, 630 F.3d 1085, 1089 (8th Cir. 2011) (alterations in original) (internal citations and quotations omitted).

for Defendants' proposition that courts deciding a § 1983 action should defer to a state's rules regarding the statute of limitations contained in its wrongful death statute.

And for good reason. It is well established that courts borrow from an entirely different state statute to determine the limitations period applicable to § 1983 claims. *Wilson v. Garcia*, 471 U.S. 261, 266 (1985), *superseded by statute on other grounds by* 28 U.S.C. § 1658(a) *as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 377–81 (2004). In *Wilson v. Garcia*, noting the absence of federal law containing a specific statute of limitations for § 1983 actions, the Supreme Court interpreted § 1988's borrowing mandate as a "directive to select, in each State, the *one* most appropriate statute of limitations for *all* § 1983 claims." *Id.* at 275 (emphasis added). And concluding that Congress "would have characterized § 1983 as conferring a general remedy for injuries to personal rights," the *Wilson* Court held that "§ 1983 claims are best characterized as personal injury actions" for statute of limitations purposes. *Id.* at 278–80.

A few years after *Wilson*, the Supreme Court considered which statute of limitations would apply to § 1983 claims in states with multiple statutes of limitations for personal injury actions. *Owens v. Okure*, 488 U.S. 235 (1989). In *Owens v. Okure*, the Supreme Court held that in such a case, courts should borrow "the residual or general personal injury statute of limitations" of the forum state. *Id.* at 236. Thus, as the Eighth Circuit has repeatedly recognized, under *Wilson* and *Owens*, *all* § 1983 actions filed in Minnesota are subject to the six-year statute of limitations contained in the state's personal injury statute, Minn. Stat. § 541.05, subdivision 1(5). *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618

n. 3 (8th Cir. 1995); *see also Anunka v. City of Burnsville*, 534 F. App'x 575, 576 (8th Cir. 2013) (per curiam).

Notwithstanding *Wilson* and *Owen*'s clear directives that the statute of limitations applicable to all § 1983 claims filed in Minnesota is six years, and that this period has not yet expired, Defendants urge this Court to hold that Plaintiff's federal claims are time-barred. In an attempt to reconcile their position with *Wilson* and *Owens*, Defendants argue that Minnesota's wrongful death statute "retains" the proper six-year statute of limitations, so "[it] continues to apply here, together with the condition precedent for bringing wrongful death suits within three years of death." (City Defs.' Reply [Doc. No. 131] at 17.) The critical flaw in Defendants' arguments is that they ask this Court to apply Minnesota's survivorship and wrongful death law to § 1983 cases *wholesale*. (*See id.* at 16 ("If 'state survival statutes govern survival of personal injury actions,' then Minnesota's survival statute bars this action because Plaintiff attempted to bring it as trustee more than three years after Plaintiff's death." (quoting *Andrews*, 253 F.3d at 1056–57)); *id.* at 17 ("[T]his Court should apply Minnesota's survivorship law to § 1983 cases.").) That is not the law. Under *Guled*, *Andrews*, *Williams*, and related cases, this Court must look to Minnesota's survival law only for the purposes of determining standing, or "who" may bring § 1983 claims after a decedent's death.[10] And under *Wilson* and *Owens*, this Court looks to Minnesota's personal-injury statute to determine the statute of limitations period that applies

---

[10] After the Eighth Circuit issued the *Guled* opinion, Defendants filed a letter arguing that it supported their position. (Defs.' Letter to the District Judge [Doc. No. 134]; *see also* Pl.'s Letter to the District Judge [Doc. No. 135].) For the reasons already described, *Guled* does not support Defendants' position.

to those actions.[11] The Eighth Circuit has followed this approach in numerous cases decided after *Wilson*. *See, e.g.*, *DeVries v. Driesen*, 766 F.3d 922, 923 (8th Cir. 2014) ("In *Wilson v. Garcia*, the Supreme Court held that the state statute of limitations for personal injury torts was the appropriate period of limitations for *all* § 1983 cases." (emphasis added)); *Ketchum v. City of W. Memphis*, 974 F.2d 81, 82 (8th Cir. 1992) ("[T]he Supreme Court held that § 1983 claims . . . are to be governed by th[e] state's general personal-injury statute of limitations, not by particular state statutes covering particular torts.").

It should also be noted that Defendants' position is contrary to *Wilson*'s objectives of furthering the "federal interests in uniformity, certainty, and the minimization of unnecessary litigation." 471 U.S. at 275. Were this Court to adopt Defendants' arguments and defer to the rules established by Minnesota courts regarding the statute of limitations applicable to § 573.02 suits, § 1983 actions to recover damages for wrongful death would be subject to different limitations periods depending on the facts of the case. For instance, although Minnesota law provides that most actions for wrongful death must be brought within three years of the decedent's death, cases involving murder are subject to an exception. *See Huttner v. State*, 637 N.W.2d 278, 283 (Minn. Ct. App. 2001). This "murder exception" provides that "[a]n action to recover damages for a death caused by an intentional act constituting murder may be commenced at any time after the death of the decedent." *Id.* (quoting Minn. Stat. § 573.02, subdiv. 1) (holding that a plaintiff-trustee's

---

[11] That is also why, more fundamentally, Defendants' argument that Minnesota's wrongful death statute "retains" a six-year statute of limitations is flawed. Under *Wilson*, the fact that § 573.02 "retains" a six-year limitations period, as Defendants contend, even if true, is irrelevant. No limitations period from that statute could apply to a § 1983 case.

claims were not barred by her failure to serve certain defendants within three years of the decedent's death). Thus, if this Court were to defer to Minnesota courts' rules regarding the various limitations periods applicable to wrongful death actions, § 1983 plaintiffs alleging wrongful death caused by murder would not be subject to the three-year suit commencement "condition precedent" to bringing suit. *Wilson* sought to foreclose this type of case-by-case determination of the limitations period by announcing a bright-line rule. *See Wilson*, 471 U.S. at 273–74. Accordingly, this Court holds that because the applicable six-year limitations period has not yet expired, Plaintiff's § 1983 claims are timely.

This Court's conclusion is fully supported by a decision of a federal district court within this District, *Baxter-Knutson v. Brandt*, No. 14–3796 (ADM/LIB), 2015 WL 4633590 (D. Minn. Aug. 3, 2015). In *Baxter-Knutson*, the plaintiff's son committed suicide while in custody at the Stearns County Jail. *Id.* at *1–2. More than three years later, the plaintiff was appointed trustee for her son's next-of-kin under § 573.02. *Id.* at *2. Two months later—by then almost four years after her son's death—the plaintiff filed a complaint seeking recovery of damages under § 1983. *Id.* The defendants brought a motion for summary judgment, arguing that the three-year limitations period for claims arising under § 573.02 had expired. *Id.* at *3. The court denied the motion. *Id.* at *5. It concluded that the plaintiff had standing to bring § 1983 claims by virtue of § 573.02, and that her claims were timely under Minn. Stat. § 541.05, subdivision 1(5), which "governs the limitations period for § 1983 claims in Minnesota" *Id.* at *4–5. The *Baxter-Knutson* court conducted a thorough analysis of *Robertson*, *Wilson*, and *Owens*, and, like this Court, concluded that "[t]here is no support" in the text of *Wilson* or *Owens* for the notion that the

23

plaintiff's § 1983 action should have been brought within three years of the decedent's death. *Id.* The *Baxter-Knutson* court stressed that subsequent Eighth Circuit cases support the proposition that "*Wilson* and *Owens* extended their statute of limitations reasoning to wrongful death suits," and that other circuits have similarly declined to draw a distinction between § 1983 claims for wrongful death and other § 1983 actions. *Id.* at *5 (collecting cases).

Defendants contend that *Baxter-Knutson* was wrongly decided. (*See, e.g.*, City Defs.' Mem. at 8.) They argue that *Baxter-Knutson* erroneously "separated the requirements in Minn. Stat. § 573.02 that a trustee be appointed, and that the appointed trustee bring suit within three years, calling the former a standing issue and the latter a statute of limitations issue." *Id.* Indeed, *Baxter-Knutson* separated these requirements. But it was correct in doing so because that is precisely the approach that the Supreme Court has instructed courts to take. In § 1983 actions, "[courts] look to state law to determine who is a proper plaintiff," *Guled*, 869 F.3d at 683 (quoting *Andrews*, 253 F.3d at 1056), and "[w]ith regard to the limitations period, the law could not be more straightforward: courts look to the state personal injury statute of limitations and its attendant tolling provisions." *Ray v. Maher*, 662 F.3d 770, 774 (7th Cir. 2001). "When" a plaintiff must file a § 1983 suit, therefore, has nothing to do with Minnesota's wrongful death statute, as this Court and *Baxter-Knutson* have concluded.

In sum, this Court concludes that Plaintiff has standing to assert the § 1983 claims contained in his Second Amended Complaint even though he was appointed trustee more than three years after Anderson's death. Moreover, because the six-year statute of

limitations has not yet expired, Plaintiff's § 1983 claims are timely. Accordingly, this Court has jurisdiction over Counts I–IV of the Second Amended Complaint.

### 3.   Jurisdiction over State Law Claims

Defendants contend that Plaintiff's state law claims—gross negligence and negligent undertaking—are also governed by Minn. Stat. §§ 573.01–.02 and should likewise be dismissed because Plaintiff failed to bring them as trustee within three years of Anderson's death. (City Defs.' Mem. at 9–11; City Defs.' Reply at 18–21; McGinness & Pham Reply [Doc. No. 130] at 5–6.) Plaintiff responds that he did not plead wrongful death, and thus § 573.02 is irrelevant to his state law claims. He argues that even his state law claims are subject to the six-year statute of limitations that govern his § 1983 claims. (Pl.'s Opp'n [Doc. No. 128] at 24–26.) To reach that conclusion, Plaintiff asserts that because his federal and state law claims "together encompass one 'constitutional case'" under principles of supplemental jurisdiction, and because this Court must apply federal procedural law to the entire case, all his claims are subject to the same six-year statute of limitations. (*Id.*) In the alternative, Plaintiff argues that were this to Court conclude that a three-year statute of limitations applies to his state law claims, those claims "relate back" to the date he filed his First Complaint (which was within three years of Anderson's death). (*Id.* at 27–30.)

### a.   Applicable Statute of Limitations

This Court's subject matter jurisdiction over Plaintiff's Second Amended Complaint is based on federal question jurisdiction for the § 1983 claims, Counts I–IV, and on supplemental jurisdiction for the state law claims, Counts V–VI. *See* 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966). Under *Erie R.R. v. Tompkins*,

304 U.S. 64 (1938), state substantive law governs claims over which a federal court exercises supplemental jurisdiction. *See Witzman v. Gross*, 148 F.3d 988, 990 (8th Cir. 1998) (citing *Gibbs*, 383 U.S. at 726). Accordingly, while federal law provides the substantive law for Plaintiff's § 1983 claims and the procedural law for the entire case, state law provides the substantive law for Plaintiff's state law claims.

At the outset, this Court concludes that Plaintiff's two state law claims—negligence and negligent undertaking—are governed by Minn. Stat. § 573.02 despite Plaintiff's failure to plead them as wrongful death claims. As explained above, Minnesota law provides that "a cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists, except as provided in section 573.02." Minn. Stat. § 573.01. Counts V and VI allege injury to Anderson; thus, Plaintiff may only assert those claims as part of an action under § 573.02. *Cf. Stuedemann v. Nose*, 713 N.W.2d 79, 83 (Minn. Ct. App. 2006) (setting forth the elements that a party must prove in a negligence-based wrongful death action).

Turning now to the critical question presented—which statute of limitations applies—this Court concludes that Counts V and VI are subject to the three-year limitations period contained in § 573.02. The statute of limitations applicable to state law claims is undoubtedly a matter of state substantive law. *See Erie*, 304 U.S. at 64; *Guar. Tr. Co. v. York*, 326 U.S. 99, 110 (1945); *Saxton v. ACF Indus., Inc.*, 254 F.3d 959, 961–62 (11th Cir. 2001) (en banc) ("Alabama law provides the applicable statute of limitations" for federal court sitting in diversity deciding state law claims); *Larsen v. Mayo Med. Ctr.*, 218 F.3d 863, 866 (8th Cir. 2000) ("Minnesota's substantive law, including its statute of limitations,

applies."). And as discussed at length above, claims under § 573.02 must be brought by a court-appointed trustee within three years of the decedent's death unless murder is involved. Accordingly, because Plaintiff did not bring Counts V and VI as trustee within three years of Anderson's death, his claims would be time-barred unless they can relate back to a timely complaint.

### b.    Relation Back

Plaintiff contends that Counts V and VI relate back to the date of the First Complaint. (*See* Pl.'s Opp'n. at 27–28.) He argues that federal law, namely, Federal Rule of Civil Procedure 15, governs and allows relation back. (*Id.* at 27, 29.) Plaintiff cites two Eighth Circuit cases, *Russell v. New Amsterdam Casualty Co.*, 303 F.2d 674 (8th Cir. 1962), and *Crowder v. Gordons Transports, Inc.*, 387 F.2d 413 (8th Cir. 1967), where relation back was allowed, for the general proposition that "[c]ourts have routinely allowed changes in the legal capacity in which plaintiffs bring suit without requiring the filing of a new complaint or facing statute of limitations bars." (*Id.* at 28–29). He argues that in so doing, "courts reason that defendants are put on adequate notice by the filing of a complaint and that the change in capacity does not effect a material substantive change to the complaint," presumably referring to the relation back analysis under Rule 15(c)(3). (*Id.*) Defendants do not explicitly state whether they challenge Plaintiff's position that Rule 15 applies. (*See, e.g.*, City Defs.' Reply at 20–21.) However, they reiterate that under Minnesota law, the First Complaint was a "legal nullity," and therefore cannot serve as the foundation for an amendment. (*Id.*)

At the outset, this Court agrees with Plaintiff that federal law controls the issue of relation back. While this Court would ordinarily conduct a choice-of-law analysis under *Erie* and its progeny, the Eighth Circuit has already held that "the issue of relation back is one of procedure and is controlled by the Federal Rules of Civil Procedure." *Crowder*, 387 F.2d at 416 (relying on *Russell*, 303 F.2d at 680–81, and *Hanna v. Plumer*, 380 U.S. 460 (1965)); *see also Estate of Butler ex rel. Butler v. Maharishi Univ. of Mgmt.*, 460 F. Supp. 2d 1030, 1040 (S.D. Iowa 2006).[12] Nevertheless, this Court agrees with Defendants that even applying federal procedural law, Counts V and VI do not relate back to Plaintiff's First Complaint, as that complaint was "no[t] a valid action to which [Plaintiff's] amended complaint could relate back." *Capers v. Nat'l R.R. Passenger Corp.*, 673 F. App'x 591, 594 (8th Cir. 2016).

Two Eighth Circuit cases guide this Court's analysis. The first, which is directly on-point, is *Williams v. Bradshaw*, already mentioned above. Relevant here, in addition to holding that the plaintiff lacked § 1983 standing, *Williams* also considered whether the district court had abused its discretion in denying the plaintiff's motion to amend her original complaint. *Id.* at 849. To cure the standing defect, the plaintiff sought to amend her original complaint to reflect her new status as special administrator of the decedent's estate,

---

[12] The Court notes that at least one subsequent Eighth Circuit opinion considering relation back "prefer[red] to engage in the *Hanna* analysis anew rather than rely on the authority of *Crowder*" for the proposition that Federal Rule of Civil Procedure 15(c) supplies the rule of decision for relation back questions. *Brown v. E.W. Bliss Co.*, 818 F.2d 1405, 1408 n.2 (8th Cir.), *adhered to by*, 831 F.2d 810 (8th Cir. 1987). The rationale for doing so was that the federal rule was more restrictive than the state rule in that case, which created the possibility that applying the federal rule would impair state substantive rights. *Id.* These concerns are not present here, since application of the federal rule is not more restrictive than application of the state rule.

which would allow her to bring her claims. *Id.* By then, however, the limitations period had

run. *Id.* at 848. The Eighth Circuit held that the district court had properly denied the

plaintiff's motion to amend, as granting it "would have been impossible." *Id.* at 849 (citing

*Jones ex rel. Jones v. Corr. Med. Servs.*, 401 F.3d 950, 952 (8th Cir. 2005)). The Eighth

Circuit reasoned that because the plaintiff lacked standing when she filed her original

complaint, that complaint was "null." *Id.* The Court stated, "When, as here, a complaint

amounts to a nullity, it cannot serve as the foundation for an amendment: Since the original

complaint was without legal effect, there was nothing to amend." *Id.*  The plaintiff's claims

were thus time-barred.

   Albeit under slightly different factual circumstances, the Eighth Circuit reached the

same conclusion in *Capers v. National Railroad Passenger Corp*. In *Capers*, the plaintiff

filed suit against Amtrak alleging that she had been sexually assaulted by an Amtrak porter.

673 F. App'x at 592. Within the statute of limitations, the plaintiff filed her complaint under

the pseudonym "Jane Doe No. 49." *Id.* She had not, however, sought leave from the district

court to proceed anonymously. *Id.* at 592–93. It was only after the statute of limitations had

expired that she filed an amended complaint disclosing her identity. *Id.* at 593. Before the

Eighth Circuit, the plaintiff argued, *inter alia*, that her amended complaint related back to

her original filing under Federal Rule of Civil Procedure 15. *Id.* at 593–94. The Eighth

Circuit disagreed. First, it noted that although it "generally appl[ies] federal law on

procedural matters like amendability, [it] defer[s] to state law as to considerations that form

an integral part of the state statute of limitations, at least in the absence of a federal rule

directly on point." *Id.* at 594 (internal quotation marks and citations omitted). Applying this

29

principle, the Eighth Circuit concluded that Arkansas law controlled and precluded relation back. *Id.* But particularly relevant here, the Eighth Circuit also concluded that "even if the direct-conflict analysis of *Hanna v. Plumer* . . . required [it] to apply Federal Rule 15, there would be no valid action to which [the plaintiff's] amended complaint could relate back." *Id.* That was because "[u]nder Federal Rule 10(a), she failed to initiate a valid action at least until she sought to amend her complaint, by which time the statute of limitations had run, as she was not properly before the court until then, if at all." *Id.* at 594–95.

*Williams* and *Capers* thus counsel that Rule 15 does not permit relation back when there is "no valid action" which can serve as the foundation for an amendment. Applying that principle here, it is not possible for Counts V and VI of Plaintiff's Second Amended Complaint to relate back to the date of the First Complaint because that complaint was not a "valid" action: Plaintiff lacked standing to bring any of the state claims asserted therein because he was not a court-appointed trustee. *Cf. Mandacina v. United* States, 328 F.3d 995, 1000 (8th Cir. 2003) ("The relation back doctrine allows untimely claims to be deemed timely by treating the claims as if they had been filed when the timely claims were filed.") Although Plaintiff filed his First Complaint on December 8, 2016, a few days short of the three-year anniversary of Anderson's death, he did not obtain trustee status until March 9, 2017—by then more than three years and two months after Anderson's death. Accordingly, as in *Williams* and *Capers*, Counts V and VI cannot relate back to the date of the First Complaint because that complaint is not a valid foundation for relation back purposes.[13]

---

[13] The Court notes that although Plaintiff in fact amended his First Complaint twice, Defendants have always stated their position that any amendments would not relate back

The Court acknowledges that this result is opposite to that reached by the Eighth Circuit in *Crowder*, which the Plaintiff relies on in support of his position. *Crowder*, however, precedes *Williams* and *Capers* and is distinguishable. In *Crowder*, the plaintiff filed a complaint in federal district court seeking damages for the wrongful death of her husband. 387 F.2d at 414. At that time, the applicable Missouri statute provided that wrongful death actions were subject to a one-year limitations period. *Id.* at 415. The statute further provided that "[t]he surviving spouse ha[d] the right to institute the action within six months after the death of the deceased," but that if she failed to do so, the surviving minor children could institute the action within the one-year limitations period. *Id.* (citing *Forehand v. Hall*, 355 S.W.2d 940 (Mo. 1962)). The plaintiff originally filed her complaint in her capacity as "administratrix of the estate of the decedent," and although she filed it within a year of her husband's death, she did not file it within six months. *Id.* at 414–15. After the one-year limitations period had expired, the plaintiff amended her complaint to reflect her status as "mother and next friend" of the decedent's two minor children. *Id.* at 414. The Eighth Circuit considered whether the amended complaint related back to the date of the original complaint. *Id.* at 415–19. Applying Federal Rules of Civil Procedure 15 and 17, the court held that the amended complaint related back. *Id.*

Although *Crowder* permitted relation back, the critical distinction here is the validity of the original complaint. In contrast to *Williams* and *Capers*, *Crowder* in no way indicated that the original complaint was without legal effect under state law. To the contrary, the

---

because the First Complaint was a "nullity." (*See* City Defs.' Letter to the District Judge [Doc. No. 35].)

Eighth Circuit noted that it was "firmly established that . . . the action was filed within the time fixed by Missouri law for the commencement of wrongful death actions by children of the party wrongfully killed." *Id.* at 415. This case presents an entirely different situation. Under Minnesota law, Plaintiff's First Complaint "ha[d] no legal effect." *Ortiz*, 590 N.W.2d at 123. Thus, here, unlike in *Crowder*, there simply was no valid action instituted before the expiration of the statute of limitations.[14]

In sum, this Court concludes that Counts V and VI of the Second Amended Complaint are untimely and that they do not relate back to the date of the First Complaint. Accordingly, they are dismissed.[15]

Having found jurisdiction over Plaintiff's § 1983 claims, the Court now addresses Defendants' arguments advanced under Federal Rule of Civil Procedure 12(b)(6).

**B. Rule 12(b)(6) Motions**

**1. Standard of Review**

When evaluating a motion to dismiss under Rule 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). The Court, however, need not accept as true wholly conclusory

---

[14] The Court notes that the result would be the same had it concluded that Minnesota rules, and not the Federal Rule of Civil Procedure, control. In *Ortiz*, the Minnesota Supreme Court held that Minnesota Rules of Civil Procedure 15.03 and 17.01 do not allow for relation back when the complaint filed within the statute of limitations is not brought by a duly-appointed trustee. 590 N.W.2d at 122–124. Thus, Minnesota law would undoubtedly preclude relation back in this case. *See Regie*, 399 N.W.2d at 92.

[15] Because this Court dismisses Counts V and VI as untimely, it need not address Defendants' alternative arguments as to these claims, *e.g.* service and official immunity.

allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that plaintiffs draw from the facts pled, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). A complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 2. Section 1983 Claims Against the Individual Defendants—Counts I & II

Morey, Mahoney, and the Individual MFD, HCMC, MPD and MPRB Defendants (all collectively, "Individual Defendants") are sued in their individual capacities.[16] (*See* Second Am. Compl. at 5–9, ¶¶ 7–24). They move to dismiss Counts I–II for failure to state a claim upon which relief may be granted and under the doctrine of qualified immunity. (*See* Cty. Defs.' Mem. at 15–31; Cty. Defs.' Reply at 8–9; City Defs.' Mem. at 15–23; McGinness & Pham Mem. at 7–14). Because district courts have an obligation to "resolv[e] immunity questions at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam), this Court will analyze qualified immunity at the outset.

---

[16] Morey and Mahoney are also sued in their official capacities. *See infra*.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is an affirmative defense that a plaintiff need not anticipate to state a claim. *See Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996); *see also Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). However, if the defense is raised on a 12(b)(6) motion, it will be upheld if the immunity is established "on the face of the complaint." *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005); *see also Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995). Thus, the Individual Defendants are entitled to qualified immunity unless this Court determines that (1) Counts I and II state a plausible claim for a violation of a constitutional right, and (2) that right was "clearly established at the time of the alleged infraction." *Hager*, 735 F.3d at 1013–14; *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."). This Court has discretion to decide which of these two prongs it analyzes first. *Pearson*, 555 U.S. at 236.

### a.  Violation of a Constitutional Right

Counts I and II allege that the Individual Defendants violated Anderson's "substantive due process right to life and . . . bodily integrity" secured by the Fourteenth Amendment. (Second Am. Complaint ¶ 151; *see also* ¶ 172.) Specifically, Plaintiff alleges that the Individual Defendants violated Anderson's substantive due process rights by failing

to perform an adequate medical assessment and by failing to render any medical treatment when they encountered him. (*Id.* ¶ 241.) In so doing, Plaintiff avers, the Individual Defendants contravened well-established medical protocols and operating procedures derived from the well-known medical axiom that "a person is not dead until they are warm and dead." (*Id.*) Plaintiff argues that the Individual Defendants thus deprived Anderson "of his Constitutional right to life and bodily integrity, and denied his chance of survival." (*Id.* ¶ 81.)

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In *DeShaney v. Winnebago County Department of Social Services*, the Supreme Court held that the "[Due Process] Clause is phrased as a limitation on the State's power to act," and thus "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. 189, 195–96 (1989). Thus, *DeShaney* established that the government has no general constitutional duty to provide police protection or other similar protective services. *See Gladden v. Richbourg*, 759 F.3d 960, 964 (8th Cir. 2014) (citing *DeShaney*, 489 U.S. at 196).

There are, however, two exceptions to this general rule. First, pursuant to the "custody" exception, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200; *accord Montgomery v. City of Ames*, 749 F.3d 689, 694 (8th Cir. 2014). Second, under the

"state-created danger" exception, a similar constitutional duty arises when the state itself creates or amplifies the danger to which an individual is exposed. *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011); *Montgomery*, 749 F.3d at 694. Even in these situations, however, state officials are liable for breaching this duty "only if their actions are so egregious or outrageous as to 'shock the contemporary conscience.'" *Dodd v. Jones*, 623 F.3d 563, 567 (8th Cir. 2010) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

The Individual Defendants argue that Plaintiff's Second Amended Complaint fails to state a violation of Anderson's due process rights—and thus that they are entitled to qualified immunity—because neither of the two *DeShaney* exceptions were triggered in this case. (*See, e.g.*, City Defs.' Mem. at 15–20.) They argue that Plaintiff alleges no facts from which this Court could reasonably infer that Anderson was in their custody, or that they affirmatively created or exacerbated the danger that Anderson faced that day. (*Id.*) Absent a constitutional duty to act, the Individual Defendants argue, they cannot be held liable under the Due Process Clause. (*Id.*) Plaintiff disagrees.  (Pl.'s Opp'n at 36–70.) He argues that he has plausibly pled both that the Individual Defendants held Anderson in "functional" custody, (*id.* at 44–49), and that they increased the danger to him, (*id.* at 49–61).

This Court must begin its analysis by stating clearly again that the circumstances of this case are very tragic. A young university student was found by a passerby out in the cold, exposed to sub-zero ambient temperatures. As any other good citizen might do, the passerby called on the state to help. The young man, however, was declared dead on the scene, despite the possibility that he might still have been alive. This Court has enormous sympathy for the Anderson family's loss, but it nevertheless must conclude that Plaintiff has

36

not stated a claim for a violation of Anderson's substantive due process rights. Almost certainly, Plaintiff has stated a claim for negligence, or even gross negligence.[17] But even construing all reasonable inferences in Plaintiff's favor, his Second Amended Complaint fails to plausibly allege a substantive due process violation.

First, Plaintiff has not plausibly alleged that the Individual Defendants created or amplified the danger to Anderson. The state-created danger theory requires that state officials "act[] affirmatively to place someone in a position of danger *that he or she would not otherwise have faced*" before a constitutional duty to render protective services will arise. *S.S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000) (en banc) (emphasis added) (holding that complaint was properly dismissed where the state returned a child to an already existing dangerous environment, concluding that such conduct was effectively the same as "do[ing] nothing"); *see also Carlton v. Cleburne Cty.*, 93 F.3d 505, 508–09 (8th Cir. 1996) (collecting cases where liability has been found under the state-created danger theory, noting that in all of them, "the individuals would not have been in harm's way but for the government's affirmative actions"). Here, there simply is no allegation that state actors were involved in the circumstances that led to Anderson's exposure to the cold in the first instance. This is not a case like *Riordan v. City of Joliet*, which Plaintiff relies on, where police officers affirmatively took the plaintiff outdoors, exposing him to sub-zero temperatures. 3 F. Supp. 2d 889, 892 (N.D. Ill. 1998). In *Riordan*, police officers removed the plaintiff from an ostensibly warm environment, transported him in the back of their

---

[17] As described, *supra*, however, Plaintiff's state law claims are barred by the statute of limitations.

squad car, and then released him onto the street, knowing he lacked adequate clothing and was intoxicated. *Id.* at 894–95. The *Riordan* court denied the officers' motion for summary judgment on qualified immunity grounds, concluding, *inter alia*, that the officers had affirmatively "*placed* Riordan in a manifestly dangerous position." *Id.* at 895 (emphasis added).

Nor has Plaintiff plausibly alleged that the Individual Defendants increased Anderson's vulnerability to the cold. Plaintiff argues that the Individual Defendants increased the risk to Anderson by "continuing to keep [his] body exposed to the cold for an additional two hours, declining to offer necessary medical assistance, and preventing help from reaching him." (Pl.'s Opp'n at 52.) In essence, Plaintiff's argument is that the Individual Defendants did not *decrease* the risk to Anderson. That may very well be inferred. But failing to avert danger is quite distinct from affirmatively increasing danger or one's vulnerability to danger. *See Jackson v. City of Joliet*, 715 F.2d 1200, 1202–06 (7th Cir. 1983) (concluding that there was no liability where officers did not create danger but merely failed to avert it by not rescuing decedents from a burning car). Here, the Individual Defendants in effect did nothing; they retained the *status quo*. Such inaction, however, when standing alone, although likely negligent, does not trigger liability under the state-created danger theory. *See Dodd*, 623 F.3d at 568 (finding no substantive due process violation where some police conduct led to risks to plaintiff that were "[no] greater than if the officers had retained the *status quo* upon their arrival"); *see also Avalos v. City of Glenwood*, 382 F.3d 792, 799–800 (8th Cir. 2004) (affirming summary judgment in favor of defendants because they did not place party claiming injury "in any greater danger than he otherwise

38

would have faced"); *Montgomery*, 749 F.3d at 695 (no state-created danger where plaintiff merely alleged that defendants had "failed to timely respond to [her] medical needs" after she had been shot); *Carlton*, 93 F.3d at 509 ("To impose an affirmative duty to protect the general public from a situation created by the processes of nature would be to impose upon a county an impossible burden.")

Similarly, this Court concludes that Anderson was not in the custody of Defendants so as to trigger the corresponding duty to protect. Courts have construed the custody exception narrowly, and the Eighth Circuit has held that "*DeShaney*-type liability can only be imposed 'when the State by the affirmative exercise of its power so *restrains* an individual's liberty that it renders him unable to care for himself.'" *Burton v. Richmond*, 370 F.3d 723, 728 (8th Cir. 2004). For example, in *Lee v. Pine Bluff School District*, dismissed at the pleadings stage, the Eighth Circuit held that a student was not in state custody during a school-sponsored band trip. 472 F.3d 1026, 1031 (8th Cir. 2007). In evaluating whether the decedent was in the state's custody, the court looked to whether his attendance was compulsory, whether he was prohibited from leaving, or whether he was prohibited from contacting his family or seeking help. *Id.* Because there was no sign of any restraint, the court held that the student's voluntary participation in the trip did not involve a custodial relationship. *Id.* Here, as in *Lee*, Plaintiff does not allege any facts from which this Court could infer that the Individual Defendants restrained Anderson or affirmatively prohibited him from seeking aid.

Notwithstanding the narrow reach of the custody exception, Plaintiff urges this Court to infer that a custodial relationship existed here because the Individual Defendants

undertook to render aid to Anderson and he relied on them "to adequately perform their promised duties of care to protect his life and provide him with competent medical care." (Second Am. Compl. ¶ 168.) But *DeShaney* explained that the affirmative duty to protect under the custody exception "arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf through imprisonment, institutionalization, or other similar restraint of personal liberty." 489 U.S. at 200. As already described, Plaintiff alleges no facts from which this Court could infer that Anderson's freedom to act on his own behalf was limited in any way. Plaintiff only states that Anderson's ability to act on his own behalf was limited because he was unconscious and in need of medical help.

Those circumstances, however, do not render the situation custodial. For instance, in a case with similar facts, the Sixth Circuit held that an unconscious man was not in custody, and therefore was not deprived of his due process rights when he died after being placed in an ambulance. *See Jackson*, 429 F.3d at 590–91. The decedent in that case was suffering from a gunshot wound and had fallen unconscious when an ambulance arrived on the scene. *Id.* at 588. First responders loaded the man into the ambulance, where they "watched him die" without providing any life support or attempting to take him to a trauma center, in contravention of their department policies. *Id.* Nonetheless, the court held that

> the EMTs did nothing to restrain decedent. The EMTs did not cause decedent to be shot nor did they render him unconscious. There is no allegation that the EMTs restrained or handcuffed the decedent. There is no

> allegation that the decedent was not free to leave the ambulance or be removed from the ambulance. Decedent's liberty was "constrained" by his incapacity, and his incapacity was in no way caused by the defendants.

*Id.* at 591. Similarly, the Individual Defendants in this case are not alleged to have constrained Anderson's liberty by handcuffing him or applying some other restraint. Anderson's liberty was regrettably constrained by his incapacity, which was not caused by the Individual Defendants.

For all of the aforementioned reasons, this Court is similarly unpersuaded by Plaintiff's contention that Anderson was under custody because the Individual Defendants "created a situation depriving [Anderson] of any alternative avenue of rescue." (Pl.'s Opp'n. at 47.) Plaintiff argues that the custody exception broadly applies to situations where state actors "cut off alternative sources of aid," relying on *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 708 (7th Cir. 2002), and *Bynum v. City of Magee*, 507 F. Supp. 2d 627, 632 (S.D. Miss. 2007). (Pl.'s Opp'n at 46–47.) While the proposition that affirmatively cutting off alternative sources of aid could evince custodial restraint may be true generally, it has no application here. First, the cases Plaintiff cites only affirm the general principle that the rationale for the custody exception is that the state would transgress "the substantive limits . . . set by the Eighth Amendment and the Due Process Clause" if it restrains an individual, rendering him unable to care for himself—including by seeking aid from others—and yet declines to provide for his basic human needs. *DeShaney*, 489 U.S. at 200; *see Martin*, 295 F.3d at 632 (state-created danger case merely stating general rule that the state has no duty to protect unless "[it]

41

has custody of a person, thus cutting off alternate avenues of aid, or if the state somehow created the danger of harm"); *Bynum*, 507 F. Supp. 2d at 633 (holding that no custodial relationship existed where plaintiff's son committed suicide at home several days after being taken there by police). Second, and more fundamentally, there is no allegation here that someone on the scene in fact attempted to assist Anderson and was prohibited from doing so. *See Dodd*, 623 F.3d at 567 (no custodial relationship where there was no showing that plaintiff "could have removed himself from the roadway, or that a passersby would have moved him out of [harm's way]" if the officers had not arrived on the scene). This Court cannot speculate, as Plaintiff suggests, that "any bystander or other individual arriving on [the] scene would have been prevented from approaching Jake, as the MPD would have prevented such incursion." Pl.'s Opp'n at 47–48; s*ee Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (internal citations omitted)).[18]  Simply, there is no indication here that Anderson was in "custody" as that term is construed in *DeShaney* and its progeny.

Finally, even assuming that Plaintiff had plausibly alleged that the Individual Defendants had a constitutional duty to provide aid to Anderson, the Second Amended

---

[18] Plaintiff argues that "[t]he fact that the MFD responders called off the paramedics' response to the scene is evidence that these defendants acted affirmatively to cut off alternative sources of aid to Jake." (Pl.'s Opp'n at 47.) But the Second Amended Complaint states that the paramedics, the Individual HCMC Defendants, arrived nonetheless and in fact approached Anderson's body. (Second Am. Compl. at ¶¶ 47–49.) There is no allegation that had the Individual HCMC Defendants wished to assess Anderson, they would have been prevented from doing so by the MFD Individual Defendants. *See Montgomery*, 749 F.3d at 696.

Complaint nevertheless faces an insurmountable hurdle: the conduct alleged is not sufficiently "conscience-shocking" to give rise to a substantive due process violation. *Avalos*, 382 F.3d at 800.  "In order to succeed, a complaint for a violation of substantive due process rights must allege [state] acts that shock the conscience." *S.S.*, 225 F.3d at 964. "Actionable substantive due process claims involve a level of abuse of power so brutal and offensive that they do not comport with traditional ideas of fair play and decency." *Avalos*, 382 F.3d at 800 (alterations and quotation marks omitted); *see also Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (substantive due process violations involve conduct "so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience" (alterations in original)). "To shock the conscience, . . . an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference." *Montgomery*, 749 F.3d 689, 695.

Plaintiff does not allege that the Individual Defendants acted with intent to harm; rather, he argues that they acted with deliberate indifference and thus their behavior shocks the conscience. (Pl.'s Opp'n. at 55–61.) Plaintiff highlights operating procedures that he argues mandated that the Individual Defendants initiate medical treatment upon encountering Anderson, and that their failure to follow them indicates deliberate indifference.  (*Id.* at 58*.*) As just one example, Plaintiff alleges that § 9-105.01 of the MFD Standard Operating Procedures states that CPR must begin "immediately when patient is found cold in a cold environment," and that an automated external defibrillator should be

applied "when a breathless, pulseless patient does NOT have signs of obvious trauma consistent with death." (Second Am. Compl. at 19, ¶ 27.) He similarly points to § 9-104.03.04, which states that hypothermic patients must be rewarmed and that MFD should be "aggressive" with hypothermic arrests. (*Id.*)  Plaintiff makes similar claims against the HCMC Defendants, (*see, e.g.*, *id.* ¶ 74), the MPD and MPRB Defendants, (*see id.* ¶¶ 103–08), Mahoney, (*id.* ¶¶ 157–63), and Morey, (*id.* ¶¶ 113–21). In all, Plaintiff argues that the Individual Defendants "had time to make an unhurried judgment in this situation," "knew of the potential for hypothermia in cold weather conditions," should have understood that medically "a person cannot be declared dead unless he is warm," yet "consciously disregarded [Anderson] and created a great risk of serious harm when they left him exposed to the cold." (*Id.* ¶¶ 125–28, 156.)

Even accepting Plaintiff's factual allegations as true, and drawing all inferences in his favor, the Second Amended Complaint certainly adequately pleads negligence and perhaps even gross negligence, but it falls short of plausibly alleging deliberate indifference. Deliberate indifference requires both that the state actors "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that they actually draw that inference. *Montgomery*, 749 F.3d at 695 (quoting *Hart v. City of Little Rock*, 432 F.3d 801, 805–06 (8th Cir. 2005)). To be sure, Plaintiff has plausibly pled that the Individual Defendants knew or should have known that hypothermia victims may appear deceased even though they are actually alive. And this Court could likewise infer that these Defendants perhaps should have done more before readily pronouncing Anderson dead on arrival. But this Court finds no factual allegations in Plaintiff's Second Amended Complaint

44

from which it could infer that any of the Individual Defendants *in fact* recognized that Anderson might still be alive and yet "deliberately decided not to protect [him] from a known substantial risk of serious harm." *Beck v. Wilson*, 377 F.3d 884, 891 (8th Cir. 2004). To the contrary, Plaintiff asserts that it was the Individual Defendants' subjective *failure* to recognize that Anderson was a victim of hypothermia that amounts to the due process violation. (*See e.g.*, Pl.'s Opp'n at 59 ("While the individual officers may claim to have believed Jake was dead, all of the medical literature on hypothermia, its pathophysiology and its effects on the body, would lead to the *objectively reasonable conclusion* that Jake was a viable patient deserving and in need of emergency medical care, including rewarming.") (emphasis added).) Again, at most, the Individual Defendants' alleged failure of judgment states a claim for negligence, even gross negligence, but it does not state a claim for deliberate indifference. *See S.S.*, 225 F.3d at 964 (explaining that under the deliberate indifference standard, negligence, or even gross negligence, does not suffice).

This reasoning applies to all of the Individual Defendants. The Individual MFD Defendants were first to arrive on the scene. These Defendants did not ignore Anderson; they conducted a pulse check and determined that he was not breathing and had no pulse. They also observed that Anderson had "scrapes and cuts on his hand which appeared suspicious." (*See* Aff. of Tracey Fussy, Ex. 1 [Doc. No. 18-1], MFD Run Report at 2.)[19]

---

[19] On a motion to dismiss, this Court may consider the pleadings, "some public records, materials that do not contradict the complaint, [and] materials that are 'necessarily embraced by the pleadings.'" *Noble Systems Corp.*, 543 F.3d at 982 (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). Plaintiff's Second Amended Complaint embraces the reports and operating procedures referenced and quoted here. (*See, e.g.*, Second Am. Compl. at 24, ¶ 24.)

While MFD Standard Operating Procedures dictate that hypothermia victims should be given medical treatment, they also caution against disturbing a crime scene, including moving the body of a deceased individual unless necessary. (*See* Decl. of Ivan Ludmer, Ex. A [Doc. No. 106-1], MFD Standard Operating Procedures § 12-102.03.) Although hindsight might suggest that these Defendants should have recognized that Anderson *might* still be alive, and that they possibly weighed signs of potential foul play more heavily than they should have, their behavior does not indicate deliberate indifference.

The same can be said about the rest of the Individual Defendants. The Individual HCMC Defendants—the next group to arrive on the scene—walked over to where Anderson lay, noted that there was a "frozen body near [the] river," (*id.* ¶ 55), and deferred to MFD's determination that Anderson was deceased.  True enough, one might question why these trained paramedics declined to conduct an independent evaluation of Anderson. But as in *DeShaney*, "[t]he most that can be said of the[se] [Defendants] . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." 489 U.S. at 203. Even crediting Plaintiff's contentions that these Defendants "summarily accepted the MFD's conclusion that Jake Anderson was 'dead on arrival', paying no heed to their own duty to perform a full and complete patient assessment, ignoring their specific knowledge regarding hypothermia victims in the field, and failing to transport Jake Anderson to the HCMC Emergency Room," (Second Am. Compl. ¶ 79), the most that can be said is that these allegations state a claim for gross negligence. As for the Individual MPD and MPRB Defendants, MPD reports likewise indicate not only that Anderson appeared to be "frozen to death" and had a "blue" skin color, but that he had

46

"[s]mall cuts/scratches . . . on his face, hands[,] and . . . exposed legs," and that he was lying

on "a snow-covered rock pile near the river with his torso resting on a metal fence." (Aff. of

Tracey Fussy, Ex. 3 [Doc. No. 18-3], MPD Case Report at 4, 7.) Again, the most that can be

said is that these Defendants, in light of all the facts available to them, were grossly

negligent in failing to question whether Anderson *might* still be alive. As for Morey and

Mahoney, who were not even on the scene, it is difficult to see how they could have been

deliberately indifferent to Anderson's particular needs.

In sum, the collective response by the Individual Defendants as pled may state a

claim for negligence, even gross negligence, when construed most favorably to Plaintiff.

But "[l]iability for negligently inflicted harm is categorically beneath the threshold of

constitutional due process, and the Constitution imposes no obligation on the State to

provide perfect or even competent rescue services." *Dodd*, 623 F.3d at 568 (internal

citations omitted). Indeed, "an official's failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation cannot under our cases be

condemned." *Farmer v. Brennan*, 511 U.S. 825, 838 (1970) (holding that the deliberate

indifference standard is a subjective, not objective, test). More to the point, courts

categorically hold that "failure to rescue" claims alleging inadequate, or even totally absent,

medical treatment are not actionable under § 1983 absent a custodial relationship or a state-

created danger. *See, e.g.*, *Brown v. Commonwealth of Pa. Dep't of Health Emergency Med.*

*Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003) ("[T]here is no federal constitutional

right to rescue services, competent or otherwise."); *Weeks v. Portage Cty. Exec. Offices*,

235 F.3d 275, 278 (6th Cir. 2000) (absent either of the *DeShaney* exceptions, "the victim

has no constitutional right to have the police provide medical assistance or intervene to protect him from the actions of private actors.") This Court would, however, be remiss not to note that "[i]t may well be that, by voluntarily undertaking to protect [Anderson] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger." *DeShaney*, 489 U.S. at 201–02. But as arguably condemnable as Defendants' conduct may be in hindsight, "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202

### b. Clearly Established Right

In light of its conclusion that Plaintiff has not plausibly alleged that the Individual Defendants violated Anderson's substantive due process rights, this Court need not reach the question of whether the rights claimed to have been infringed were clearly established at the time of Anderson's death. *See Avalos*, 382 F.3d at 801. And because the Second Amended Complaint does not state a violation of a constitutional right, the Individual Defendants are entitled to qualified immunity. Accordingly, all § 1983 claims asserted against the Individual Defendants in their individual capacities are dismissed with prejudice. *See Moore ex rel. v. Briggs*, 381 F.3d 771, 775 (8th Cir. 2004).

### 3. Section 1983 Claims Against the Municipalities—Counts III & IV

Plaintiff asserts two claims against the governmental entities that employ the Individual Defendants. Count III alleges that the City, the County, and Mahoney provided

deliberately indifferent training and supervision.[20] (*See* Second Am. Compl. ¶¶ 178–225.) Count IV, titled "Municipal Liability for Negligent Performance of Duty by State Actor," is asserted against Morey and the Individual MFD, HCMC, MPD and MPRB Defendants.[21] (*Id.* ¶¶ 226–34.)

There are several ways municipalities may be held liable under § 1983. "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise." *Atkinson, v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (quotation marks and citations omitted). Unconstitutional policy, custom, or failure to train claims against a municipality are often called "*Monell* claims" after *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court decided "that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Municipalities may not be held liable under § 1983 for injuries caused by their agents or employees on a theory of vicarious liability like *respondeat superior. Id.*; *see also Atkinson*, 709 F.3d at 1214; *Parrish*, 594 F.3d at 997; *Brockinton v. City of Sherwood*, 503 F.3d 667, 674 (8th Cir. 2007). Consistent with these principles, the Eighth Circuit has repeatedly "recognized a general rule that, in order for

---

[20] Mahoney is sued in his official capacity as well as in his individual capacity. (Second Am. Compl. at 5, ¶ 7.) "[A] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010) (alterations and quotation marks omitted).

[21] Like Mahoney, Morey is sued in his official capacity. (Second Am. Compl. at 5, ¶ 8.)

municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *see also Brockinton*, 503 F.3d at 674.

Under this framework, Counts III and IV fail as a matter of law. Because this Court has concluded that the Second Amended Complaint does not plausibly allege that any of the Individual Defendants violated Anderson's constitutional rights, the governmental entities involved cannot be held liable "on either an unconstitutional policy or custom theory or on a failure to train or supervise theory." *McVoy*, 411 F.3d at 922–23 (dismissing the plaintiff's *Monell* claims against a municipality where there was no individual § 1983 liability against the officers); *Avalos*, 382 F.3d at 802 (holding that the court's decision that the officers were entitled to qualified immunity "'necessarily resolve[d]' the remaining claims in the municipal defendants' favor," as "there must be an unconstitutional act by the municipal employee before the municipality is liable" (quoting *Lockridge v. Bd. of Trs. of the Univ. of Ark.*, 315 F.3d 1005, 1013 (8th Cir. 2003) (en banc)); *see also City of Canton*, 489 U.S. at 385 ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). Accordingly, Count III and IV must be dismissed.[22]

---

[22] To the extent that Count III is asserted against Mahoney in his individual capacity, he is not subject to liability for the same reason. "[A] supervising officer can be liable for an inferior officer's constitutional violation only 'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'" *Parrish*, 594 F.3d at 1001 (quoting *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir.1997)). Moreover, Count IV cannot reach the municipalities to the extent it is asserted against the Individual MFD, HCMC, MPD and MPRB Defendants, as they were

## III.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT:**

1. Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants County of Hennepin, Hennepin Healthcare System, Inc., Daniel Shively, Dr. Mitchel Morey, and Dr. Brian Mahoney [Doc. No. 96] is **GRANTED as detailed herein**;

2. Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants City of Minneapolis, Shana D. York, Anthony J. Buda, Raul A. Ramos, Daniel J. Tyra, Shannon L. Miller, Dustin L. Anderson, Scott T. Sutherland, D. Blaurat, Emily Dunphy, Christopher Karakostas, and Arlene M. Johnson [Doc. No. 103] is **GRANTED as detailed herein**;

3. Motions to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants Joseph McGinness and Calvin Pham [Doc. No. 108], and Mathew Ryan and Mathew George [Doc. No. 123], are **GRANTED as detailed herein**; and

4. This action is **DISMISSED WITH PREJUDICE** in its entirety.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**




Dated: March 30, 2018                     s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge

---

sued only in their individual capacities. To reach a municipality, a plaintiff must bring a § 1983 claim against a specific agent or employee in his or her official capacity. *See id.*